CODY S. BARNETT*
BEATRICE O. STRNAD (SBN 327791)
LINCOLN J. KORELL*
Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
*Counsel for Plaintiff State of Nebraska*
*Admitted pro hac vice ~~application forthcoming~~

Additional counsel listed in signature block

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

STATE OF NEBRASKA, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NORTH DAKOTA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TEXAS, STATE OF UTAH, STATE OF WEST VIRGINIA, NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,

Plaintiffs,

v.

ZOE HELLER, in her official capacity as Director of the California Department of Resources Recycling & Recovery, CIRCULAR ACTION ALLIANCE~~, Inc.~~,

Defendants.

Case No.: 2:26-cv-02214-DC-CKD

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Judge:** Hon. Dena Coggins
**Action Filed:** June 22, 2026 (service not yet completed)

## INTRODUCTION

1. In a blatant and unprecedented attempt to impose its own policy preferences on the entire nation, California has enacted the Plastic Pollution Prevention and Packaging Producer

Responsibility Act ("the Act") (codified as amended at Cal. Pub. Res. Code. §§ 42040–42084). In essence, the Act conditions access to California markets on revolutionary changes to the way manufacturers, distributors, and companies (large and small) design and package their products, as well as how plastic or plastic-containingmost packaging waste is disposed. Many of the Act's unprecedented requirements reflect California's bespoke environmental preferences—preferences irreconcilably at odds with those of many other States.

2. While the Act has a sweeping general aim, its text is vague and fails to give businesses fair notice of how to actually comply with its obligations. The Act uses words like "covered material" and "recyclable" without giving businesses fair warning of what they mean. In fact, the Act's requirement that certain material be "recyclable" by 2032 incorporates standards of "recycla[bility]" that have already been preliminarily enjoined by the United States District Court for the Southern District of California because they are unconstitutionally vague. *Cal. League of Food Prods. v. Bonta*, No. 3:26-cv-01675, 2026 WL 2055589 (S.D. Cal. July 14, 2026).

2.3. Whatever the Act's vague terms embrace, California clearly intends for it to be sweeping—that virtually every product packaged or shipped in plastic containers, as well as a significant number of other types of packaging materials that merely *incorporate* plastics, fall into the Act's remarkable sweep. Either directly or indirectly, the Act purports to mandate a wholesale transformation of many products and related business models of innumerable businesses across the country, many of whom are members of the National Association of Wholesaler-Distributors.

3.4. The Act offends State sovereignty. California is not entitled to pronounce nationwide policies; it has no power to "project its legislation" into other States as if it were first among equals. *Baldin v. G.A.F. Seeling, Inc.*, 294 U.S. 511, 521 (1935). The genius of our system of federalism is that it allows for differing views on and approaches to important policy questions. *See Bond v. United States*, 564 U.S. 211, 221–22 (2011). What it does *not* allow is for one State—no matter how populous or economically significant—to impose its policy preferences on all others. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 406–07 (2023) (Kavanaugh, J., concurring and

dissenting in part) (noting that one State's attempt to "unilaterally impose its moral and policy preferences … on the rest of the Nation … undermines federalism and the authority" of other States).

~~4.~~5. Not only does the Act infringe the sovereignty of California's sister States, but it also improperly vests power in an unelected, unaccountable body. To implement its regulatory power grab, the Act designates and then purports to delegate a wide swath of California's legislative, regulatory, enforcement, and taxing authority to an unaccountable private organization: ~~the~~ Circular Action Alliance. By law, California exercises only minimal oversight over ~~the~~ Circular Action Alliance's implementation of the Act. But California's sovereign power *is* used to compel producers to join the Alliance. This structure allows California to outsource the hard—and inevitably unpopular—work of enforcing the Act to a nongovernmental entity. Meanwhile, California need only sit back and collect the $500,000,000 annual tribute payment extracted by ~~the~~ Circular Action Alliance from its dragooned members: businesses that sell, distribute, or import regulated ~~plastic or plastic-containing products~~virtually any product packaging in or into California.

~~5.~~6. In addition to these sovereign harms, the Act also directly harms both producers/manufacturers/distributors (including NAW member entities) and consumers. The Act unrepentantly claims to saddle producers with the costs imposed—which raises a host of issues. But notwithstanding California's expressed intent, economic reality always prevails. Accordingly, the Act's onerous mandates and associated inefficiencies will cause steep and persistent price increases on a wide array of products that ordinary residents of the Plaintiff States—and their counterparts nationwide—purchase and consume to satisfy basic needs. Those price increases will, at least in part, be passed on to consumers. And because prices will increase on many goods that are everyday necessities, the Act's inflationary effects will fall especially hard on low-income and otherwise vulnerable Americans.

~~6.~~7. At bottom, the Act violates both the United States and the California Constitutions. *First*, it violates the Commerce Clause by discriminating against interstate commerce, substantially

burdening interstate commerce, and imposing unfairly apportioned taxes. *Second*, the Act violates the Import-Export Clause by "condition[ing] sale of a good on the use of preferred farming, manufacturing, or production practices in another State where the good was grown or made." *Pork Producers*, 598 U.S. at 408 (Kavanaugh, J., concurring and dissenting in part). *Third*, it offends the First Amendment and California's state-level equivalent, both by censoring the speech of producers who want to inform consumers *what* is causing these price increases and *why*, and because it compels those producers to associate with and fund the speech of an organization expressing a viewpoint with which they fundamentally disagree. *Fourth*, the Act violates the structural Constitution and the Fifth Amendment's Due Process Clause as an *ultra vires* attempt to exercise power California does not have. Finally, the Act involves an unconstitutional delegation of regulatory authority to a private organization, in violation of the Fourteenth Amendment's Due Process Clause and the California Constitution's nondelegation doctrine.

~~7.~~8. Plaintiffs therefore seek a declaratory judgment that the Act violates both the United States and California Constitutions, along with injunctive relief precluding Director Heller, the Circular Action Alliance, and anyone working in concert with either from enforcing the Act and its implementing regulations.

**JURISDICTION AND VENUE**

~~8.~~9. This action involves claims arising under the Constitution and laws of the United States, so this Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

~~9.~~10. Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over ~~Plaintiff's~~Plaintiffs' state-law claim because that claim arises from the same nucleus of operative fact as the claims arising under federal law. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

~~10.~~11. This Court has personal jurisdiction over Director Heller, a California public official who discharges her duties within the Eastern District of California.

~~11.~~12. The Court has personal jurisdiction over the Circular Action Alliance because it has sufficient minimum contacts—through its implementation and enforcement of the Act—with California generally and the Eastern District in particular.

~~12.~~13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims have occurred or will occur in this district. Additionally, Director Heller resides in California and in this judicial district. Among other things, a substantial portion of the covered material regulated under the Act and its implementing regulations will be sold, offered for sale, distributed, and/or imported within this district. Moreover, a substantial portion of producers, including members of the National Association of Wholesaler-Distributors, operate in this district or will ship products to or through the Eastern District, and thereby are subject to regulation, taxes, and fees arising under the Act and its implementing regulations flowing from their activity in the district.

**PARTIES**

~~13.~~14. Nebraska, Alabama, Florida, Georgia, Idaho, Indiana, Iowa, Louisiana, Missouri, Montana, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Utah, and West Virginia (collectively the "Plaintiff States") are sovereign States who will suffer both imminent and substantial sovereign harms *and* direct pocketbook injuries directly traceable to the implementation and enforcement of the Act. The Plaintiff States will also suffer quasi-sovereign harm relating to the hardships and damage the Act will cause to their citizens and affected resident businesses.

~~14.~~15. The National Association of Wholesaler-Distributors ("NAW") is a national trade association whose members constitute wholesalers and distributors across the United States, including members that conduct business in California. Founded in 1946, NAW comprises direct member companies and a federation of national, regional, and state associations across 19 commodity lines of trade, which together include approximately 35,000 companies operating nearly 150,000 locations throughout the nation.

~~15.~~16. NAW's members import, distribute, or supply packaged goods in and into California and are subject to the Act's requirements.

~~16.~~17. NAW's members include mid-sized businesses that are integral to regional and national supply chains. These companies typically operate distribution centers, manage inventory, and coordinate logistics across state lines. As part of their operations, many use or distribute packaging materials, or products containing those materials, that fall within the Act's scope.

~~17.~~18. NAW's members play a critical role in the supply and movement of goods nationwide, including in and through California. These business activities require sourcing, handling, and distributing packaged products, including those produced by others, which in certain cases means that NAW's members are considered "producers" under the Act (e.g., because they introduce covered materials into California).

~~18.~~19. The Act's classification of NAW's members as producers imposes extensive compliance responsibilities on these companies, which often have little or no control over the design or composition of the packaging they distribute, forcing them to shoulder financial and logistical obligations not aligned with their operational role in the product life cycle.

~~19.~~20. Defendant Zoe Heller is the Director of the California Department of Resources Recycling & Recovery ("CalRecycle") and is sued solely in her official capacity.

~~20.~~21. CalRecycle is a state agency within the executive branch of the State of California. CalRecycle is the state agency charged with carrying out California's roles under the Act.

~~21.~~22. Director Heller and CalRecycle personnel operating at her direction implement the Act principally from CalRecycle's headquarters in Sacramento, within this district.

~~22.~~23. CalRecycle—at the direction and under the control of Director Heller—is engaged in conduct relating to the subject matter of this action within the Eastern District, including regulating and imposing taxes and fees on entities within this district, sales occurring within this district, and covered material located, distributed, or imported in or into this district.

~~23.~~24. ~~The~~ Circular Action Alliance ("CAA") is a self-described "Producer Responsibility Organization (PRO)" that is "dedicated to implementing … Extended Producer Responsibility (EPR) laws for … packaging."[1] ~~The~~ CAA is the "only organization approved to implement US EPR laws for … packaging" and operates as the sole "PRO in California." *Id.* ~~The~~ CAA is "committed to helping producers comply with EPR laws," *id.*, and, by delegation, has significant responsibilities related to the implementation and enforcement of the Act. For purposes of each Count set forth herein, CAA is a willful participant with CalRecycle in the State's violation of the law, and CAA's actions are fairly attributable to the State, including because California has designated CAA as the sole PRO, required producers to participate in CAA as members, and authorized CAA to administer the Act's producer obligations, fee obligations, recycling-rate obligations, and certification obligations.

## FACTUAL ALLEGATIONS

### I. The Act's Vague Definitions Leave Businesses Uncertain of Whether and How it Applies.

~~24.~~25. Enacted in 2022, the Act purports to create a "new statewide comprehensive circular economy framework" for recycling "covered material." Cal. Pub. Res. Code §§ 42040(b)(2)(A), 42041(e).

26. The Act imposes a number of requirements on "producers" of "covered material" to achieve those ends. These requirements are triggered by the manufacture, sale, distribution, or importation of "covered material." *See* Cal. Pub. Res. Code. §§ 42041(w), 42050, 42051.

27. The Act defines "[c]overed material" as "[s]ingle-use packaging that is *routinely* recycled, disposed of, or discarded after its contents have been used or unpackaged." and "[p]lastic single-use food service ware." Cal. Pub. Res. Code. § 42041(e)(1) (emphasis added).

28. The Act fails to define how often a product must be recycled, disposed of, or discarded to be considered "routinely" recycled, disposed of, or discarded. The Act thus requires producers to

[1] *See* About Circular Action Alliance, archived at https://perma.cc/CZJ8-CSTR.

predict what downstream consumers will do with various types of packaging and then measure that prediction against a nebulous "routinely" standard. The Act also fails to elucidate what evidence a producer would need to produce to prove a material is or is not "routinely" recycled, disposed of, or discarded.

29. CalRecycle's regulations and guidance offer no clarity on how often a material must be recycled, disposed of, or discarded before it is considered "routine[]." CalRecycle's "Covered Material Categories Reporting Guidance" provides that "Step 1" for determining the obligations that a particular material carries is determining, "Is it covered material?" *Covered Material Categories Reporting Guidance*, CalRecycle at 10 (Sept. 8, 2025), available at https://perma.cc/4MN2-MYNS. To help answer that question, the guidance merely refers producers to the statutory definition of "covered material."

30. The Act's definition of "covered material," and the obligations attached thereto, also do not include a scienter requirement, meaning a producer can violate the Act and be subject to penalties by coming to a good-faith but different conclusion than CalRecycle as to whether a material is "routinely" recycled, disposed of, or discarded after its contents have been used or unpackaged.

31. The Act also defines "producer" as "a person who manufactures a product that uses *covered material* and who owns or is the licensee of the brand or trademark under which the product is used in a commercial enterprise, sold, offered for sale, or distributed in the state." *Id.* § 42041(w)(1) (emphasis added). If no such person is in California, then the definition of "producer" extends to the owner, licensee, distributor, or retailer of the "covered material." *Id.* § 42041(w)(2)–(3). Because the definition of "covered material" is vague, the Act's definition of "producer" that references "covered material" is also vague and does not put a business on fair notice as to whether it is a "producer" subject to the Act.

32. The Act also mandates that "all covered material offered for sale, distributed, or imported in or into the state on or after January 1, 2032, is *recyclable* in the state or eligible for being labeled 'compostable.'" Cal. Pub. Res. Code § 42050(b) (emphasis added).

33. To be deemed recyclable, covered material must "meet[] the requirements of … Section 42355.51." *Id.* § 42061(c).

34. At least four of Section 42355.51's recyclability requirements are currently enjoined by order of the United States District Court for the Southern District of California because plaintiffs there are likely to succeed on their claim that such requirements are unconstitutionally vague. *See Cal. League of Food Prods. v. Bonta*, No. 3:26-cv-01675, 2026 WL 2055589 (S.D. Cal. July 14, 2026).

35. *First*, the court preliminarily enjoined Section 42355.51's "routinely becomes feedstock" provision, which requires a product to be "of a material type and form that *routinely* becomes feedstock used in the production of new products or packaging." Cal. Pub. Res. Code § 42355.51(b)(1) (emphasis added). The court reasoned that the "routinely becomes feedstock" requirement "imposes an uncertain threshold requirement and relies substantially on conduct outside of manufacturers' control and about which they may lack reliable information," and thus "the provision fails to provide adequate notice to a business of ordinary intelligence to understand what the law prohibits." *Cal. League of Food Prods.*, 2026 WL 2055589, at *13.

36. *Second*, the court preliminarily enjoined the "Basil convention" requirement, which provides that a product or package is recyclable only if "[t]he material type and form is sorted into defined streams for recycling processes by large volume transfer or processing facilities … that process materials and collectively serve at least 60 percent of recycling programs statewide, *with the defined streams sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention*." *Id.* § 423551.51(d)(2) (emphasis added). Neither Section 42355.51's text nor implementing regulations explain what it means to be "consistent with" the Basel Convention, the requirements of which are highly complex and embedded in an evolving body of international

law. In fact, CalRecycle's latest Material Characterization Study admits that it "does not provide information regarding [the Basel Criterion]" because "it does not contain all the information necessary to determine the recyclability status for any particular product or packaging." *SB 343 Material Characterization Study Final Findings 2023/2024*, CalRecycle at 3 (April 2025), available at https://perma.cc/FN5V-B9GZ. Thus, the court reasoned that "the lack of guidance as to the elements of the Basel Convention that bear on eligibility … leaves manufacturers without a 'reasonable opportunity to understand what conduct [Section 423551.51] prohibits.'" *Cal. League of Food Prods.*, 2026 WL 2055589, at *13 (quoting *NetChoice, LLC v. Bonta*, 170 F.4th 744, 764 (9th Cir. 2026)).

37. *Third*, the court preliminarily enjoined Section 42355.51's "APR Design Guide" requirement, which provides that plastic packaging is not recyclable unless it "is designed to not include any components, inks, adhesives, or labels that prevent the recyclability of the packaging according to the APR Design® Guide." Cal. Pub. Res. Code § 42355.51(d)(3)(A). The court reasoned that at least two of the APR Design® Guide's categories—designs that are "tolerated but need[] improvement" and designs that are "detrimental to recycling"—fail to elucidate whether such designs "prevent" the recyclability of packaging. *Cal. League of Food Prods.*, 2026 WL 2055589, at *15.

38. And *fourth*, the court preliminarily enjoined Section 42355.51's requirement that recyclable products and packaging be "designed to *ensure* recyclability and do[] not include any components, inks, adhesives, or labels that *prevent* the recyclability of the product or packaging," Cal. Pub. Res. Code § 423551.51(d)(3) (emphasis added). The court reasoned that while "[t]he 'ensure/prevent' provision … considers the fact of whether the product or package has been designed in a manner that 'ensures' and does not 'prevent' recyclability … , the bill offers no definition or guidance on what is meant by ensuring or preventing recyclability." *Cal. League of Food Prods.*, 2026 WL 2055589, at *17.

39. Because Section 42355.51's recyclability requirements are both vague and enjoined, producers are without fair notice as to what material "is deemed recyclable" under Section 42061.

## II. The Act Imposes a Series of Unrealistic and Economically Catastrophic Regulatory Mandates.

25.40. The Act defines "covered material" broadly to include virtually all single-use packaging "As noted, the Act regulates "[c]overed material," which is defined as "[s]ingle-use packaging that is routinely recycled, disposed of, or discarded after its contents have been used or unpackaged" and "[p]lastic single-use food service ware." Cal. Pub. Res. Code. § 42041(e)(1).

26.41. This presumably encompasses not only the plastic and plastic-containing packaging of nearly every consumer product sold in California, but also glass, ceramic, metal, paper, fiber, and wood single-use packaging.

27.42. "Covered material" is not limited to "[s]ales packaging," *i.e.*, the packaging in which a consumer purchases a product. *See* Cal. Pub. Res. Code § 42041(s). "Covered material" also includes all "packaging intended to protect the product during transport" and all "packaging intended to bundle, sell in bulk, brand, or display the product." *Id.* § 42041(s)(2), (3).

28.43. In other words, "covered material" is ubiquitous: Nearly all consumer products involve single-use packaging somewhere along the supply chain. The Act thus implicates, either directly or indirectly, almost all aspects of the economy.

29.44. The Act purports to achieve its vision of a "new statewide comprehensive circular economy framework" through several broad categories of onerous mandates, which collectively are framed as a form of "extended producer responsibility" ("EPR"). As described in more detail below, this stated statutory purpose sweeps far beyond waste management. The Act necessarily compels producers nationwide to redesign products, reconfigure nationwide (and even global) supply chains, resource materials, and finance state-directed programs untethered from any purported harms in California associated with the producer's products.

## I. I. In several ways, the Act profoundly impacts the national economy. The Act Imposes a Series of Unrealistic and Economically Catastrophic Regulatory Mandates.

~~30.~~45. ***First***, the Act mandates that "[a]ll plastic covered material [be] source reduced." Cal. Pub. Res. Code § 42050(a).

~~31.~~46. "Source reduced" is a euphemism for the dramatic and unrealistic elimination of plastic and plastic-containing packaging from the economy. In particular, the Act dictates that, by 2032, there must be a "25-percent reduction by weight and 25 percent by plastic component source reduction requirement for covered material sold, offered for sale, or distributed in the state." Cal. Pub. Res. Code § 42057(a)(1).

~~32.~~47. Nearly half of this "source reduction" must be achieved "through shifting a plastic covered material to refillable or reusable packaging or food service ware or through eliminating a plastic component." *Id.* § 42057(a)(2)(A).

~~33.~~48. The Act also sets interim "source reduction" mandates to be achieved by January 1, 2027, and January 1, 2030. *Id.* § 42057(a)(2)(C), (D).

~~34.~~49. Compliance with the Act's "source reduction" mandates will require dramatic and extremely expensive transformations of a wide range of products, business models, and logistics practices. Moreover, the timing of the mandates means that this source reduction must be accomplished with very little lead time for producers to evaluate feasible packaging alternatives.

~~35.~~50. Even CalRecycle has recognized the significant barriers to, and limitations of, "source reduction."

~~36.~~51. For example, one form of source reduction proposed by CalRecycle is "lightweighting," or "reducing the weight or thickness of plastic covered material while maintaining the required level of functionality and product protection." CalRecycle, *Current State Report: An Evaluation of Reuse and Refill Systems and Covered Materials that Utilize Other Source Reduction Strategies*, at 80 (Feb. 2026).[2] However, CalRecycle acknowledged that "[m]any businesses indicated that most feasible lightweighting opportunities, estimated by some at around 90%, have

[2] Available at https://perma.cc/6TYE-R59Y.

already been achieved within their product portfolios." *Id.* Thus, lightweighting provides little opportunity for the further extraordinary plastic reductions mandated by the Act.

~~37.~~52. Another form of source reduction proposed by CalRecycle is "material substitution," or "replacing plastic components or plastic covered material formats with nonplastic components or formats." *Id.* at 86. But CalRecycle acknowledges that material substitution is "often limited by technical performance, cost, and material availability." *Id.* In many cases, alternative materials simply lack certain indispensable characteristics that plastics have. For example, "[a]lternative materials such as paper and fiber generally provide less moisture and grease resistance than plastic," *id.*, making those materials ineffective for packaging oily or liquid products. In some instances, additional coatings can be added to paper or fiber products to improve their performance, but "[t]hese additions may affect recyclability," *id.*, in many cases making the alternative materials *less* recyclable and *more* environmentally harmful than plastics. In some cases, "alternative materials may have increased transport weight or lower production efficiency compared to some plastics," *id.*, making the net environmental effect of using those alternative materials far less favorable than using plastics.

~~38.~~53. CalRecycle has reluctantly acknowledged significant practical limitations to all forms of source reduction, including "right-sizing," "large format packaging," "concentration," and "elimination." *See id.* at 80–87. These limitations and many others mean that—depending on the producer and the product—the Act's interim and final source-reduction mandates are either impossible to achieve or else can be achieved only through radical changes to product design, components, and supply chains that will impose extraordinary financial burdens on both producers and consumers.

~~39.~~54. ***Second***, the Act mandates that "all covered material offered for sale, distributed, or imported in or into the state on or after January 1, 2032, is recyclable in the state or eligible for being labeled 'compostable.'" Cal. Pub. Res. Code § 42050(b).

~~40.~~55. Notably, of the 35 categories of plastics reflected on CalRecycle's *Update to Covered Material Category (CMC) List* (Dec. 31, 2025),[3] only 13 categories (or 37% of the categories identified for regulation under the Act) have been determined to be "recyclable" or "compostable" under the Act.

~~41.~~56. Compliance with the Act's mandate that 100% of covered materials be recyclable will necessarily involve excluding a wide range of products from the California market entirely, and it will also necessitate dramatic and extremely expensive transformations of a wide range of products, business models, and logistics practices.

~~42.~~57. ***Third***, the Act mandates that "all plastic covered material offered for sale, distributed, or imported in or into the state" must achieve certain "recycling rates." Cal. Pub. Res. Code § 42050(c).

~~43.~~58. The "[r]ecycling rate" is "the percentage, overall and by category, of covered material sold, offered for sale, distributed, or imported in the state that is ultimately recycled." Cal. Pub. Res. Code § 42041(ab).

~~44.~~59. Under the Act's recycling-rate mandate, all covered materials must achieve a recycling rate of 30% by January 1, 2028; a recycling rate of 40% by January 1, 2030; and a recycling rate of 65% by January 1, 2032. Cal. Pub. Res. Code § 42050(c).

~~45.~~60. These aggressive recycling-rate mandates contrast starkly with the current recycling rates for various types of plastics. For example, the table below reflects the current recycling rates reported by CalRecycle for various plastics products covered by the Act:

| **Material Type** | **Form** | **Recycling Rate** |
|---|---|---|
| PET (#1) | Bottles, Jugs, and Jars (Clear/Natural) | 16% |
| PET (#1) | Bottles, Jugs, and Jars (Pigmented/Color) | 5% |
| PET (#1) | Other Rigid Containers, Cups, Lids, Plates, Trays, Tubs | 4% |

[3] Available at https://perma.cc/DZ8K-JHXF.

| | | |
|---|---|---|
| HDPE (#2) | Bottles, Jugs and Jars | 19% |
| HDPE (#2) | Pails & Buckets | 0% |
| HDPE (#2) | Flexible and Film Items | 5% |
| LDPE (#4) | Clear Non-Bag Film | 5% |
| PP (#5) | Bottles, Jugs and Jars | 2% |
| PS (#6) | Utensils | <1% |
| PS (#6) | Solid Hinged Containers, Plates, Cups, Tubs, Trays, and Other Solid Forms | <2% |
| Multi-Material Laminate | Pouches and Envelopes | <2% |
| Other/Mixed Plastics | Rigid Items | <3% |

CalRecycle, *Update to Covered Material Category (CMC) List*, *supra*, note 3, at 8–11.

46.61. Moreover, the data reported by CalRecycle likely dramatically overestimates the recycling rates within the meaning of the Act. In particular, the CalRecycle dataset "does not consider whether material reaches responsible end markets." *Id.* at 2. However, under the Act, "[t]o be considered recycled, covered material shall be sent to a responsible end market." Cal. Pub. Res. Code § 42041(aa)(3). The recycling rates noted above do not take into account compliance with this additional requirement, which itself incorporates a number of substantial mandates.

47.62. Achieving the Act's recycling-rate mandates—which significantly outstrip current recycling rates—will necessitate dramatic and extremely expensive transformations of a wide range of products, business models, and logistics practices. As with its source reduction mandates, the Act provides insufficient time for producers to evaluate alternative materials for improving their packaging recyclability and places them at risk of penalties if they do not quickly transform.

48.63. Moreover, single-use packaging plays a critical role in preserving the safety, quality, integrity, and longevity of consumer products. Achieving the Act's extreme mandates will necessarily involve product and process changes that diminish product safety, quality, integrity, and longevity.

**II.III. II. To Implement Its Onerous Mandates, the Act Delegates Unprecedented Regulatory, Legislative, Exaction, and Enforcement Authority to a Private Party, the CAA.**

~~49.~~64. Rather than supervising the implementation of the Act's extraordinary mandates itself, California has outsourced its sovereign authority to an unaccountable private party, ~~the~~ CAA.

~~50.~~65. With limited exceptions, the Act forces all "producers of covered material" to "form and join a PRO." Cal. Pub. Res. Code § 42051(a). That PRO is then empowered to implement the Act's mandates. *Id.*

~~51.~~66. CalRecycle has designated ~~the~~ CAA as the sole PRO under the Act. As a result, by law, ~~the~~ CAA "shall proceed to carry out the requirements of [the Act]." *Id.*

~~52.~~67. The Act delegates to ~~the~~ CAA the authority to formulate plans to achieve various requirements of the Act, including the mandates discussed above. *See generally* Cal. Pub. Res. Code §§ 42051–57.

~~53.~~68. In so doing, the Act gives ~~the~~ CAA the authority to dictate unprecedented changes to the products and business practices of companies nationwide—changes that could impose billions of dollars of economic losses on companies, consumers, and governments across the country—backed by the sovereign power of California.

~~54.~~69. The Act further authorizes ~~the~~ CAA to impose state-mandated fees on producers. *See* Cal. Pub. Res. Code § 42053.

~~55.~~70. To be sure, the Act prohibits these state-mandated fees from "be[ing] passed on to consumers as a separate item on a receipt or invoice." *Id.* § 42053(a)(1).

~~56.~~71. This problematic (and, as discussed below, unconstitutional) censorship notwithstanding, economic reality necessitates that at least some portion of these fees will be passed along to consumers in the form of higher prices.

~~57.~~72. But for the Act's express prohibition, constituent members of NAW would include a line item (or items) on their receipts and/or invoices detailing the cost increases that are attributable to the impact of the Act.

58.73. Likewise, several of the Plaintiff States, when operating in a proprietary capacity, would include a line-item (or items) on their receipts and/or invoices detailing the cost increases that are attributable to the Act.

59.74. The inclusion of such a line item or items is designed to inform business partners and consumers—including consumers in California—of the magnitude of the cost-increasing impact of the Act.

60.75. One purpose of the inclusion of such line items would be to galvanize political support for a repeal or amendment of the Act.

61.76. Another purpose would be to forestall the adoption of similar EPR regimes in States without such laws that are considering their enactment.

62.77. The inclusion of such a line item, therefore, is political speech protected by both the First Amendment and Article I, Section 2 of the California Constitution.

63.78. Alternatively, even if such line items are not protected political speech, they are protected commercial speech because they are purely factual and non-misleading.

64.79. The state-mandated fees imposed by the Act and enforced by the CAA include several components. Cal. Pub. Res. Code § 42053(c).

65.80. One form of state-mandated fees involves "[i]ndividual assessments imposed on a producer." *Id.* § 42053(c)(1).

66.81. CalRecycle's regulations issued under the Act set out the formula that the CAA must use to calculate these individual assessments. *See* 14 Cal. Code of Regs. § 18980.6.7(e).

67.82. That formula includes two basic components. The first is a "base fee rate" set by the CAA applicable to each "covered material category" under the Act. *Id.* § 18980.6.7(e)(1).

68.83. That base fee rate is then multiplied by the "weight of covered material of that covered material category sold, distributed, or imported in or into the state within the previous calendar year." *Id.* § 18980.6.7(e)(2)(A). "The total individual assessment [of a given producer] shall be the

sum of the base fees of each covered material category [for which a regulated entity is a producer].” *Id.* § 18980.6.7(e)(2)(B).

~~69.~~84. The formula for calculating the individual assessment does not take into account the location of the manufacture, use, or disposal of the covered material that is the basis of the assessment.

~~70.~~85. A substantial portion of the ~~plastic~~ waste generated in California is exported to other jurisdictions. For example, according to data compiled by CalRecycle, in 2024, more than 10 million tons of waste were exported from California for recycling in other jurisdictions.[4]

~~71.~~86. In addition, a substantial portion of the covered material sold, distributed, or imported in or into California is manufactured in other jurisdictions.

~~72.~~87. On information and belief, a substantial portion of covered material sold, distributed, or imported in or into California is used principally or entirely outside California by end users.

~~73.~~88. Thus, the individual assessment fee will require producers to pay fees—likely in very significant amounts—for covered material that is neither manufactured, used, nor disposed of in California.

~~74.~~89. Producers subject to these individual assessments are likely to pass along a significant portion of the cost of the individual assessments on to consumers in the form of higher prices. Those prices are unlikely to be limited just to California but instead will likely apply to consumers located in the Plaintiff States.

~~75.~~90. As described above, the individual assessment requires producers to pay a significant fee for the “weight of covered material of that covered material category sold, distributed, or ***imported in or into*** the state within the previous calendar year.” 14 Cal. Code of Regs. § 18980.6.7(e)(2)(A) (emphasis added).

---

[4] *See* CalRecycle, *State of Disposal and Recycling in California* (2024), available at https://perma.cc/2Y4D-PYW8.

~~76.~~91. Based on this provision, producers are likely to pay significant fees for covered goods that merely pass through California as part of the interstate distribution process and that are never sold, offered for sale, distributed, or used in California.

~~77.~~92. To be sure, the Act's implementing regulations attempt to curb this effect (to some degree) by purporting to define "import" to exclude "products [that] are transported outside the state without being provided to users of the products in the state or discarded in the state." 14 Cal. Code of Regs. § 18980.1(a)(17)(F)(i).

~~78.~~93. But that redefinition of the statutory term "import" does not fully cure the problem. The individual-assessment formula looks to the amount imported during a specified time period, *i.e.*, a particular calendar year. 14 Cal. Code of Regs. § 18980.6.7(e)(2)(A).

~~79.~~94. If products are imported into California during a given calendar year and are not re-exported from California during the same calendar year, then the formula includes the weight of those goods in the individual assessment for that calendar year *even if* the goods are exported from California during the following calendar year. Nothing in the Act or its implementing regulations purports to provide a credit or adjustment to avoid this result.

~~80.~~95. Goods are commonly imported into California and stored there for distribution and shipping elsewhere. If covered products are imported into California near the end of a calendar year, it is highly foreseeable that such goods might remain within California awaiting further distribution at the end of the calendar year. Under those circumstances, the products would increase the producer's individual assessment, even if the products were removed from California early in the following calendar year. On information and belief, under existing practices, the circumstances described above implicate a substantial volume of covered material.

~~81.~~96. In addition to mandating certain fees that ~~the~~ CAA ***must*** charge its members (such as the individual assessment described above), the Act and its implementing regulations also give ~~the~~ CAA essentially ***unbridled discretion*** to charge any additional amounts that ~~the~~ CAA deems

"sufficient to ensure the requirements of [the Act] are met by the PRO and [its] plan is fully implemented." Cal. Pub. Res. Code § 42053(a)(1).

~~82.~~97. The Act does not provide meaningful standards that guide or constrain ~~the~~ CAA in setting fees.

~~83.~~98. ~~The~~ CAA may unilaterally adjust fees and modify the fee structure without meaningful regulatory oversight. ~~The~~ CAA must adjust fee schedules "at least every year or more frequently if needed." *Id.* § 42053(a)(2).

~~84.~~99. The Act also authorizes ~~the~~ CAA to impose "malus fees" (penalties) and award credits, based on factors determined by ~~the~~ CAA. *Id.* § 42053(e).

~~85.~~100. Producers subject to additional fees imposed by ~~the~~ CAA are likely to pass a significant portion of the cost of those fees on to consumers in the form of higher prices.

~~86.~~101. As one scholar who has studied EPR programs has explained, "the reality is that these costs are absorbed by the consumer, in the form of increases in the cost of consumer packaged goods."[5]

~~87.~~102. Those increased prices are unlikely to be limited just to California but instead will likely apply to consumers located in the Plaintiff States.

~~88.~~103. That result is especially likely given that the Act prohibits PRO fees from "be[ing] passed on to consumers as a separate item on a receipt or invoice." Cal. Pub. Res. Code § 42053(a)(1).

~~89.~~104. The effect of these price increases caused by the Act is likely to be regressive, falling especially hard on low-income consumers in the Plaintiff States.

**~~III.~~IV. ~~III.~~ The Act Requires Producers to Pay $500,000,000 Per Year to California. This Amount—Deceptively Called an "Environmental Mitigation Surcharge Assessment"—Is a Tax Laundered Through ~~the~~ CAA.**

[5] Calvin Lakhan, *Modeling impact on consumer packaged goods prices resulting from the adoption of Extended Producer Responsibility for Packing in Maine*, York University, available at https://perma.cc/BS4L-JM6S.

~~90.~~105. The Act mandates that ~~the~~ CAA pay an annual "environmental mitigation surcharge" of $500,000,000 to California. Cal. Pub. Res. Code § 42064(e)(1).

~~91.~~106. The Act further mandates that ~~the~~ CAA pass this exorbitant surcharge on to producers. *Id.* § 42064(f); *see also* Cal. Pub. Res. Code § 42053(c)(5).

~~92.~~107. The formula that ~~the~~ CAA uses to apportion the surcharge among its members must "be based on the number of plastic components and weight of plastic covered material a producer offers for sale, sells, distributes, or imports in or into the state." 14 Cal. Code of Regs. § 18980.6.7(g).

~~93.~~108. The formula for calculating a producer's share of the "environmental mitigation surcharge" does not take into account the location of the manufacture, use, or disposal of the covered material that is the basis of the assessment.

~~94.~~109. A substantial portion of the ~~plastic~~ waste generated in California is exported to other jurisdictions. As noted above, according to data compiled by CalRecycle, in 2024 more than 10 million tons of waste were exported from California for recycling.

~~95.~~110. In addition, a substantial portion of the ~~plastic~~ covered packaging material sold, distributed, or imported in or into California is manufactured in other jurisdictions.

~~96.~~111. On information and belief, a substantial portion of ~~plastic~~ covered packaging material sold, distributed, or imported in or into California is used principally or entirely outside California by end users.

~~97.~~112. Thus, the environmental mitigation surcharge will require producers to pay fees—likely in very significant amounts—for covered material that is neither manufactured, used, nor disposed of in California.

~~98.~~113. In essence, these "fees" and "surcharges" are akin to a tax imposed by California on all commercial activity involving covered material.

~~99.~~114. Producers subject to these tax-like fees are likely to pass on a significant portion of the resulting cost of increase to consumers in the form of higher prices.

~~100.~~115. Those prices are unlikely to be limited to California; they will instead impact consumers nationwide, including many in the Plaintiff States.

~~101.~~116. That result is especially likely given that the Act prohibits PRO fees from "be[ing] passed on to consumers as a separate item on a receipt or invoice." Cal. Pub. Res. Code § 42053(a)(1).

~~102.~~117. This censorship regime is designed to keep consumers in the dark about the underlying cause of price increases directly attributable to the implementation and enforcement of the Act, and thereby stymie the efforts of affected entities, including members of NAW and the Plaintiff States themselves, to engage in speech designed to rally political opposition and responses to the Act.

**~~IV.~~V. ~~IV.~~ The Act Will Impose Substantial Harms on the Plaintiff States, Their Citizens, and the National Economy.**

~~103.~~118. The Act is likely to impose substantial harm on the Plaintiff States in several ways: It will reduce the tax revenue they collect, inflict direct pocketbook harm, invade and infringe their sovereign prerogatives, and cause quasi-sovereign harms to both businesses and citizens in those States.

~~104.~~119. The Act is likely to reduce tax revenue collected by the Plaintiff States.

~~105.~~120. For example, when taxing businesses, Nebraska generally imposes a tax only on the business's taxable income, that is, the difference between the business's cognizable gross revenue and the business's allowable expenses. *See* Neb. Rev. Stat. §§ 77-2716(1)(e), 77-2734.07. The same is true in the other Plaintiff States, such as Florida. *See* Fla. Stat. § 220.13. The higher a business's allowable expenses, the less tax the business will pay, absent an offsetting increase in revenue.

~~106.~~121. As described above, the Act is likely to substantially increase the allowable expenses faced by businesses within the Plaintiff States. The Act imposes onerous regulatory mandates, fees, and taxes that are likely to increase the costs of almost all products that are packaged

or transported in ~~plastic or plastics containing materials~~packaging—that is, a significant proportion of the goods used every day by businesses and consumers across the country.

~~107.~~122. A study of Maine's EPR regime—which is less onerous than California's—projected price increases of up to 5.57% for many common products. *See* Lakhan, *supra* note 5, at 2.

~~108.~~123. These significant increases in the operating costs of businesses in the Plaintiff States will result in substantially reduced taxable income, absent offsetting revenue increases. To be sure, some businesses will seek to pass along some portion of these increased expenses to consumers in the form of higher prices. However, competitive pressures and other factors likely will prevent businesses from passing along *the entirety* of the costs to consumers, meaning that businesses will bear a nontrivial portion of the resulting cost increase and, as a result, pay decreased income tax to the Plaintiff States. Higher prices also often result in decreased sales volume. For some businesses that seek to pass these costs on to consumers in the form of higher prices, the decreased sales volume will result in decreased gross revenues even with price increases.

~~109.~~124. In addition, businesses in the Plaintiff States, including some NAW member entities, produce or distribute covered material subject to the Act. Complying with the Act's onerous mandates will require extraordinary capital investments and changes to their products and business models—all of which will necessitate significant increases in allowable expenses that will decrease their taxable income. Given the economic reality described above, these businesses likely cannot pass along the entirety of their increased expenses to purchasers in the form of higher prices.

~~110.~~125. Other businesses in the Plaintiff States, including some NAW member entities, that currently produce or distribute covered material in the California market may be unable to comply with the draconian and unrealistic mandates imposed by the Act. As a result, those businesses will be foreclosed from participating in the California market. Any business that faces the prospect of exclusion from the California market is likely to see a substantial decrease in revenue, which in turn reduces those businesses' taxable income.

~~111.~~126. In addition, as described below, the Act operates to deter California retailers and distributors from selling products produced by businesses having no presence in California, including businesses operating and/or based in the Plaintiff States. As a result, those businesses likely will lose substantial revenue from California sales that they otherwise would have made. These lost sales necessarily will decrease the businesses' gross revenue, which in turn reduces their taxable income.

~~112.~~127. Furthermore, the Act operates to deter exporting recyclable goods to recyclers outside California, including recyclers within the Plaintiff States. As a result, those recyclers in the Plaintiff States will generate reduced revenues, which in turn reduces their taxable income.

~~113.~~128. The Act will also inflict pocketbook harm on the Plaintiff States.

~~114.~~129. The Plaintiff States act, in numerous ways and contexts, in a proprietary capacity as a distributer and/or retailer of products shipped in plastic or plastic-containing packaging.

~~115.~~130. For example, Nebraska's public universities (along with affiliated enterprises under their control) ship apparel and other Nebraska or university-branded products to alumni, sports fans, parents, and other consumers nationwide, including to individuals, households, and secondary retailers located in California. The same is true for public universities in many of the Plaintiff States, such as Florida.

~~116.~~131. The Plaintiff States also directly operate retail outlets. For example, Nebraska operates a gift and souvenir shop in the Nebraska State Capitol that sends and receives merchandise shipped in plastic or plastic-containing packaging that qualifies as covered material subject to the Act's regulatory sweep. Similarly, Florida operates several gift shops, including ones associated with museums and others associated with its state parks.

~~117.~~132. The price and cost inflationary effects of the Act will thus diminish the revenue the Plaintiff States' proprietary retail and related distribution operations generate.

~~118.~~133. The Plaintiff States will also be impacted by the fees associated with conducting business with customers (such as public university alumni and parents of students) who reside in California.

~~119.~~134. The Plaintiff States will also suffer pocketbook injuries as a consumer.

~~120.~~135. Increases in the price of products, traceable to the impact of the Act, will harm Nebraska.

~~121.~~136. Many commodities and products that the Plaintiff States and their myriad agencies and constituent entities rely on to carry out their essential functions are packaged and/or transported in plastic—that is, the purchase of those products involves covered material regulated by the Act. For example, the Plaintiff States' correctional facilities and state-run juvenile facilities require single-use plastic food service ware (including but not limited to utensils, plates, cups, etc.), as an operational necessity. Nebraska's annual expenditures on single-use plastic food service ware are measured in the hundreds of thousands of (and likely millions of) dollars.

~~122.~~137. The nationwide price increases on these critical commodities will result in significant additional expenditures by the Plaintiff States and their constituent agencies. In Nebraska, additional expenditures will be required by the Nebraska Department of Correctional Services ("NDCS") and the Nebraska Department of Health and Human Services ("DHHS"). The same is true for Florida and its constituent agencies, including the Florida Department of Corrections ("FDC") and the Florida Department of Health ("DOH").

~~123.~~138. As noted above, many products indispensable to the medical and healthcare industries are shipped in plastic or plastic-containing packaging.

~~124.~~139. Healthcare providers (such as state-run or affiliated hospitals and other facilities associated with DHHS and DOH and correctional facilities operated by NDCS and FDC) cannot avoid purchasing products shipped in packaging that qualifies as covered material under the Act.

~~125.~~140. Those healthcare providers necessarily will face increased expenses due to the substantial price increases resulting from the Act's onerous mandates.

~~126.~~141. Medical suppliers and distributors are likely to pass a significant portion of the cost increases flowing from the Act to healthcare payors.

~~127.~~142. The Plaintiff States are significant healthcare payors.

~~128.~~143. Nebraska, as outlined above, and other Plaintiff States directly purchase a significant quantity (millions of dollars) of medical supplies used or administered by state entities.

~~129.~~144. Nebraska is directly responsible for more than $1 billion in annual expenditures on Medicaid. Other Plaintiff States have similar—and in several cases greater—expenditures. Florida, for instance, is directly responsible for more than $20 billion in annual expenditures on Medicaid.

~~130.~~145. Increases in the price of medical supplies attributable to the Act will increase the Plaintiff States' Medicaid outlays.

~~131.~~146. Thus, the Act will impose substantial pecuniary costs, direct and indirect, on the Plaintiff States. Those States will necessarily spend more on essential supplies *and* be forced to increase their outlays for a myriad of government programs.

~~132.~~147. The Plaintiff States also have a quasi-sovereign interest in resisting the imposition of significant harms to their citizens and resident businesses.

~~133.~~148. Preventing discrimination against a State's citizens and/or businesses in violation of the United States Constitution is a quasi-sovereign interest. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 607 (1982) ("[A] State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system."). In particular, as described below, the Act discriminates against interstate commerce and otherwise violates the federal system protected by the Constitution.

~~134.~~149. As noted above, the Act is likely to impose significant, across-the-board price increases on products—many of which are necessities consumed or otherwise used by residents of the Plaintiff States on a daily basis.

~~135.~~150. These impacts are especially likely to be felt by the States' low-income citizens. As a leading study on price increases caused by EPR programs has noted, "it is evident that any price increase, irrespective of magnitude, can have adverse economic impacts, particularly to vulnerable low income households." *See* Lakhan, *supra* note 5, at 1.

~~136.~~151. These serious harms to a substantial segment of the Plaintiff States' citizens (especially harms that fall on their most vulnerable citizens) implicate the States' "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp*, 458 U.S. at 607.

~~137.~~152. Businesses located in the Plaintiff States also face the prospect of unconstitutional duplicative or double taxation.

~~138.~~153. As outlined above, the Act will result in the imposition of various surcharges, assessments, taxes, and fees associated with covered material that is neither manufactured, used, nor disposed of in California.

~~139.~~154. This creates scenarios in which material that is, for example, disposed of in Nebraska is taxed twice. First, when California imposes a surcharge or fee under the Act, despite the absence of any connection (or, at most, only a highly tangential one) with California. And then again when that covered material is disposed of in Nebraska. *See generally* Neb. Rev. Stat. §§ 81-15,158.01 to 81-15,165.

**COUNT I**
**VIOLATION OF ~~THE COMMERCE CLAUSE~~DUE PROCESS VAGUENESS**

155. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 154.

156. The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

157. A statute or regulation "fails to comport with due process if … [it] fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

158. Indeed "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

159. The Act's requirement that producers use only recyclable or compostable materials by 2032 is unconstitutionally vague because it expressly incorporates Cal. Pub. Res. Code § 42355.51's recyclability requirements that are currently enjoined. *See Cal. League of Food Prods.*, 2026 WL 2055589. Without application of those definitions, producers have no meaningful way to determine what is required—and prepare accordingly—to ensure that all material is "recyclable" by 2032.

160. Even absent *California League of Food Producers*' preliminary injunction, the Act's recyclability requirement is vague because, for the reasons laid out in *California League of Food Producers*, Section 42355.51's recyclability requirements do not provide fair notice to producers as to what is required of them. *See* ¶¶ 34–38, *supra*.

161. Further, the Act in its entirety is unconstitutionally vague because its definition of "covered material"—the manufacture, sale, and distribution of which triggers producer obligations that are the *sine qua non* of the Act, *see, e.g.*, Cal. Pub. Res. Code. §§ 42041(w), 42050, 42051—is vague.

162. "Covered material" is defined as material "that is *routinely* recycled, disposed of, or discarded after its contents have been used or unpackaged." Cal. Pub. Res. Code. § 42041(e)(1)

(emphasis added). A producer of ordinary intelligence has no way of knowing what materials are "routinely recycled, disposed of, or discarded after its contents have been used or unpackaged."

163. Not only does the provision require producers to predict and ascertain the behavior of downstream consumers—that is, whether consumers will recycle, dispose of, or discard packaging after opening or using a product—but it also requires producers to determine, with no guidance from the Act, how *often* a certain type of packaging must be recycled, disposed of, or discarded to be considered "routinely" so. The Southern District of California has already held that a similar use of "routinely" under Section 42355.51's recyclability requirements "fail[ed] to provide adequate notice to a business of ordinary intelligence to understand what the law prohibits." *Cal. League of Food Prods.*, 2026 WL 2055589, at *13.

164. The unconstitutionally vague provisions of the Act—the definitions of "covered material," "producer," and "recyclable"—are inseverable from the remainder of the Act because they "'can[not] be removed as a whole without affecting the wording' or coherence" of the Act. *Cal. Redev. Ass'n v. Matosantos*, 53 Cal. 4th 231, 270 (Cal. 2011).

**COUNT II**
**VIOLATION OF THE COMMERCE CLAUSE**
**DISCRIMINATION AGAINST INTERSTATE COMMERCE**

~~140.~~165. Plaintiffs re-allege and incorporate by reference paragraphs 1 through ~~138~~164.

~~141.~~166. The Act serves protectionist aims and discriminates against interstate commerce in several distinct ways.

~~142.~~167. *First*, the Act discriminates against interstate commerce through its definition of "producer"—a definition that permeates the Act and determines the scope and impact of almost every provision of the Act.

~~143.~~168. A producer must pay both the environmental mitigation surcharge and the individual assessment.

~~144.~~169. Both of these exactions depend on the weight of covered material that the producer sells, distributes, or imports in or into California. *See* 14 Cal. Code of Regs. § 18980.6.7(e)(2)(A), (g).

~~145.~~170. In other words, the more tonnage of covered material for which a particular entity is deemed to be the "producer," the higher the environmental mitigation surcharge and individual assessment fee the entity must pay.

~~146.~~171. The structure of these fees discriminates against interstate commerce in the context of retailers operating in California.

~~147.~~172. Retailers generally sell products manufactured by other companies. That raises the question of who qualifies as the "producer" of products manufactured by one company but sold to consumers by another.

~~148.~~173. Where the manufacturer of covered material has a presence "in the state" of California, the manufacturer—and not the retailer—qualifies as the "producer" of the covered material, even if the covered material is sold to consumers by the retailer. *See* Cal. Pub. Res. Code § 42041(w)(1), (2). And for this reason, the weight of the covered material increases the tax liability of the manufacturer, not the retailer.

~~149.~~174. But if the product manufacturer has no presence in California, the retailer—not the manufacturer—~~qualifies~~may qualify as the "producer" of the covered material. *See id.* § 42041(w)(3). And the weight of the covered material increases the retailer's tax liability.

~~150.~~175. The Act therefore directly imposes a fee on retailers who carry products manufactured by companies having no presence in California, including manufacturers in Nebraska and the other Plaintiff States. That fee does not apply, however, if those retailers replace the non-California products with alternative products manufactured by companies having a presence in California.

~~151.~~176. This arrangement creates a strong economic incentive for retailers operating in California not to carry products manufactured by companies having no presence in California and

instead to replace those products with ones manufactured by companies having a presence in California.

152.177. “State laws that discriminate in this manner face a virtually *per se* rule of invalidity.” *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025) (cleaned up).

153.178. This discrimination is not narrowly tailored to advance any legitimate state interest.

154.179. *Second*, the Act discriminates against interstate commerce in how it defines “recycling rates.” As described above, a central component of the Act is the mandate that covered materials achieve certain specified “recycling rates.” Cal. Pub. Res. Code § 42050(c).

155.180. The Act defines “[r]ecycling rate” as “the percentage, overall and by category, of covered material sold, offered for sale, distributed, or imported in the state that is ultimately ***recycled***.” Cal. Pub. Res. Code § 42041(ab) (emphasis added).

156.181. The Act’s definition of “recycle” imposes substantive limits on when recycling can count toward the recycling-rate mandates. “For any mixture of plastic waste exported to other states or countries, the PRO [*i.e.*, the CAA] or producer shall certify to [CalRecycle] that the recycling technology used meets the requirements of this subdivision.” Cal. Pub. Res. Code § 42041(aa)(4)(C). “In meeting [this] requirement[] … [the CAA] or producer shall provide documentation necessary to verify this certification and shall make the certification under penalty of perjury.” *Id.* § 42041(aa)(4)(D).

157.182. No comparable requirement applies if the CAA or a producer opts to use a California-based recycler. In particular, the Act does not require the CAA or a producer to make *any* certifications to CalRecycle about the technology used by a California-based recycler, let alone make representations ***under oath*** about the technology used by such a recycler.

158.183. The CAA and producers face substantial compliance costs and risks if they opt to use non-California recyclers. For out-of-state recyclers (but not in-state recyclers), the CAA and producers must conduct substantial additional due diligence to determine what technology the

recycler uses, assess whether that technology complies with the Act's byzantine requirements and its implementing regulations, and obtain enough documentation to prove these facts to CalRecycle. Moreover, because ~~the~~ CAA or the producer must certify these matters to CalRecycle under the penalty of perjury, those entities face substantial legal risk (including criminal liability) if CalRecycle ultimately concludes that the technology used by an out-of-state recycler somehow fails to comply with the Act or its implementing regulations.

~~159.~~184. ~~The~~ CAA and producers face none of those costs and none of that risk if they use California-based recyclers.

~~160.~~185. Under these circumstances, ~~the~~ CAA and its constituent producers are likely to shift as much recycling as possible to California-based recyclers, to the detriment of non-California recyclers, including recyclers in the Plaintiff States.

~~161.~~186. As noted above, according to data compiled by CalRecycle, in 2024 more than 10 million tons of waste were exported from California for recycling. Thus, California stands to gain economically if it can shift a substantial portion of those exports to California-based recyclers.

~~162.~~187. The discrimination inherent in the recycling-rate mandate is not narrowly tailored to advance any legitimate state interest.

**COUNT ~~II~~III**
**VIOLATION OF THE COMMERCE CLAUSE**
**SUBSTANTIAL BURDENS ON INTERSTATE COMMERCE**

~~163.~~188. Plaintiffs re-allege and incorporate by reference paragraphs 1 through ~~161~~187.

~~164.~~189. The Act substantially burdens interstate commerce, imposing burdens that are clearly excessive in relation to any putative local benefits.

~~165.~~190. *First*, the Act's definition of "producer" strongly deters California retailers from doing business with product manufacturers having no presence in California. That regulation is likely to deter or prevent a substantial volume of interstate commerce, while not burdening any intrastate commerce. Moreover, that regulation serves no legitimate local purpose—and certainly not one that warrants the significant and discriminatory harm on interstate commerce.

166.191. *Second*, the Act's recycling-rate mandate strongly deters the CAA and its constituent producers from doing business with non-California recyclers. That regulation is likely to deter or prevent a substantial volume of interstate commerce, while not burdening any intrastate commerce. Moreover, that regulation serves no legitimate local purpose—and certainly not one that warrants the significant and discriminatory harm on interstate commerce.

167.192. *Third*, the individual assessment fee applies to certain covered materials that are imported into California and kept there for storage but are not sold, offered for sale, distributed, recycled, or discarded in California. The individual assessment fee thereby "ha[s] the inevitable effect of threatening the free movement of commerce by placing a financial barrier around the State." *Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005) (cleaned up). It also threatens "the ability of instrumentalities of interstate commerce to continuously use an artery of interstate commerce to move through [California]." *Ass'n to Preserve & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40, 57 (1st Cir. 2025). This effect is likely to burden a substantial volume of interstate commerce and directly and substantially burdens the instrumentalities of interstate transportation. That is especially true given that the Port of Long Beach and the Port of Los Angeles are two of the largest ports in the country by total trade tonnage. Moreover, this fee serves no legitimate local purpose—and certainly not one that warrants the significant burden on interstate commerce.

168.193. *Fourth*, the Act deliberately seeks to shift the PRO fees to consumers outside California through the Act's prohibition on passing fees to California consumers as a line item on receipts or invoices. Cal. Pub. Res. Code § 42053(a)(1). That regulation substantially burdens a substantial volume of commerce occurring outside California, and it serves no legitimate local purpose.

169.194. *Fifth*, the Act threatens to fragment the national economy in ways that substantially burden interstate commerce and that involve burdens far in excess of any putative local benefits. For example, the substantial burdens associated with complying with the Act are likely to

induce many producers to avoid selling in California, to create distinct supply chains that avoid California, or to create California-specific product lines that are inconsistent with those offered in other States. This economic fragmentation strikes at the heart of why the Founders replaced the Articles of Confederation with our current Constitution. *See Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976); *see also Pork Producers*, 598 U.S. at 404 (Kavanaugh, J., concurring and dissenting in part).

**COUNT ~~III~~IV**
**VIOLATION OF THE COMMERCE CLAUSE**
**IMPOSITION OF UNFAIRLY ~~APPORTION~~APPORTIONED TAXES**

~~170.~~195. Plaintiffs re-allege and incorporate by reference paragraphs 1 through ~~168~~194.

~~171.~~196. The "environmental mitigation surcharge" is essentially a tax. Concomitantly, ~~the~~ CAA's imposition of a share of the "environmental mitigation surcharge" on producers, backed by the coercive power of California, is effectively a tax.

~~172.~~197. The individual assessment mandated by the Act and imposed by ~~the~~ CAA also constitutes a tax.

~~173.~~198. The Commerce Clause of the United States Constitution prohibits state taxes on interstate commerce unless the tax "(1) applies to an activity with a substantial nexus with the taxing State, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services the State provides." *South Dakota v. Wayfair*, 585 U.S. 162, 174 (2018).

~~174.~~199. The second requirement of this test—the "fair apportionment" prong—requires that the tax be both "internally and externally consistent." *Goldberg v. Sweet*, 488 U.S. 252, 261 (1989). "To be internally consistent, a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result." *Id.* "External consistency … looks … to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185 (1995).

~~175.~~200. Both the environmental mitigation surcharge and the individual assessment fail both the internal-consistency standard and the external-consistency standard—and thus both violate the Commerce Clause.

~~176.~~201. Both the environmental mitigation surcharge and the individual assessment are not internally consistent. If every State adopted a regulatory regime identical to the Act, double taxation likely would occur.

~~177.~~202. As noted above, a producer's share of the environmental mitigation surcharge is based on "the number of plastic components and weight of plastic covered material a producer offers for sale, sells, distributes, or imports in or into the state." 14 Cal. Code of Regs. § 18980.6.7(g).

~~178.~~203. Similarly, a producer's individual assessment fee is based on the "weight of covered material of that covered material category sold, distributed, or imported in or into the state within the previous calendar year." *Id.* § 18980.6.7(e)(2)(A).

~~179.~~204. For interstate transactions, a product often will not be sold, offered for sale, distributed, and imported all in one State. And for this reason, the same transaction might be subject to double taxation where other States have adopted regimes identical to the Act.

~~180.~~205. For example, a covered product might be manufactured in Nebraska, shipped to a purchaser in California, passing through Nevada en route, and then discarded in Nevada. Under those circumstances, the product would be taxed at least twice: in Nevada, because the product was "imported into" the State, and in California, because it was sold in the State. Notably, this double taxation would occur at least twice, under both the environmental mitigation surcharge and the individual assessment.

~~181.~~206. The environmental mitigation surcharge and the individual assessment also are not externally consistent.

~~182.~~207. As described above, both the environmental mitigation surcharge and the individual assessment apply to covered material and require producers to pay taxes for covered material that is neither manufactured, used, nor disposed of in California.

~~183.~~208. As a result, neither the environmental mitigation surcharge nor the individual assessment has any rational connection to the economic or environmental impact that the taxed material has on California.

~~184.~~209. In addition, as described above, the individual assessment will tax certain covered materials that are imported into California and kept there for storage, but are not sold, offered for sale, distributed, recycled, or discarded in California.

~~185.~~210. Both the environmental mitigation surcharge and the individual assessment are wholly untethered from any impact that the taxed material may have on California's recycling programs, California's environment, or any other legitimate interest that California may have.

~~186.~~211. As the environmental mitigation surcharge and the individual assessment are structured under the Act and its implementing regulations, California has no rational "economic justification for [its] claim upon the value taxed." *Jefferson Lines*, 514 U.S. at 185.

~~187.~~212. An additional factor bearing on the external consistency of a tax is the impact of other States enacting similar—but not identical—taxes. *See id.* ("[T]he threat of real multiple taxation (though not by literally identical statutes) may indicate a State's impermissible overreaching.").

~~188.~~213. It is entirely foreseeable that other States would impose weight-based taxes for plastics and other covered materials (such as paper and glass, which are relatively easy to recycle but are heavier than many other materials) that are recycled or otherwise discarded within those States. Those taxes may rationally relate to additional costs that plastics impose on the State's recycling or solid waste systems.

~~189.~~214. Indeed, at least six other States—Colorado, Maine, Maryland, Minnesota, Oregon, and Washington—already have EPR laws similar to (but less onerous than) California's. EPR legislation has also been introduced in the legislatures of several other States in recent years.

~~190.~~215. The enactment of those taxes alongside California's irrational scheme foreseeably would lead to double taxation. For example, where covered material is sold in California but recycled in another State, the same weight of covered material would be subject to duplicative taxes in two States: in California, because the plastic was sold there, and in the other State, because it was recycled there. These duplicative taxes would not represent different interests or expenditures by two different States. Instead, the duplicative taxation would stem solely from California's "impermissible overreaching." *Id.*

**COUNT ~~IV~~V**
**VIOLATION OF DUE PROCESS & HORIZONTAL SEPARATION OF POWERS**
**ULTRA VIRES EXTRATERRITORIAL REGULATION**

~~191.~~216. Plaintiffs re-allege and incorporate by reference paragraphs 1 through ~~189~~215.

~~192.~~217. In our system of federalism, all 50 States are residual sovereigns who "enjoy equal sovereignty" relative to each other. Shelby County v. Holder, 570 U.S. 529, 535 (2013).

~~193.~~218. Excepting narrow and unusual corner cases, the jurisdiction of a sovereign is "co-extensive with its territory." United States v. Bevans, 16 U.S. 336, 386–87 (1818) (Marshall, C.J.).

~~194.~~219. Thus, "State sovereign authority is bounded by the States' respective borders." Fuld v. Palestine Liberation Org., 606 U.S. 1, 14 (2025).

~~195.~~220. Furthermore, "[t]he sovereignty of each State … implie[s] a limitation on the sovereignty of all its sister States." World-Wide Volkswagen v. Woodson, 444 U.S. 286, 293 (1980); see also Bonaparte v. Tax Ct. of Balt., 104 U.S. 592, 594 (1881) ("No State can legislate except with reference to its own jurisdiction. … Each State is independent of all the others in this particular.").

~~196.~~221. Accordingly, in most circumstances, when one State attempts to exercise sovereign authority "beyond [its] own [territorial] limits" there "arises a conflict of sovereign power … which renders the exercise of such a power incompatible with the rights of other States, and with the constitution of the United States." Ogden v. Saunders, 25 U.S. 213, 369 (1827) (Johnson, J.); see also Boyle v. Zacharie, 31 U.S. 635, 643 (1832) (confirming Justice Johnson's opinion spoke for a majority of the Court).

~~197.~~222. Consistent with these principles, the Supreme Court has recognized that while "Congress has ample authority" to enact "polic[ies] for the entire Nation," it is "clear that no single State could do so, or even impose its own policy choice on neighboring States." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 571 (1996).

~~198.~~223. Each individual State's "power to impose burdens on [an] interstate market" is "not only subordinate to the federal power over interstate commerce" but "also constrained by the need to respect the interests of other States." Id. (internal citations omitted).

~~199.~~224. The horizontal separation of powers—reflected in the equal sovereignty of the States inherent to our federalism—precludes "the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982) (White, J.) (plurality op.); *see also Pork Producers*, 598 U.S. at 376 n.1 (highlighting the view that the Edgar plurality may be best understood as enforcing "the territorial limits of state authority under the Constitution's horizontal separation of powers"). Thus, attempts to "assert extraterritorial jurisdiction over persons or property [in other States generally] offend[s] sister States and exceed the inherent limits of the State's power." *Shaffer v. Heitner*, 433 U.S. 186, 197 (1977).

~~200.~~225. The Fifth Amendment's Due Process Clause prohibits the enforcement of laws that are inconsistent with the federal Constitution. See generally Randy E. Barnett & Evan D. Bernick, No Arbitrary Power: An Originalist Theory of the Due Process of Law, 60 Wm. & Mary L. Rev. 1599 (2019). In short, because enactments that are "not made in pursuance of the

Constitution … are mere acts that do not become part of the 'law of the land,'" the enforcement of such enactments violate due process. Id. at 1619 (citing and quoting M'Culloch v. Maryland, 17 U.S. 316, 406 (1819)).

~~201.~~226. As outlined above, the "practical effect" of the Act is "to control" the manner in which goods are packaged and the way ~~plastic-containing~~ packaging is disposed of "beyond the boundaries of the state"—California—that has enacted the regulatory scheme. *S. Pac. Co. v. Arizona*, 325 U.S. 761, 775 (1945).

~~202.~~227. The impact of the Act is not limited to only products that are purchased by California consumers or otherwise enter the California marketplace, are disposed of in California, or have some direct and unattenuated connection to the health, safety, and welfare of Californians.

~~203.~~228. California has no power—and thus cannot properly exercise jurisdiction—over conduct, including commercial activity, that takes place entirely outside its borders.

~~204.~~229. To the extent the Act is aimed at conduct originating in other jurisdictions that may in some way impact the health, safety, or welfare of Californians, there must be a nexus between California's regulatory interest and the ostensibly detrimental impacts that occur within California's borders.

~~205.~~230. For example, while California may have an interest in the ultimate disposition of plastic-containing packaging waste and other covered material that is disposed of in California, that interest cannot justify an extension of its regulatory reach to the disposal of such waste that occurs in other States.

~~206.~~231. Despite this, the formula used to calculate the "base fee rate" effectively requires producers to pay fees for covered material that is neither manufactured, used, nor disposed of in California

~~207.~~232. Because the Act extends California's regulatory reach far beyond its borders and brings within its sweep conduct wholly unconnected to California, the Act violates principles of federalism, the horizontal separation of powers, and due process.

~~208.~~233. Therefore, the extraterritorial aspects of the Act are ultra vires; such aspects exceed California's legitimate power, and they cannot be enforced consistent with the federal Constitution.

**COUNT ~~V~~VI**
**VIOLATION OF THE IMPORT-EXPORT CLAUSE**
**BURDENSOME TAXES ON IMPORTS**

~~209.~~234. Plaintiffs re-allege and incorporate by reference paragraphs 1 through ~~207~~233.

~~210.~~235. The Act effectively imposes a tax on goods imported into California.

~~211.~~236. Yet the Constitution prohibits any State, absent "the Consent of the Congress," from imposing "any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing" its "inspection Laws." Art. I, §10, cl. 2.

~~212.~~237. The Supreme Court has wrongly limited the Import-Export Clause to imports from foreign countries. *See Woodruff v. Parham*, 8 Wall. 123, 133–36 (1869).

~~213.~~238. Properly interpreted, the Import-Export Clause also prevents States "from imposing certain especially burdensome" taxes and duties on domestic imports from other States—not just on imports from foreign countries. *Comptroller of Treasury of Md. v. Wynne*, 575 U. S. 542, 573 (2015) (Scalia, J., dissenting); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 621–37 (1997) (Thomas, J., dissenting); *Almy v. California*, 65 U.S. 169, 173–75 (1860); Brown v. Maryland, 12 Wheat. 419, 438−39, 449 (1827) (Marshall, C.J., for the Court); Brannon P. Denning, Justice Thomas, the Import-Export Clause, and Camps Newfound/Owatonna v. Harrison, 70 U. Colo. L. Rev. 155 (1999).

~~214.~~239. The Act therefore violates the Import-Export Clause.

**COUNT ~~VI~~VII**
**VIOLATION OF THE FIRST AMENDMENT**
**IMPERMISSIBLE CONTENT-BASED RESTRICTION ON SPEECH**

~~215.~~240. Plaintiffs re-allege and incorporate by reference paragraphs 1 through ~~213~~239.

~~216.~~241. The First Amendment prohibits the enactment and enforcement of laws that "abridge[e] the freedom of speech." U.S. Const. Amdt. 1.

~~217.~~242. This protection provided by the First Amendment generally restricts the ability of a government to enact "content-based laws"—that is, laws that "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

~~218.~~243. Content-based laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*

~~219.~~244. That is, content-based laws are constitutional only if they withstand strict scrutiny. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618 (2020).

~~220.~~245. A law that "applies to particular speech because of the topic discussed" is content-based. *Town of Gilbert*, 576 U.S. at 163.

~~221.~~246. A speech restriction is also content-based if it "singles out specific subject matter for differential treatment." *Barr*, 591 U.S. at 619 (quoting *Town of Gilbert*, 576 U.S. at 169).

~~222.~~247. The Act's prohibition on including "a separate item on a receipt or invoice" accurately reflecting the fee charged by ~~the~~ CAA is a content-based restriction on speech.

~~223.~~248. The Act prohibits speech that informs customers, via an individual line item, that a portion of the price they are paying is directly attributable to the Act.

~~224.~~249. Business associations and other nonnatural persons have a First Amendment right to include expressive content in the bills they provide their customers. *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 533–44 (1980).

~~225.~~250. The inclusion of a separate line item that allows customers to see the size and weigh the impact of the fee imposed by enactment and enforcement of the Act is expressive speech on a matter of public concern.

~~226.~~251. The overall utility and effectiveness of plastic, as well as its relative efficiency (or lack thereof) is a matter of public concern heavily informed by a balancing of the relative costs and benefits of the Act.

~~227.~~252. The inclusion of a separate line item accurately reflecting the fee imposed by and thus directly attributable to the Act thus facilitates the weighing of the merits of the Act by impacted consumers.

~~228.~~253. At a minimum, the First Amendment "embraces … the liberty" to "discuss publicly and truthfully all matters of public concern." *Thornhill v. Alabama*, 310 U.S. 88, 101–02 (1940).

~~229.~~254. Via what is in effect a complete prohibition on the inclusion in a bill or receipt of a separate line item identifying the size of the Act-imposed fee, California has prohibited core political speech.

~~230.~~255. A prohibition of that sort is not constitutionally permitted. *Cf. Town of Gilbert*, 576 U.S. at 169 ("[A] law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed."); *Consol. Edison*, 447 U.S. at 532–33 (holding that New York regulatory order that barred a utility company from including bill insert advocating for the "benefits of nuclear power" which reflected the company's "viewpoint[] on controversial issues of public policy" violated the First Amendment).

~~231.~~256. The Act cannot survive strict scrutiny.

~~232.~~257. Insulating the Act from negative consumer sentiment is not a compelling state interest.

~~233.~~258. Nor does the Act's separate line-item prohibition serve some neutral, non-speech related objective.

~~234.~~259. Forbidding the inclusion of a separate line item does not substantively preclude producers or distributors from passing along to consumers some or all of the fee imposed by the Act.

~~235.~~260. That is, the incidence of the imposed fee—which is essentially a tax—is dictated by economic realities; it is not determined by what appears (or does not appear) on a receipt or invoice.

~~236.~~261. Thus, the only work accomplished by the separate line-item prohibition is to censor constitutionally protected speech; that censorship is not merely incidental to an otherwise permissible, non-speech focused regulation. *Cf. Sorrell v. IMS Health Inc.,* 564 U.S. 552, 566 (2011) (concluding that when the purpose of a statute is "to suppress speech" and its "burdens on expression" are unjustified, it is likely to be unconstitutional).

~~237.~~262. As indicated above, the inclusion of a separate line item disclosing the fee imposed by the Act is core political speech that receives the highest degree of protection provided by the First Amendment. It is not "expression related *solely* to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Com'n of N.Y.*, 447 U.S. 557, 561 (1980) (emphasis added).

~~238.~~263. But even if the speech in question is deemed to be merely "commercial speech" and thus its restriction is evaluated under the lower "intermediate scrutiny" standard, *see, e.g.*, *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995), the Act would still violate the First Amendment.

~~239.~~264. Regulations of commercial speech must be premised on a "substantial" government interest. *Central Hudson*, 447 U.S. at 564.

~~240.~~265. Insulating the Act from political pressure by obfuscating its impact is not a substantial governmental interest.

~~241.~~266. Therefore, regardless of what constitutional test governs, the Act substantially burdens—indeed, overtly censors—speech in a way that cannot survive application of the relevant First Amendment principles.

**COUNT VIIVIII**
**VIOLATION OF ARTICLE I, SECTION 2**
**OF THE CALIFORNIA CONSTITUTION ARTICLE I, SECTION 2**
**IMPERMISSIBLE CONTENT-BASED RESTRICTION ON SPEECH**

242.267. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 240266.

243.268. The California Constitution's protection of free speech is "not only as broad and as great as the First Amendment's" but "even broader and greater" in scope. *Fashion Valley Mall, LLC v. Nat'l Lab. Rels. Bd.*, 42 Cal. 4th 850, 863 (2007) (quotation marks omitted).

244.269. Under the California Constitution, "[c]ontent-based restrictions are 'presumptively invalid' and subject to strict scrutiny." *Ctr. for Bio-Ethical Reform, Inc. v. Irvine Co., LLC*, 37 Cal. App. 5th 97, 105 (2019) (citations omitted).

245.270. As outlined above, the Act's prohibition on including "a separate item on a receipt or invoice" accurately reflecting the fee charged by the CAA is a content-based restriction on speech.

246.271. That prohibition is "presumptively invalid" and thus is lawful only if it survives strict scrutiny.

247.272. As described above, that prohibition cannot pass strict scrutiny.

248.273. The Act therefore violates Article I, Section 2 of the California Constitution.

**COUNT VIIIIX**
**VIOLATION OF THE FIRST AMENDMENT**
**COMPELLED SPEECH & ASSOCIATION**

249.274. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 247273.

250.275. The First Amendment protects both the right to speak and a corollary right *not* to speak. It protects individuals against being compelled to express viewpoints on political and ideological matters, *see Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018), and against being compelled to make statements of fact, *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988). Thus, the First Amendment can be violated when a government program "'compel[s] [a person] to utter' a message with which he does not

agree." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005) (quoting *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 634 (1943)).

~~251.~~276. Similarly, "[f]reedom of association … plainly presupposes a freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

~~252.~~277. These principles apply when an individual is compelled "not to speak, but to subsidize a private message with which they disagree." *Johanns,* 544 U.S. at 557.

~~253.~~278. Thus, in appropriate circumstances, "mandated support" that facilitates "expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity" can be "contrary to … First Amendment principles." *United States v. United Foods, Inc.*, 533 U.S. 405, 413 (2001).

~~254.~~279. As outlined above, the Act mandates virtually all businesses that want to use "covered material" in California to "form and join a … producer responsibility organization," or PRO.

~~255.~~280. For many of Plaintiff States' constituents and NAW's members, it is not feasible to form their own PRO or to satisfy their obligations under the Act without joining the PRO—in this case, ~~the~~ CAA. The effect of the Act is thus to compel NAW's members and others to join ~~the~~ CAA as dues-paying members.

~~256.~~281. CAA has simultaneously been involved in lobbying other States with similar EPR laws to designate CAA as the sole (or dominant) PRO where similar EPR statutes have been enacted. ~~The~~ CAA is also involved in lobbying other states to enact similar EPR statutes under which CAA would or could be designated as the PRO.

~~257.~~282. By its own admission, CAA "provide[s] [its] point of view on regulatory concepts" to States considering EPR legislation designed to enable those States to "hit the ground

running when it's time to turn [an EPR] program on."[6] In this respect, ~~the~~ CAA aims to establish itself as the dominant organization responsible for administering EPR laws across multiple states.

~~258.~~283. Conditioning access to California's market on membership in ~~the~~ CAA *might*, standing alone, be constitutionally permissible *if* ~~the~~ CAA were a government entity. *See Johanns*, 544 U.S. at 559.

~~259.~~284. But the compelled association here is constitutionally problematic because ~~the~~ CAA is an "entity other than the government itself" that benefits from a compelled membership regime that allows it to extract fees from those dragooned members.

~~260.~~285. First Amendment principles are infringed when fees extracted from involuntary members are used to advance a message or legislative and regulatory agenda with which an involuntary member fundamentally disagrees. *See id.*; *see also United Foods*, 533 U.S. at 413. Here, NAW and its members overwhelmingly support sustainability and the promotion of a circular economy, but NAW and its members do not agree that packaging EPR laws are an effective or appropriate means of pursuing those interests. Nor do they believe that a single private organization should function as a *de facto* interstate regulator with monopolistic control of EPR programs across multiple states. Thus, involuntary membership in ~~the~~ CAA subsidizes an inherently political message with which many businesses—including NAW member entities—disagree.

~~261.~~286. Ultimately, association with ~~the~~ CAA's message and the involuntary funding of both that message and ~~the~~ CAA's political support of new EPR laws impermissibly burdens the First Amendment rights of NAW member entities; specifically, the protection provided against both compelled speech and compelled association.

**COUNT X**
~~**COUNT IX**~~

VIOLATION OF ~~**ARTICLE I, SECTION 2**~~

[6] *See* M. Diane McCormick, *A Look Behind Producer Responsibility Organizations*, FlexPackVoice (Feb. 28, 2025), available at https://perma.cc/R2LH-RUV6 (quoting Olivia Barker, "spokesperson" for ~~the~~ CAA).

**OF THE CALIFORNIA CONSTITUTION ARTICLE I, SECTION 2**
**COMPELLED SPEECH & ASSOCIATION**

262.287. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 260286.

263.288. The California Constitution's protection of free speech is broader than what is provided by the First Amendment.

264.289. That greater breadth includes providing more robust protection against compelled speech and compelled association. *See*, *e.g.*, *Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468 (2000).

265.290. California recognizes a constitutional "guarantee[] [of] the freedom of association" and "by extension the freedom from coerced association with particular groups." *Concerned Dog Owners of Cal. v. City of Los Angeles,* 194 Cal. App. 4th 1219, 1229 (2011).

266.291. The California Supreme Court has, invoking Thomas Jefferson, declared that "compel[ling] a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors, is sinful and tyrannical." *Gerawan Farming*, 24 Cal. 4th at 484.

267.292. The California Supreme Court has recognized that the free speech rights secured by Article I, Section 2 encompasses "speech a speaker chooses not to fund in addition to … speech he chooses to fund," *id.* at 513, and therefore that the "compel[ed] funding of commercial speech" can violate the California constitution, *id*. at 515.

268.293. Requiring NAW member entities to associate with the CAA and involuntarily extracting monetary fees from those entities to fund a message with which they fundamentally disagree violates the California Constitution.

**COUNT XI**
**COUNT X**
**VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS**
**IMPROPER PRIVATE DELEGATION**

269.294. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 267293.

270.295. The Act delegates to the CAA—an unaccountable and opaque private entity—broad authority to implement the Act and determine the specific impact of its requirements,

including the authority to develop methodology for charging fees, awarding incentives, and levying penalties.

~~271.~~296. Several of ~~the~~ CAA's founding members and many representatives on its board of directors are among the nation's largest companies.

~~272.~~297. The Fifth Amendment's Due Process Clause forbids delegations of government power that, in effect, result in one private entity being "intrusted with the power to regulate the business of another." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

~~273.~~298. The concerns animating such delegations are heightened when the private entity to whom power is handed is a market competitor of the other private entities over whom it will exercise regulatory authority. *Id.*

~~274.~~299. Many of the large companies that either sit on ~~the~~ CAA's board of directors or have been designated as founding members are direct competitors of NAW member entities. These firms' economic interests often diverge from those of the wholesalers and distributors that are subject to CAA's decisions. For example, CAA determines fee methodologies and annual fee schedules, administers producer reporting, conducts or requires audits, imposes interest or other consequences for nonpayment, and may terminate participation in its program. Participation in CAA is mandatory, in effect, because it is impracticable for many producers to use the independent compliance option under the Act.

300. Although the Act and regulations require CAA to provide some support for its methodologies, they do not identify safeguards for challenging an individual fee calculation or allocation. They also fail to provide safeguards for CAA's determination of permissible source reduction and recyclability measures, and its assignment of bonuses and maluses—mechanisms that shift costs between competing producers and material categories. The absence of procedural safeguards is especially significant because CAA is a private entity whose governing participants may have incentives to allocate costs among competing categories of producers or categories of materials. The Act also provides only high-level parameters for CAA's formulation and

implementation of its program plan, and it does not sufficiently cabin CAA's broad discretion with respect to both setting total system costs and allocating those costs to different material types.

301. CAA assesses fees based on prior years' packaging volumes. It therefore applies rates that are determined only after the fact, and businesses cannot accurately predict what their fees will be or conform their operations accordingly. Furthermore, CAA requires binding arbitration for resolving disputes involving member producers, including relates to fee-setting or allocations.

~~275.~~302. As the U.S. Supreme Court has explained, attempts to "delegate … legislative authority to trade or industrial associations or groups" which would "empower [those groups] to enact the laws they deem to be wise and beneficent for … their trade or industr[y]" are "utterly inconsistent" with the federal constitution. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935).

~~276.~~303. Private delegations of this sort are "delegation in its most obnoxious form." *Carter Coal*, 298 U.S. at 311; *cf. Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.,* 121 F.4th 1314, 1343 (D.C. Cir. 2024) (Walker, J., concurring in the judgment in part and dissenting in part) (explaining than an "extrabranch delegation" to a private entity is especially problematic because it would permit "the vast powers of the … government [to] be exercised *outside* the constitutional system" and thus facilitate governmental evasion of the "most solemn obligations imposed in the Constitution by simply resorting to the corporate form") (last quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)).

~~277.~~304. Unsupervised delegations of legislative power to a private entity are "clearly a denial of [the] rights safeguarded by the due process clause of the Fifth Amendment." *Carter Coal,* 298 U.S. at 311; *see Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928) (holding delegation of decision-making authority to a small group of private landowners to be "repugnant to the due process clause of the Fourteenth Amendment"); *see also Rice v. Vill. of Johnstown,* 30 F.4th 584, 589 (6th Cir. 2022) (explaining that private nondelegation claims are a

"species of procedural due process") (citing *Eubank v. Richmond*, 226 U.S. 137 (1912), and *Roberge*, 278 U.S. 116).

~~278.~~305. As outlined above, ~~the~~ CAA is imbued with almost entirely unfettered, unsupervised authority to "carry out the requirements" of the Act. *See* Cal. Pub. Res. Code § 42051(a).

~~279.~~306. This sort of "total, standardless control," exercised by a private entity over other private parties, is the very evil the private nondelegation doctrine is designed to guard against. *Rice*, 30 F.4th at 589; *see also id.* (recounting the *Roberge* Court's concern that private parties who are "uncontrolled by any standard or rule" could exercise governmental power for "selfish and arbitrary reasons") (quoting *Roberge*, 278 U.S. at 121–22).

~~280.~~307. The prospect of selfish or arbitrary decision making is especially acute where, as here, the private delegee who exercises regulatory power is one "whose interests … are adverse to the interests of" the private entities subject to regulation. *Carter Coal*, 298 U.S. at 311.

~~281.~~308. The large companies that control ~~the~~ CAA have a pecuniary interest in structuring the fees, assessments, and other exactions flowing from the Act so that a disproportionate burden is borne by other regulated entities, including NAW member entities.

~~282.~~309. Ultimately, there are "there are limits [on legislative] delegation which there is no constitutional authority to transcend." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 430 (1935).

~~283.~~310. California's wholesale outsourcing of the authority to shape both the regulatory contours of the Act and the enforcement of those mandates to ~~the~~ CAA transcends what is permitted by the federal Constitution.

**COUNT XII**
**~~COUNT XI~~**
**VIOLATION OF CALIFORNIA NONDELEGATION DOCTRINE**
**DELEGATION OF LEGISLATIVE POWER**

~~284.~~311. Plaintiffs re-allege and incorporate by reference paragraphs 1 through ~~282~~310.

~~285.~~312. The nondelegation doctrine under the California Constitution prohibits the state legislature from delegating its lawmaking function to agencies or private parties absent clear legislative standards guiding the exercise of delegated authority and adequate procedural safeguards to protect those subject to the entity to which authority has been delegated. *See Lovelace v. Super. Ct.*, 108 Cal. App. 5th 1081, 1096–98 (2025) (summarizing California's nondelegation doctrine). A delegation to private organizations requires even more "stringent" review, especially when private industry controls the entity in question. *People ex rel. Lockyer v. Sun Pac. Farming Co.*, 77 Cal. App. 4th 619, 634 (2000).

~~286.~~313. Here, the Act's delegation of legislative authority to a private, non-governmental entity is not constrained by clear or adequate safeguards and is therefore unlawful. The Act charges CAA with developing and implementing a producer responsibility program without providing adequate safeguards on the terms and conditions governing that program or the representation of producers comprising CAA's board of directors. Moreover, the Act fails to articulate sufficient standards to guide ~~the~~ CAA's extraction of fees, which allows ~~the~~ CAA to adopt an exorbitant and arbitrary fee methodology and unilaterally make adjustments to the resulting fee rates.

~~287.~~314. The California Constitution prevents "legislative abdication by failure to provide meaningful guidance, either at the level of basic policy or in implementation of policy." *Lovelace*, 108 Cal. App. 5th at 1097. The Act is devoid of meaningful guidance and cannot be said to provide "adequate direction." *Id.* (quoting *Samples v. Brown*, 146 Cal. App. 4th 787, 805 (2007)).

~~288.~~315. The Act prescribes no methodology for or constraints on the calculation of the participant fee described in Cal. Pub. Res. Code § 42053. For example, the Act directs that the participant fee include, with no maximum amount, the "costs of the PRO, including, but not limited to, staff and the costs associated with the development and implementation of the producer responsibility plan," as well as the costs associated with "[i]nvestments to develop and sustain viable responsible end markets." Cal. Pub. Res. Code §§ 42053(c)(6), 42051.1(j)(1)(F).

~~289.~~316. The Act allows ~~the~~ CAA to impose adjustments like “malus fees” based on factors it determines, with no meaningful constraint on how these fees are to be calculated and applied. Cal. Pub. Res. Code § 42053(e).

~~290.~~317. Even a cursory review of the Act reveals the numerous means by which ~~the~~ CAA could justify its fees, no matter how exorbitant, discriminatory, or arbitrary. The Act fails to guide ~~the~~ CAA’s exercise of power and therefore violates the California nondelegation doctrine.

~~291.~~318. The Act also fails to provide sufficient procedural safeguards for producers against ~~the~~ CAA’s decision making.

~~292.~~319. Most notably, the Act does not provide for judicial review of CAA’s fee assessments. Neither the Act nor the regulations promulgated thereunder provide any procedure for participating in the determination of or challenging such assessments.

~~293.~~320. In fact, the Act purports to immunize ~~the~~ CAA’s “establishment, administration, collection, or disbursement of any fees” from numerous state law claims, including claims under the Cartwright Act, the Unfair Practices Act, and the Unfair Competition Law. Cal. Pub. Res. Code § 42055(a), (b)(3). Fee assessments are therefore insulated from meaningful review.

~~294.~~321. Similarly, although ~~the~~ CAA’s rules and directives have the same functional effect on producers as would legislation, no mechanism exists under the Act for judicial review of those rules and directives. Indeed, the Act does not even guarantee producers the right to advance notice of the rules that may be considered and the opportunity to provide input on such rules.

~~295.~~322. Producers also have no independent administrative or judicial remedy in the event of a dispute with ~~the~~ CAA.

~~296.~~323. The lack of adequate procedural safeguards also renders the Act’s delegation to ~~the~~ CAA unconstitutional under California law.

**PRAYER FOR RELIEF**

~~297.~~324. Wherefore, Plaintiffs respectfully request that the Court:

A. Declare the Act and its implementing regulations invalid and unenforceable pursuant to 28 U.S.C. § 2201;

B. Issue a permanent injunction enjoining Director Heller—as well as all other persons acting in concert with or at her direction—from implementing or enforcing the Act and any regulations promulgated thereunder;

C. Issue a permanent injunction enjoining ~~the~~ CAA—as well as all other persons acting in concert with ~~the~~ CAA or at its direction—from implementing or enforcing the Act and any regulations promulgated thereunder;

D. Award any and all other relief as the Court deems just and proper.

Date: ~~June 22~~August 19, 2026

Respectfully Submitted.

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ *Cody S. Barnett*
Cody S. Barnett*
*Solicitor General*
/s/ *Beatrice O. Strnad* (as authorized Aug. 19, 2026)
Beatrice O. Strnad (SBN 327791)†
*Assistant Attorney General*
Lincoln J. Korell*
*~~Assistant~~Deputy Solicitor General*
Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov
bebe.strnad@nebraska.gov
lincoln.korell@nebraska.gov
*Counsel for Plaintiff State of Nebraska*

Additional counsel listed on next page

| | |
|---|---|
| STEVE MARSHALL<br>Attorney General of Alabama<br><br>A. Barrett Bowdre*<br>*Solicitor General*<br><br>Office of the Alabama Attorney General<br>501 Washington Avenue<br>Montgomery, AL 36104<br>(334) 242-7300<br>Barrett.Bowdre@AlabamaAG.gov<br>*Counsel for Plaintiff State of Alabama* | JAMES UTHMEIER<br>Attorney General of Florida<br><br>Timothy Fraser**<br>*Special Counsel*<br>Antitrust Division<br><br>Florida Office of the Attorney General<br>PL-01 The Capitol<br>Tallahassee, Florida 32399<br>Telephone: (850) 414-3733<br>Email: timothy.fraser@myfloridalegal.com<br>*Counsel for Plaintiff State of Florida* |
| CHRISTOPHER M. CARR<br>Attorney General of Georgia<br><br>John Henry Thompson*<br>*Solicitor General*<br>Elijah J. O'Kelley**<br>*Principal Deputy*<br>*Solicitor General*<br><br>Office of the Georgia Attorney General<br>40 Capitol Square, SW<br>Atlanta, Georgia 30334<br>(404) 458-3373<br>jhthompson@law.ga.gov<br>*Counsel for Plaintiff State of Georgia* | RAUL R. LABRADOR<br>Attorney General of Idaho<br><br>Michael A. Zarian*<br>*Solicitor General*<br><br>Office of the Idaho Attorney General<br>700 W. Jefferson St., Suite 210,<br>Boise, Idaho 83720<br>(208) 334-2400<br>michael.zarian@ag.idaho.gov<br>*Counsel for Plaintiff State of Idaho* |
| THEODORE E. ROKITA<br>Attorney General of Indiana<br><br>James A. Barta**<br>*Solicitor General*<br><br>Office of the Indiana Attorney General<br>302 W. Washington Street<br>IGC South, Fifth Floor<br>Indianapolis, IN 46204-2770<br>Phone: (317) 232-0709<br>Fax: (317) 232-7979<br>James.Barta@atg.in.gov | BRENNA BIRD<br>Attorney General of Iowa<br><br>Eric H. Wessan**<br>*Solicitor General*<br><br>Office of the Iowa Attorney General<br>1305 E. Walnut Street<br>Des Moines, Iowa 50319<br>(515) 823-9117<br>(515) 281-4209 (fax)<br>eric.wessan@ag.iowa.gov<br>*Counsel for Plaintiff State of Iowa* |

| | |
|---|---|
| *Counsel for Plaintiff State of Indiana* | |
| LIZ MURRILL<br>Attorney General of Louisiana<br><br>J. Benjamin Aguiñaga*<br>*Solicitor General*<br><br>Louisiana Department of Justice<br>1885 N. Third Street<br>Baton Rouge, LA 70804<br>(225) 326-6766<br>AguinagaB@ag.louisiana.gov<br>*Counsel for Plaintiff State of Louisiana* | CATHERINE L. HANAWAY<br>Attorney General of Missouri<br><br>Louis J. Capozzi III**<br>*Solicitor General*<br>Kathleen Hunker**<br>*Principal Deputy Solicitor General*<br>Madeline S. Lansdell*<br>*Assistant Solicitor General*<br><br>Office of the Missouri Attorney General<br>815 Olive St., Suite 200<br>St. Louis, MO 63101<br>(314) 340-4754<br>Kathleen.Hunker@ago.mo.gov<br>Madeline.Lansdell@ago.mo.gov<br>*Counsel for Plaintiff State of Missouri* |
| AUSTIN KNUDSEN<br>Attorney General of Montana<br><br>Brent Mead**<br>*Deputy Solicitor General*<br><br>Montana Department of Justice<br>(406) 444-2026<br>Brent.Mead2@mt.gov<br>*Counsel for Plaintiff State of Montana* | DREW H. WRIGLEY<br>Attorney General of North Dakota<br><br>Philip Axt*<br>*Solicitor General*<br><br>Office of the North Dakota Attorney General<br>600 E. Boulevard Ave., Dept. 125<br>Bismarck, ND 58505<br>(701) 328-2210<br>pjaxt@nd.gov<br>*Counsel for Plaintiff State of North Dakota* |
| GENTNER DRUMMOND<br>Attorney General of Oklahoma<br><br>Garry M. Gaskins, II**<br>*Solicitor General*<br><br>Office of the Attorney General of Oklahoma<br>313 NE Twenty-First St.<br>Oklahoma City, OK 73105<br>(405) 521-3921<br>garry.gaskins@oag.ok.gov<br>*Counsel for Plaintiff State of Oklahoma* | ALAN WILSON<br>Attorney General of South Carolina<br><br>J. Emory Smith, Jr.*<br>*General Counsel*<br><br>Office of the South Carolina Attorney General<br>P.O. Box 11549<br>Columbia, SC 29211<br>Ph.: (803) 734-3680<br>Fax: (803) 734-3677<br>ESmith@scag.gov<br>*Counsel for Plaintiff State of South Carolina* |

| | |
|---|---|
| MARTY J. JACKLEY<br>Attorney General of South Dakota<br><br>Emily Greco*<br>*Assistant Attorney General*<br><br>Office of the South Dakota Attorney General<br>1302 East SD Hwy 1889, Suite 1<br>Pierre, SD 57501-8501<br>Telephone: (605) 773-3215<br>Email: emily.greco@state.sd.us<br>*Counsel for Plaintiff State of South Dakota* | KEN PAXTON<br>Attorney General of Texas<br><br>Brent Webster<br>First Assistant Attorney General<br><br>Ralph Molina<br>Deputy First Assistant Attorney General<br><br>Rob Farquharson<br>Deputy Attorney General for Legal Strategy<br><br>Munera Al-Fuhaid*<br>*Special Counsel, Special Litigation Division*<br>Texas Bar No. 24094501<br><br>Office of the Attorney General of Texas<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>Tel.: (512) 463-2100<br>munera.al-fuhaid@oag.texas.gov<br><br>*Counsel for Plaintiff State of Texas* |
| DEREK BROWN<br>Attorney General of Utah<br><br>Joshua B. Cutler*<br>*Assistant Solicitor General*<br>Federalism and Strategic Litigation Section<br><br>Office of the Utah Attorney General<br>160 E. 300 S., 5th floor<br>Salt Lake City, UT 84111<br>(801) 366-0533<br>jbcutler@agutah.gov<br>*Counsel for Plaintiff State of Utah* | JOHN B. MCCUSKEY<br>Attorney General of West Virginia<br><br>Michael R. Williams*<br>*Solicitor General*<br><br>Office of the West Virginia Attorney General<br>State Capitol Complex<br>Building 1, Room E-26<br>1900 Kanawha Blvd. E<br>Charleston, WV 25301<br>(304) 558-2021<br>michael.r.williams@wvago.gov<br>*Counsel for Plaintiff State of West Virginia* |
| */s/ David R. Carpenter* (as authorized ~~June 15~~Aug. 18, 2026)<br>David R. Carpenter (SBN 230299)<br>SIDLEY AUSTIN LLP<br>350 South Grand Avenue | |

Los Angeles, CA 90071
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
drcarpenter@sidley.com
Gordon D. Todd*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
gtodd@sidley.com
*Counsel for Plaintiff National Association of Wholesaler-Distributors*

**Admitted *pro hac vice*
** Pro Hac Vice application pending/forthcoming
† Beatrice O. Strnad is also counsel for the States of Alabama, Florida, Georgia, Idaho, Indiana, Iowa, Louisiana, Missouri, Montana, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Utah, and West Virginia.