CODY S. BARNETT*
BEATRICE O. STRNAD (SBN 327791)
LINCOLN J. KORELL*
Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
*Counsel for Plaintiff State of Nebraska*
**Admitted pro hac vice*

Additional counsel listed in signature block

**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

STATE OF NEBRASKA, ET AL.,

Plaintiffs,

v.

ZOE HELLER, in her official capacity as Director of the CALIFORNIA DEPARTMENT OF RESOURCES RECYCLING & RECOVERY, CIRCULAR ACTION ALLIANCE,

Defendants.

Case No. 2:26-cv-02214-DC-CKD

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**Date:** Jan. 15, 2027
**Time:** 1:30 p.m.
**Location:** Courtroom 10, 13th Floor
**Judge:** Hon. Dena Coggins

# TABLE OF CONTENTS

Table of Authorities .......... iii
Statement Regarding Oral Argument .......... viii
Introduction .......... 1
Background .......... 2
Legal Standard .......... 5
Argument .......... 6
I. Plaintiffs Are Likely to Succeed on the Merits. .......... 6
A. The Act is unconstitutionally vague. .......... 6
B. The Act is *ultra vires*. .......... 9
C. The Act violates the dormant Commerce Clause. .......... 13
D. The Act infringes on free speech and free association. .......... 19
E. The Act violates the Import-Export Clause. .......... 21
F. The Act is an impermissible private delegation. .......... 21
II. Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm. .......... 23
III. The Balance of the Equities and Public Interest Favor Plaintiffs. .......... 24
Conclusion .......... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) .... 23

*Alden v. Maine*,
527 U.S. 706 (1999) .... 9

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) .... 5, 24

*Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*,
821 F.3d 19 (D.C. Cir. 2016) .... 22

*Ass'n of Nat. Advertisers, Inc. v. Lungren*,
809 F. Supp. 747 (N.D. Cal. 1992) .... 8

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .... 5, 6, 24

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) .... 19

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996) .... 10

*Bonaparte v. Tax Ct. of Balt.*,
104 U.S. 592 (1881) .... 9, 10

*Bristol-Myers Squibb Co. v. Sup. Ct. of Calif.*,
582 U.S. 255 (2017) .... 12

*Brown v. Maryland*,
25 U.S. 419 (1827) .... 21

*Cal. League of Food Prods. v. Bonta*,
No. 3:26-cv-01675, 2026 WL 2055589 (S.D. Cal. July 14, 2026) .... 2, 7, 8

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
563 F.3d 847 (9th Cir. 2009) .... 24

*Cal. Teachers Ass'n v. State Bd. of Educ.*,
271 F.3d 1141 (9th Cir. 2001) .... 8

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997) .... 21

**Cases—continued**

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) .......... 21, 22

*Center for Bio-Ethical Reform, Inc. v. Irvine Co.*,
37 Cal. App. 5th 97 (2019) .......... 19

*Comptroller of Treasury of Md. v. Wynne*,
575 U.S. 542 (2015) .......... 17, 18, 21

*Concerned Dog Owners of Calif. v. City of Los Angeles*,
194 Cal. App. 4th 1219 (2011) .......... 20

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 11

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) .......... 18

*Fashion Valley Mall, LLC v. National Lab. Rels. Bd.*,
42 Cal. 4th 850 (Cal. 2007) .......... 19

*Flynt v. Bonta*,
131 F.4th 918 (9th Cir. 2025) .......... *passim*

*Franchise Tax Bd. of Cal. v. Hyatt*,
587 U.S. 230 (2019) .......... 1, 9, 10

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025) .......... 9, 10

*Gen. Elec. Co. v. N.Y. State Dep't of Labor*,
936 F.2d 1448 (2d Cir. 1991) .......... 22

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) .......... 15

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) .......... 10

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018) .......... 20

*Johanns v. Livestock Mktg. Ass'n*,
544 U.S. 550 (2005) .......... 20

*Johnson v. Mich. Milk Mktg. Bd.*,
295 N.W. 346 (Mich. 1940) .......... 22

**Cases—continued**

*M'Culloch v. Maryland*,
17 U.S. 316 (1819) .......... 13

*Nat'l Pork Prods. Council v. Ross*,
598 U.S. 356 (2023) .......... *passim*

*Ogden v. Saunders*,
25 U.S. 213 (1827) .......... 13

*Perry v. Sindermann*,
408 U.S. 593 (1972) .......... 21

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) .......... 13, 15

*Police Dep't of Chi. v. Mosley*,
408 U.S. 92 (1972) .......... 20

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 19, 20

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 20

*S. Pac. Co. v. State of Ariz. ex rel. Sullivan*,
325 U.S. 761 (1945) .......... 16

*Schenck v. Pro-Choice Network of Western N.Y.*,
519 U.S. 357 (1997) .......... 19

*Shaffer v. Heitner*,
433 U.S. 186 (1977) .......... 10

*Shelby County v. Holder*,
570 U.S. 529 (2013) .......... 1, 9

*South Dakota v. Wayfair*,
585 U.S. 162 (2018) .......... 13

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019) .......... 15

*Thornhill v. Alabama*,
310 U.S. 88 (1940) .......... 20

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 23

**Cases—continued**

*United States v. Bevans*,
16 U.S. 336 (1818) .......... 9, 10

*United States v. Williams*,
553 U.S. 285 (2008) .......... 6, 7, 8

*Williams-Yulee v. Florida Bar*,
575 U.S. 433 (2015) .......... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 5

*Woodruff v. Parham*,
75 U.S. 123 (1869) .......... 21

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) .......... 9

**Statutes & Regulations**

Cal. Code Regs. tit. 14,
§ 17989.2 .......... 6, 7
§ 18980.1 .......... 12, 17
§ 18980.3 .......... 2, 7
§ 18980.6.7 .......... 11, 12, 17

Cal. Pub. Res. Code
§ 42040 .......... 2, 15, 18
§ 42041 .......... *passim*
§ 42050 .......... *passim*
§ 42051 .......... *passim*
§ 42051.1 .......... 4
§ 42053 .......... *passim*
§ 42057 .......... 2, 24
§ 42061 .......... 2, 7
§ 42061.5 .......... 4, 22
§ 42063 .......... 4
§ 42064 .......... 5
§ 42067 .......... 5, 18
§ 42355.51 .......... 2, 6, 7

**Constitutions & Other Authorities**

Cal. Const. art. I, § 2 .......... 10

CalRecycle, *Covered Material Categories Reporting Guidance* (Sept. 8, 2025),
available at https://perma.cc/4MN2-MYNS .......... 8, 9

**Constitutions & Other Authorities—continued**

CalRecycle, *Update to Covered material Category (CMC) List* (December 31, 2025), available at https://perma.cc/6ZTN-928W ........ 8

Randy E. Barnett & Evan D. Bernick, *No Arbitrary Power: An Originalist Theory of the Due Process of Law*, 60 Wm. & Mary L. Rev. 1599, 1643 (2019) ........ 12, 13

U.S. Const.
amend. I ........ 19
amend. X ........ 10
amend. XIV ........ 6, 12, 21
art. I, § 8, cl. 3 ........ 13
art. I, § 10, cl. 2 ........ 21
art. IV, § 1 ........ 10
art. VII ........ 9

*Ultra Vires*, Black's Law Dictionary (12th ed. 2024) ........ 9

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs respectfully request a hearing on their motion for preliminary relief. This case raises important, complex constitutional questions; Plaintiffs believe a hearing will aid the Court's resolution of these matters. Plaintiffs propose a one-hour hearing.

**INTRODUCTION**

Our Constitution is structured around a fundamental principle: Every State enjoys equal sovereignty and station vis-à-vis all other States. *Shelby County v. Holder*, 570 U.S. 529, 535 (2013). Because some issues are "interstate" and therefore "inappropriate for state law to control," every State agreed to surrender some sovereignty to a *federal* government. *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 246 (2019) (citation omitted). But no State agreed to surrender any of its sovereignty to any other State. *Id.* at 245.

That means States like California can implement California solutions to California problems reflecting California's preferences—*in California*. But California may not impose California solutions on any other State, much less the entire nation. *See, e.g.*, *Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 406–07 (2023) (Kavanaugh, J., concurring and dissenting in part). Doing so would violate the Constitution's horizontal separation of powers, its guarantee of due process of law, and its prohibition against state regulation of interstate commerce.

Yet that is exactly what California has done here. The Plastic Pollution Prevention and Packaging Producer Responsibility Act's ambitious sweep subjects the entire nation to a California regulation designed to effectuate a California policy preference. Virtually every product packaged or shipped in a plastic or single-use container—so very nearly every product—falls within the Act's ambit. While the Act's implementing regulations nominally are limited to material sold or discarded in the State, in reality the fees will be inevitably imposed even on products distributed outside the state, be passed onto consumers outside California, and require businesses nationwide to adopt revolutionary but impractical changes to the way they design and transport products.

The constitutional infirmities do not end there. The Act delegates fee-setting authority to a private third-party entity. Its fees go beyond the reasonable costs of waste created by producers' products and instead create new statewide infrastructure—on top of a $500 million general fund. In other words, the Act allows a third-party entity to stealth tax its competitors to fund California's policies. The Act insulates itself from political backlash by prohibiting producers from identifying the real reasons costs will increase—and then forces those producers to associate with a nongovernmental entity that espouses views with which they disagree.

Like any sovereign, California can adopt regulations that govern behavior within its own borders. California is even free to adopt regulations that may have indirect effects on other States' commerce. *Pork Producers*, 598 U.S. at 368–69. But the Act is not so cabined. Our Constitution does not permit California to unilaterally set commercial and environmental policy for the entire United States. Because the Act facilitates and furthers a myriad of constitutional violations that irreparably harm the Plaintiffs and damage the public interest, it should be enjoined.

After Plaintiffs sued, a federal court preliminarily enjoined California's SB 343—the "Truth in Recycling Act"—which was enacted during the same legislative session as the Act here and supplied the "recyclability" definitions and criteria on which this Act relies. *See Cal. League of Food Prods. v. Bonta*, No. 3:26-cv-01675, 2026 WL 2055589 (S.D. Cal. July 14, 2026). Because the Act's regulations explicitly condition legal and financial outcomes on the enjoined recyclability criteria, the Act here should also be preliminarily enjoined.

**BACKGROUND**

The Act purports to create a "comprehensive circular economy framework" to "shift the burden of costs to collect, process, and recycle materials … to the producers of covered material." Cal. Pub. Res. Code § 42040(b)(2)(A). The statute does so by requiring all "producers" of "covered material" that is "sold, offered for sale, imported, or distributed in the state" to meet certain requirements. *Id.* § 42050. Producers must reduce their use of covered materials by 25 percent (by both weight and "plastic component source reduction") by January 2032. *Id.* § 42057(a)(1). Producers must also use only materials that are recyclable or compostable as of 2032 and must increase their recyclability rates for covered materials up to 65 percent as of 2032. *See id.* § 42050(a)–(c). A producer's compliance with these recyclability or compostability requirements, as well as the delegated fee-setting mechanism provided in the Act, rely on criteria set forth in a separate law, SB 343. *See id.* § 42061(c) (recyclability determined based on Cal. Pub. Res. Code § 42355.51); Cal. Code Regs. tit. 14, § 18980.3(b) (same). That law has been preliminarily enjoined because plaintiffs are likely to succeed in their void-for-vagueness and First Amendment challenges. *See Cal. League of Food Prods.*, 2026 WL 2055589 (S.D. Cal. July 14, 2026).

This Act suffers from the same lack of precision. Not only does it rely on "recyclability"

criteria that has been preliminarily enjoined as vague, but the Act regulates "covered material," which is defined to include "[s]ingle-use packaging that is *routinely* recycled, disposed of, or discarded after its contents have been used or unpackaged." Cal. Pub. Res. Code § 42041(e)(1) (emphasis added). The Act provides no insight into how producers are supposed to determine whether packaging is "routinely" recycled, disposed of, or discarded after use.

More, this Act goes beyond SB 343's vagueness problems and tries to regulate affairs outside California's power to control. The Act's breadth is also demonstrated by its definition of several key terms. A "covered material" includes "[s]ingle-use packaging" and "[p]lastic single-use food service ware." *Id.* § 42041(e)(1)(A), (B). In turn, "packaging" includes "any separable and distinct material component used for the containment, protection, handling, delivery, or presentation of goods," including "[s]ales packaging," "[t]ransport packaging," and any "ancillary elements integrated into packaging." *Id.* § 42041(s). So the "covered materials" regulated by the statute make up an enormous portion of all consumer goods shipped in interstate commerce. Am. Compl. ¶ 3.

To illustrate, just consider all the "covered material" required for a consumer to enjoy potato chips, manufactured and "contain[ed]" in a single-use bag. That bag is likely "contain[ed]" and "protect[ed]" together with other bags in a "separable and distinct" box. A carrier "handl[es]" and "deliver[s]" many of those boxes in crates or pallets covered in "[t]ransport packaging."

That's not all. Not only is the Act breathtaking in *what* it covers, but it's also broad in *whom* it covers. The statute defines a "producer" as, among other things, "a person who manufactures a product that uses covered material … in a commercial enterprise [or that is] sold, offered for sale, or distributed in the state." *Id.* § 42041(w)(1). If "there is no person in the state" who meets that definition, then the term "producer" extends to any "owner or, if the owner is not in the state, the exclusive licensee of a brand or trademark under which the product using the covered material is used in a commercial enterprise, sold, offered for sale, or distributed in the state." *Id.* § 42041(w)(2). And if "there is no person in the state" who meets that definition, either, then the term extends to any "person who sells, offers for sale, or distributes the product … in or into the state." *Id.* § 42041(w)(3). In other words, even when a product is manufactured, owned, and licensed outside California, the Act will pin its regulation on a retailer or distributor who can't say how the product is manufactured.

Then there's the *how*. The statute repeatedly uses phrases like "covered material offered for sale, distributed, or imported in or into the state." *See*, *e.g.*, *id.* § 42050(b); *see also id.* § 42041(w). That language reaches materials that will never be used or disposed of in California. For example, a product that is "offered for sale" and purchased in California but then transported out of the state would be regulated by the Act even though it will never see a California landfill or recycling center. And a product that is "imported in or into" California only briefly while traveling between States would also come within the Act's ambit.

Worse, the Act outsources this tremendous breadth to a non-governmental entity, requiring all "producers of covered material" to "form and join a PRO [producer responsibility organization]." *Id.* § 42051(a). Ultimately, the Act practically forces all producers to join a single PRO charged to "implement" the Act. *Id.*; *see also id.* § 42061.5(b). Currently, the only approved PRO is Circular Action Alliance ("CAA"). Am. Compl. ¶ 5. For a producer to "sell, offer for sale, import, or distribute covered materials in" California, a producer must either participate in CAA's approved plan or meet requirements even more onerous than those the Act otherwise requires. *Id.* § 42051(b)(1), (2).

The Act gives CAA extraordinary power. CAA must submit a "plan" for "compliance" with the Act, subject to the California Department of Resources Recycling and Recovery's ("CalRecycle") approval. *Id.* § 42063(a); *see also id.* § 42051.1. Yet CAA retains significant discretion over enforcement. Though the Act places many requirements on what CAA's plan "shall include," it leaves CAA significant leeway in determining the exact content of that substance. *See, e.g.*, *id.* § 42051.1(b)(1); *id.* § 42051.1(b)(3).

Perhaps the greatest power that the Act vests in CAA is fee-setting. To fund the necessary infrastructure to achieve the Act's goals, CAA extorts producers in two ways. First, producers must pay a "fee … sufficient to ensure the requirements of [the Act] are met by the PRO" and that CAA's plan is "fully implemented." *Id.* § 42053(a)(1). The fee may also include "[i]ndividual assessments imposed on a producer," the "California circular economy administrative fee," reimbursements for certain CalRecycle expenses, "[a]ny fees associated with environmental mitigation activities" described elsewhere in the statute, and the "costs of the PRO." *Id.* § 42053(c).

While CalRecycle must approve CAA's initial plan for calculating and collecting fees, *see id.*

§ 42051.1(d), the Act gives CAA authority to annually (or more frequently) increase fees as CAA deems "sufficient to ensure the requirements of [the Act] are met by the PRO and [its] plan is fully implemented." *Id.* § 42053(a)(1). And CAA can impose those fees without CalRecycle's approval.

Second, CAA extorts from participating producers an annual $500 million "environmental mitigation surcharge." *Id.* § 42064(e)(1), (f), (i). The surcharge funds various California agencies "to monitor and reduce the environmental impacts of plastics" and also "provide[s] benefits to residents living in a disadvantaged or low-income community or rural area." *Id.* § 42064(j).

The statute also obligates CAA to fund CalRecycle's "statewide needs assessment" to determine the "necessary steps and investment … to achieve the requirements of this chapter." *Id.* § 42067(a), (b). CAA, of course, includes those costs in its fees. *See id.* § 42053(c). The assessment evaluates factors entirely outside of producers' control—including "[e]xisting state statutory provisions," "existing access to on-premises recycling and composting for multifamily residences," and "[c]onsumer education needs for recycling, composting, reuse, and reduction." *Id.* § 42067(e)(2). So the Act requires producers—many of whom are out-of-state—to fund California's evaluation and mitigation of problems that producers have not created. To top things off, producers can't identify these fees "as a separate item on a receipt or invoice." *Id.* § 42053(a)(1).

## LEGAL STANDARD

Preliminary injunctive relief requires a party to show: (1) likelihood of success on the merits, (2) likely irreparable harm, (3) the balance of the equities, (4) consideration of the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Likelihood of success on the merits is the "most important"—"especially" when a plaintiff "alleges a constitutional violation," because it "usually demonstrates [the plaintiff] is suffering irreparable harm no matter how brief the violation." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). That's because "constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted).

When a governmental entity is a nonmoving party, the balance of the equities and public interest factors merge. *Baird*, 81 F.4th at 1040.

**ARGUMENT**

**I. Plaintiffs Are Likely to Succeed on the Merits.**

The Act inflicts a litany of constitutional injuries. It violates due process by prohibiting conduct in such vague terms that ordinary people can't discern what the Act requires. Am. Compl. ¶¶ 155–64. Its extraterritorial reach violates the horizontal separation of powers. Am. Compl. ¶¶ 216–33. It also discriminates against out-of-state commerce and substantially burdens interstate commerce. Am. Compl. ¶¶ 165–94. The Act's prohibition against identifying the Act's regulatory costs on receipts or invoices is an unconstitutional content-based restriction on producers' speech. Am. Compl. ¶¶ 240–73. Its mandate that producers associate with a non-governmental entity that espouses views contrary to those of many of NAW's members also violates fundamental free speech and free association principles. Am. Compl. ¶¶ 274–86. And its delegation of enforcement authority to CAA violates producers' due process rights. Am. Compl. ¶¶ 294–323.

Though Plaintiffs are likely to succeed on all these claims, only one is sufficient for injunctive relief. *Baird*, 81 F.4th at 1040.

**A. The Act is unconstitutionally vague.**

The Act violates the Fourteenth Amendment's Due Process Clause because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). First, the Act's "recyclability" requirement depends on SB 343—which is itself currently enjoined as vague. And second, the Act's definition of "covered material"—which triggers producer obligations that are the *sine qua non* of the Act—fails to fairly notify businesses what material is actually covered by the Act.

**1. SB 343's injunction renders the Act's recyclability requirement vague.**

The Act requires producers to "[e]nsure that all covered material offered for sale, distributed, or imported in or into the state on or after January 1, 2032, is recyclable in the state or eligible for being labeled 'compostable.'" Cal. Pub. Res. Code § 42050(b). To determine what material is deemed "recyclable," the Act incorporates Cal. Code Regs. tit. 14, § 17989.2, "and Section 42355.51" of the

Public Resource Code. *Id.* § 42061(c); *see also* Cal. Code Regs. tit. 14, § 18980.3(a). Section 42355.51's recyclability criteria were part of SB 343, which is preliminarily enjoined. *See Cal. League of Food Prods.*, 3:26-cv-01675, 2026 WL 2055589. The court held that plaintiffs were likely to succeed in their claims that four of Section 42355.51's recyclability requirements are unconstitutionally vague and that SB 343 facially violates the First Amendment. *Id.* at *8–34.

With SB 343 enjoined, producers are left with next-to-no guidance as to what makes covered material "recyclable." Though the Act also incorporates a regulation—Cal. Code Regs. tit. 14, § 17989.2—it provides only a few requirements, specific to food service packaging, to "minimize public health and litter impacts." Section 42355.51 is the primary repository for "recyclability" criteria. And in the absence of Section 42355.51's criteria, producers have no way of knowing how to design and manufacture material to be deemed recyclable.

Even if Section 42355.51's recyclability requirements were not enjoined, the Southern District of California got it right—Section 42355.51's requirements fail to put producers on fair notice as to what materials are recyclable. *See Cal. League of Food Prods.*, 2026 WL 2055589, at *9–18; *see also* Am. Compl. ¶¶ 34–39. Thus, the Act "fails to provide [producers] of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304.

**2. The Act's definition of "covered material" is unconstitutionally vague.**

The Act attempts to achieve its ambitious goals by regulating "covered material" and the "producers" who manufacture, sell, distribute, or import it. *See* Cal. Pub. Res. Code §§ 42041(w), 42050, 42051. But the definition of "covered material" does not provide fair notice to businesses as to whether and how the Act applies to them.

The Act defines "[c]overed material" as "[s]ingle-use packaging that is *routinely* recycled, disposed of, or discarded after its contents have been used or unpackaged" and "[p]lastic single-use food service ware." *Id.* § 42041(e)(1) (emphasis added). This definition is vague for two reasons: *First*, it requires producers to ascertain downstream economic conditions beyond their control or ability to ascertain. To determine whether single-use packaging is "routinely recycled, disposed of, or discarded after its contents have been used or unpackaged," producers need to ascertain how often end consumers recycle, discard, or dispose of packaging after use. Many types of packaging may be

both routinely reused and discarded; for example, "overpack" (such as corrugated boxes), plastic buckets, and spools may fall into either category. Ex. 1 ("Simons Decl.") ¶ 15. Plaintiffs conceive of no practical way producers can track this information. *Id*. ¶¶ 4, 15. And CalRecycle certainly is not helping. Its most recent Covered Material Category List expressly states that it "does not address the destination or ultimate disposition of materials sorted and sold by large volume transfer/processing facilities." CalRecycle, *Update to Covered Material Category (CMC) List*, at 2 (December 31, 2025), available at https://perma.cc/6ZTN-928W.

*Second*, even if producers could track how often consumers recycle, dispose of, or discard certain packaging, the Act provides no clarity on how often a package must be recycled, disposed of, or discarded to be deemed "routinely" so. How often is "routinely?" Twenty, fifty, eighty percent of the time? While the Constitution does not require mathematical precision, a statute's terms must be certain enough to give fair notice of what the law requires and prevent arbitrary enforcement. *See Williams*, 553 U.S. at 304; *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001). Here, the word "routinely" "imposes an uncertain threshold requirement" such that reasonable producers do not know what the law requires. *See Cal. League of Food Prods.*, 26-cv-1675, 2026 WL 2055589, at *13; *see also Ass'n of Nat. Advertisers, Inc. v. Lungren*, 809 F. Supp. 747, 761–62 (N.D. Cal. 1992) (holding that defining "recyclable" as "conveniently recycled" is "not sufficiently clear to a manufacturer or distributor of ordinary intelligence").

While the Act requires CalRecycle to publish "a list of covered material categories … deemed to be recyclable as of January 1, 2024," that list contains only *categories* of covered materials and their recyclability—it does not say whether a material is a "covered material" in the first place. *See* CalRecycle, *Update to Covered Material Category (CMC) List*, at 5–12. The guidance specifically disclaims any "product-specific determination of recyclability." *Id.* To determine that, CalRecycle guidance provides that "Step 1" starts with answering, "Is it covered material?" CalRecycle, *Covered Material Categories Reporting Guidance*, at 9–10 (Sept. 8, 2025), available at https://perma.cc/4MN2-MYNS. To help answer that question, the guidance merely refers producers back to the statutory definition of "covered material." *Id.* And there again, producers must grapple with whether a particular product is "routinely" recycled.

In any event, CalRecycle's guidelines make clear that "applicable statutory and regulatory provisions shall control" over the guidance. *Id.* at 1. So, at end, producers carry the responsibility for determining whether a material is "routinely recycled, disposed of, or discarded after its contents have been used or unpackaged." Cal. Pub. Res. Code § 42041(e)(1). And producers lack both the necessary information and a discernable measuring stick to make that determination.

**B. The Act is *ultra vires*.**

The Act is *ultra vires*—an "[u]nauthorized" act taken "beyond the scope of power allowed or granted" to California. *Ultra Vires*, Black's Law Dictionary (12th ed. 2024). Its extraterritorial reach offends horizontal separation of powers and equal sovereignty, as well as the due process rights of Plaintiff States' citizens.

**1. The Act violates the horizontal separation of powers.**

The Act reaches beyond California's borders and imposes its policy prerogatives on Plaintiff States. The Constitution does not permit California to externalize its preferences on other, co-equal sovereign States.

Every State's "equal dignity … under the Constitution implies certain constitutional 'limitation[s] on the sovereignty of all of its sister States.'" *Hyatt*, 587 U.S. at 245 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980)). Thus, all States "enjoy equal sovereignty" relative to each other. *Shelby County*, 570 U.S. at 535. Except in narrow and unusual circumstances, a State's sovereign jurisdiction is co-equal with its territorial borders. *United States v. Bevans*, 16 U.S. 336, 386–87 (1818); *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025); *see also Bonaparte v. Tax Ct. of Balt.*, 104 U.S. 592, 594 (1881).

This balanced structure of co-equal sovereigns is "integral to the structure of the Constitution." *Hyatt*, 587 U.S. at 246. The States entered the Union as independent sovereigns, and only on their own consent. *Id.* at 237; U.S. Const. art. VII. In doing so, they retained their existing sovereignty "except as altered by the plan of the Convention or certain constitutional Amendments." *Hyatt*, 587 U.S. at 241 (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999)); *see also* The Federalist No. 32, at 200 (A. Hamilton) (J.E. Cooke ed., 1961) (upon ratifying the Constitution, States maintained "all the

rights of sovereignty … which were not by that act [exclusively] delegated to the United States").

A key aspect of the States' sovereignty is their power to govern their own affairs and enact their own policy prerogatives within their own borders. *Bonaparte*, 104 U.S. at 594. Though States surrendered some aspects of that sovereignty to the *federal government*, nothing in the Constitution arrogates any State's sovereign authority over its own territory to any other State. To the contrary, the Constitution's history and structure confirm that States remain independent sovereigns that are "independent of all others." The Federalist No. 39, at 254 (J. Madison) (J.E. Cooke ed., 1961); *see also Hyatt*, 587 U.S. at 247; *see generally* U.S. Const. amend. X (reserving undelegated power to the States); *Id.* art. IV, § 1 (Full Faith and Credit Clause); *Shaffer v. Heitner*, 433 U.S. 186, 216–17 (1977) (holding the Due Process Clause prohibits States from exercising jurisdiction over citizens of other States unless there are sufficient "contacts, ties, or relations") (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).

The Supreme Court has repeatedly recognized that the States' equal sovereignty restricts each individual State's power to its territorial limits. Chief Justice Marshall reasoned "without hesitation" that "the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative power." *Bevans*, 16 U.S. at 386–87. Just last year, the Supreme Court noted that "State sovereign authority is bounded by the States' respective borders." *Fuld*, 606 U.S. at 14. And while a State's laws may have incidental extraterritorial effects, that is not a license to extend policy prerogatives beyond its own borders. *BMW of N. Am. v. Gore*, 517 U.S. 559, 571–72 (1996).

Here, the Act's extraterritorial reach conflicts with Plaintiff States' own policy prerogatives and offends their territorial sovereignty. *Hyatt*, 587 U.S. at 246. Plaintiff States have exercised their sovereign prerogative *not* to impose onerous recycling regulations on consumer and transportation packaging within their own borders. California is, of course, free to come to a contrary determination for conduct that occurs within its borders. Were the Act's reach limited to products purchased by California consumers or that otherwise enter the California marketplace, that are disposed of in California, or that have some direct connection to the health, safety, and welfare of Californians, then the Act might be a valid exercise of California's power.

But the Act is not nearly so limited. It assesses fees for covered materials that are not

manufactured, used, or disposed of in California, and whose only nexus to California is temporary presence "in or into" California while traveling in interstate commerce. Cal. Code Regs. tit. 14, § 18980.6.7(e)(2); Am. Compl. ¶¶ 83, 90. Additionally, much covered material that is "sold, distributed, or imported in or into" California is used principally or entirely outside of California by non-Californian end users in other equally sovereign States. Cal. Code Regs. tit. 14, § 18980.6.7(e)(2); Am. Compl. ¶¶ 107–12. Thus, the Act extends California's regulatory reach far beyond its borders, requiring out-of-state producers to obey California while making products that will be used and disposed of outside California. The Constitution's horizontal separation of powers prohibits that result.

The Act is not rescued by the fact that it regulates producers only if they manufacture or otherwise sell or distribute a product "used in a commercial enterprise, sold, offered for sale, or distributed in [(or into)] the state." *Id.* § 42041(w)(1)–(3). While that language ostensibly targets in-state activity, this Court need not ignore "commonsense economic realities." *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025). While in theory a manufacturer or distributor can package goods sold in California one way and goods sold elsewhere in another, in practice, efficient manufacturing and distribution require uniformity and consistency. Supply networks are not designed to segregate products based on the requirements of a single state. *See* Ex. 2 ("Allen Decl.") ¶ 6. California is leveraging these economic realities to strongarm its regulation on the national economy, including on manufacturers and distributors who have little-to-no connection to California.

Take, for example, Plastilite Corporation. Plastilite is a Nebraska company that manufactures molded foam packaging for the transportation of various products. Ex. 3 ("Ehly Decl.") ¶¶ 3–4. The Act's economic ripple effects have already lost Plastilite its largest customer. *Id.* ¶ 12. The customer—not Plastilite—sells and ships food products nationwide, including in California. *Id.* ¶ 7. The customer estimated that the Act's various fees and requirements would increase its packaging costs by 33% if it continued to use Plastilite's foam packaging (which is 100% recyclable). *Id.* ¶ 8. So the customer dropped Plastilite and decided to ship its food products in cardboard. *Id.* ¶ 9. The customer dropped Plastilite completely—not just for product shipped to California. *Id.* ¶¶ 9, 12. The "commonsense economic realities" made it more practical for the customer to use the same packaging nationwide.

Neither is the Act rescued by the regulatory exemption for "products [that] are transported outside the state without being provided to users of the products in the state or discarded in the state." Cal. Code Regs. tit. 14, § 18980.1(a)(17)(F)(i). *First*, because California imposes its assessment fee for products "imported in or into the state within the previous calendar year," the Act requires a producer to pay the fee for any products that remained in the state during that calendar year, even if those products are slated for export in a later year. *Id.* § 18980.6.7(e)(2)(A). *Second*, even where the exemption applies, it cannot be effectuated because, for many producers, there is no mechanism for determining when products leave the state at the hands of downstream entities (such as redistributors). Allen Decl. ¶ 7; *see also* p. 17, *infra*. Thus, again, California tries to impose national regulation by leveraging economic realities and statutory language ostensibly targeted at in-state activity.

**2. The Act violates the Due Process Clause.**

The Act's impermissible extraterritorial reach harms more than just Plaintiff States—it also violates their citizens' due-process rights. *See Bristol-Myers Squibb Co. v. Sup. Ct. of Calif.*, 582 U.S. 255, 263 (2017).

As reviewed, the Act regulates the conduct of NAW's members and Plaintiff States' citizens even where that conduct occurs outside of California and with no meaningful nexus to California. *See* Ehly Decl. ¶¶ 3, 6. It does so even though not one of NAW's out-of-state members or Plaintiff States' citizens voted for any legislator who enacted the Act. And not one of NAW's out-of-state members or Plaintiff States' citizens can vote for any legislator who may be inclined to amend or repeal it. Other States' citizens have no meaningful political power over the Act whatsoever; indeed, the Act even attempts to prevent Plaintiff States' citizens from becoming aware of its costs. Permitting the Act to govern the conduct of other States' citizens is anathema to the Constitution's guarantee of due process of the law. U.S. Const. amend. XIV; *see also* Randy E. Barnett & Evan D. Bernick, *No Arbitrary Power: An Originalist Theory of the Due Process of Law*, 60 Wm. & Mary L. Rev. 1599, 1643 (2019) ("[T]hroughout its development, the end or 'spirit' of the concept [of due process of law] remained the same: barring 'arbitrary' power over life, liberty, and property.").

"Due process of law" traces its roots to the Magna Carta and "was directed against King John's

notorious efforts to impose his will by avoiding the regular processes of the common law courts." *Id.* at 1606. King John's actions were not "the law of the land," synonymous with "due process of law." *Id.* at 1643. That guarantee "came to be understood as a guarantee against *all* arbitrary government action." *Id.* To be the "law of the land," a "legislative act [must] be consistent with any higher laws." *Id.* at 1619. If a State law is "not made in pursuance of the Constitution," then it does "not become part of the 'law of the land'" and its enforcement would violate due process. *Id.* (citing *M'Culloch v. Maryland*, 17 U.S. 316, 406 (1819)).

The Act subjects NAW's out-of-state members and Plaintiff States' citizens to its strictures despite the fact that they have chosen to be subject to another States' sovereignty. California is violating the due-process rights of other States' citizens by projecting its regulation onto conduct subject to other sovereigns. Such extraterritorial applications are *ultra vires* and unenforceable under the Due Process Clause. *See Ogden v. Saunders*, 25 U.S. 213, 369 (1827).

### C. The Act violates the dormant Commerce Clause.

The Constitution grants Congress, not the States, the power to "regulate Commerce … among the several states." U.S. Const. art. I, § 8, cl. 3. That grant necessarily implies a "further, negative command"—known as the dormant Commerce Clause—that forbids enforcement of "certain state [economic regulations] even when Congress has failed to legislate on the subject." *Pork Producers*, 598 U.S. at 368 (quotations and citation omitted). A State law violates the dormant Commerce Clause if it "discriminate[s] against interstate commerce" or imposes a "burden" that is "clearly excessive in relation to the putative local benefits." *Flynt v. Bonta*, 131 F.4th 918, 925–26 (9th Cir. 2025) (second and third quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)). The Act flunks either test.

#### 1. The Act discriminates against interstate commerce.

A State statute that "discriminate[s] against interstate commerce" lies at the "very core" of the dormant Commerce Clause. *Id.* at 923 (quoting *Pork Producers*, 598 U.S. at 369). State statutes that are "designed to benefit in-state economic interests by burdening out-of-state competitors" offend this principle. *Id.* (quoting *Pork Producers*, 598 U.S. at 369). Indeed, such a discriminatory statute faces a "virtually *per se* rule of invalidity," *id.* (quoting *South Dakota v. Wayfair*, 585 U.S. 162, 173

(2018)), and may only be sustained "on a showing that it is narrowly tailored to advance a legitimate local purpose," *id.* (quotations and citations omitted).

A statute may be unconstitutional even if its discriminatory impact is practically, rather than facially, evident. *Pork Producers*, 598 U.S. at 377; *see Flynt*, 131 F.4th at 926. Here, the Act fails this "core" anti-discrimination principle because it discriminates against out-of-state commerce both facially and in effect, and it is not narrowly tailored to its purposes.

The Act discriminates against interstate commerce in two ways. *First*, the Act imposes additional costs on California retailers and distributors who choose to work with out-of-state manufacturers instead of in-state ones. The Act requires "producers" to pay its various fees, including the environmental mitigation surcharge and individual assessments. Cal. Pub. Res. Code §§ 42053(a), (c); 42064(e), (f). When a product manufacturer is present "in the state," then the manufacturer is the "producer" for purposes of paying the Act's fees. *Id.* § 42041(w)(1). But when the manufacturer is out-of-state, then a retailer becomes the "producer" subject to the Act's fees. *Id.* § 42041(w)(2), (3). As a result, the Act forces California's retailers to either buy from California manufacturers or become subject to the Act's liabilities by purchasing from out-of-state manufacturers. *See* Am. Compl. ¶¶ 171–76. Given the Act's onerous fees, that is no choice at all. Such a scheme is precisely the sort of "economic protectionism" that the dormant Commerce Clause forbids.

*Second*, the Act discriminates against out-of-state commerce through its regulation of "recycling rates." *See* Cal. Pub. Res. Code § 42050(c). A major component of the Act is its requirement that "all plastic covered material offered for sale, distributed, or imported in or into the state" achieve certain "recycling rates," with cascading increases up to 65% in 2032. *Id.* The Act defines the term "recycling rates" as the "percentage, overall and by category, of covered material sold, offered for sale, distributed, or imported in the state that is ultimately *recycled*." *Id.* § 42041(ab) (emphasis added). If a covered material is "exported to other states or countries," it is considered "recycled" only if CAA or producers themselves certify compliance with the statute "under penalty of perjury" and by documentation to "verify this certification." *Id.* § 42041(aa)(4)(C), (D).

The Act doesn't require any certification or verification from a California-based recycler. *See id.* § 42041(aa), (ab). So a producer faces substantial additional costs if it chooses to recycle material

with a non-California recycler. That impermissibly favors California's recycling industry. *Flynt*, 131 F.4th at 923 (quoting *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019)).

Not only does the Act discriminate against out-of-state commerce, but its provisions are not "narrowly tailored to advance a legitimate local purpose." *Flynt*, 131 F.4th at 923. The Act's own stated purposes only illustrate its protectionist effects. The Act declares that it is "intended to shift the burden of costs to collect, process, and recycle materials from the *local jurisdictions* to the *producers of covered material*." Cal. Pub. Res. Code § 42040(b)(2)(A) (emphasis added). While the "local jurisdictions" California seeks to relieve are in California, many of those producers are out-of-State. The Act cannot justify its protectionist effects by its protectionist purposes.

The Act also advances purposes generally related to the effects of plastic pollution, the desirability of facilitating recycling, and facilitating the use of recyclable or compostable materials. *Id.* § 42040(b). None of those goals explain or justify the Act's disincentivizing California companies from working with out-of-state producers or recyclers. Indeed, treating out-of-state businesses equally would *better* facilitate recycling because it would allow producers to take advantage of out-of-state recycling options without additional burdens. Thus, these requirements cannot be narrowly tailored to serve their ends. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).

**2. The Act substantially burdens interstate commerce.**

The Act also violates the dormant Commerce Clause because it imposes substantial burdens on interstate commerce, thereby failing the "*Pike* balancing" test. *Flynt*, 131 F.4th at 925 (under "*Pike* balancing" an "even-handed[]" state law is still unconstitutional if "the burden imposed … is clearly excessive in relation to the putative local benefits") (quotations and citation omitted); *see also Pike*, 397 U.S. at 137. *Pike* balancing applies even where a statute imposes nondiscriminatory burdens. *Pork Producers*, 598 U.S. at 379.

Under *Pike* balancing, the threshold question is whether the "challenged law imposes a 'substantial' or 'significant' burden on interstate commerce." *Flynt*, 131 F.4th at 925. If the statute imposes such a burden, then "the court proceeds to determine whether that burden is 'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike*, 397 U.S. at 142). Here, the Act

fails that test for multiple reasons.

To start, the Act substantially burdens interstate commerce for the same reasons that it discriminates against out-of-state producers and recyclers. But there are other reasons, too. In at least four ways, the Act imposes "inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Flynt*, 131 F.4th at 932 (quotation marks and citation omitted).

*First*, the Act's reach covers such a large portion of consumer goods that it threatens to fragment the national economy and impede the flow of goods. The statute covers materials used in product "packaging," including "[s]ales packaging" and "[t]ransport packaging." *Id.* §§ 42041(e)(1)(A), (B); 42041(s). Nearly all consumer goods are either packaged in some plastic for sale or are transported using plastic packaging. Am. Compl. ¶ 43. Thus, the Act's regulations will touch nearly all goods that travel in interstate commerce, guaranteeing that "out-of-state consumers indifferent to" California's environmental regulations "will have to pick up the tab." *Pork Producers*, 598 U.S at 386. That reach is staggering—and unconstitutional.

Worse, the Act directly targets materials used in the "[t]ransport" of consumer goods. Cal. Pub. Res. Code § 42041(s)(3). Contemporary distribution channels are designed to move goods between states efficiently at scale without state-specific variations. Thus, supply networks do not segregate products based on the requirements of a single state. *See* Allen Decl. ¶ 7. And the distributors that move a product to a particular state typically do not control packaging decisions, especially primary packaging (i.e., the packaging in which the product is most immediately contained, typically by the manufacturer). *See id.* ¶ 3. Doing so would require interstate supply networks to be adapted to fit state- and product-specific variations. *See id.* ¶¶ 7, 16–17. That is exactly the sort of "state regulation of the instrumentalities of interstate transportation" that the dormant Commerce Clause obligates courts to "refuse[] to enforce," even where—unlike here—those laws are "genuinely nondiscriminatory." *Pork Producers*, 598 U.S. at 379–80 & n.2 (collecting cases). Indeed, individual States cannot "impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity" are exclusively within Congress's bailiwick. *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 767 (1945).

*Second*, the Act imposes an assessment fee on producers who import a covered material,

regardless of whether that material is ultimately used or disposed of in California. *See* Am. Compl. ¶¶ 83–88. Regulations require producers to pay for the "weight of covered material … sold, distributed, or *imported in or into the state* within the previous calendar year." Cal. Code Regs. tit. 14, § 18980.6.7(e)(2)(A) (emphasis added). That formula takes no consideration of the material's ultimate disposition.

Though regulations attempt to curb this extraterritorial effect by excluding "products [that] are transported outside the state without being provided to users of the products in the state or discarded in the state," *id.* § 18980.1(17)(F)(i), that does not cure the problem. Because California imposes its fee for products "imported in or into the state within the previous calendar year," the statute requires a producer to pay the fee for any products that remained in the state during that calendar year, even if those products are slated for export in a later year. *See* Cal. Code Regs. tit. 14, § 18980.6.7(e)(2)(A). Goods are commonly imported into California and stored there for distribution and shipping elsewhere, even in later years. Am. Compl. ¶ 95. The Act would impose its assessment fees on those goods regardless of their ultimate disposition.

In addition, distributors and other producers often have no means of determining whether a product that transits a California warehouse was "provided to users of the products in the state or discarded in the state" as required to claim exemption. Ex. 4 ("Wild Decl.") ¶ 18; Allen Decl. ¶¶ 5–7. Information on the downstream distribution of products is not readily available in the marketplace in many instances and is often considered competitively sensitive information. Wild Decl. ¶ 18. This means a producer must choose to either report all products it sends to California—and thereby face inflated fees—or risk noncompliance with the Act.

*Third*, the proliferation of other state laws that impose similar requirements and assessments risks double-counting and conflicting standards. Because products can be "sold, distributed, or imported in or into" multiple states in a given "calendar year," a producer will be forced to pay an assessment in multiple states for the same product. Cal. Code Regs. tit. 14, § 18980.6.7(e)(2)(A). The dormant Commerce Clause forbids state laws that expose interstate commerce to such duplicative assessments. *See Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 550 (2015).

*Fourth*, the inevitable consumer pass-through costs of the Act will not be limited to California but will extend nationwide. Both in-state and out-of-state producers will pass on the assessment fee, the environmental surcharge, and product-development compliance costs to their customers, including out-of-state customers. And many of these costs are completely unrelated to producers' activity in California. For example, the Act requires CAA to pay for CalRecycle's "statewide needs assessment" to help determine "necessary steps and investment" needed to achieve the Act's goals. Cal. Pub. Res. Code § 42067(a). When CAA passes those costs onto producers, who will pass them off on customers, it will be citizens in Plaintiff States that will be funding California's review of its "[e]xisting state statutory provisions," "existing access to on-premises recycling and composting for multifamily residences," and "[c]onsumer education needs for recycling, composting, reuse, and reduction." *Id.* § 42067(e)(2). Requiring citizens of one state to fund the environmental projects of another is a burden too heavy for interstate commerce.

*Edgar v. MITE Corp.* is instructive. 457 U.S. 624 (1982). There, an Illinois law required "any takeover offer for the shares of a target company" to be "registered with" Illinois for purposes of "adjudicat[ing] the substantive fairness of the offer." *Id.* at 627–28. The law required that the tender offeree have an in-State nexus, for example, principal offices in Illinois, organization under Illinois law, or a threshold of Illinois shareholders. *Id.* Those requirements, however, did not stop the Court from recognizing the registration requirement's "sweeping extraterritorial effect" because it imposed itself on "those living in other States and having no connection with Illinois." *Id.* at 642. As a result, it operated as a "direct restraint on interstate commerce" and was unconstitutional. *Id.* So, too, here.

These discriminatory effects are "clearly excessive." None of the statute's purposes require differential treatment between in-state and out-of-state firms. Indeed, if anything, the Act's purposes would be *better* served if the statute imposed a symmetrical, non-discriminatory regime.

Not only that, but the Act also fails to meet any "putative local benefits." *Flynt*, 131 F.4th at 925. The Act is directed to the "health and environmental impacts of plastic pollution" and implementing a "new statewide comprehensive circular economy framework" *in California*. Cal. Pub. Res. Code § 42040(b)(1), (2)(A). Imposing fees for covered materials that happen to be present in California for some time cannot serve those interests.

**D. The Act infringes on free speech and free association.**

The First Amendment prohibits governments from "abridg[ing] the freedom of speech." U.S. Const. amend. I. So does California's Constitution, Cal. Const. art. I, § 2, whose protections are "even broader and greater" in scope than the First Amendment, *Fashion Valley Mall, LLC v. National Lab. Rels. Bd.*, 42 Cal. 4th 850, 863 (Cal. 2007).

The Act blatantly violates producers' speech rights. *First*, it prohibits producers from identifying the required PRO fee "as a separate item on a receipt or invoice." Cal. Pub. Res. Code § 42053(a)(1). That content-based censorship does not serve any legitimate purpose nor fall into any recognized exception to the general prohibition against State-restricted speech. *Second*, the Act compels producers to join a non-governmental entity—CAA—empowered to impose fees on them to advance interests with which the producers disagree. By CAA's own admission, it engages in lobbying efforts to provide its "point of view on regulatory concepts"—a political position that some of NAW's members do not share. Am. Compl. ¶ 282.

**1. The line-item prohibition is unconstitutional content-based censorship.**

Both the United States and California Constitutions heavily disfavor content-based speech restrictions and subject them to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Center for Bio-Ethical Reform, Inc. v. Irvine Co.*, 37 Cal. App. 5th 97, 105 (2019). The Act's censorial restriction on identifying the extent to which prices are increased by its imposed fees is a content-based restriction that cannot survive this high bar. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618 (2020).

The Act imposes a content-based restriction on producers' speech by prohibiting them from identifying participation fees "as a separate item on a receipt or invoice." Cal. Pub. Res. Code § 42053(a)(1). That restriction "singles out specific subject matter"—the PRO fee—and subjects it to "differential treatment"—prohibiting its identification on a receipt or invoice where there is no such prohibition for other fees or expenses. *Reed*, 576 U.S. at 169.

Worse, the speech restricted here—speech on a matter of public concern (the economic costs of particular legislation)—falls squarely in the heartland of free speech protections. *Schenck v. Pro-*

*Choice Network of Western N.Y.*, 519 U.S. 357, 377 (1997). As a general matter, "government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).

Governments bear the burden to show that content-based restrictions are narrowly tailored to serve a compelling government interest. *Reed*, 576 U.S. at 163. Yet California cannot show that the Act's restrictions serve any compelling government interest.

To start, the Act itself does not offer any justification for its restriction. It simply prohibits producers from listing the PRO fee "as a separate item on a receipt or invoice," full stop. Cal. Pub. Res. Code § 42053(a)(1). That's likely because the Act's prohibition does not stop a producer from passing that fee itself along to consumers. Am. Compl. ¶ 259. It merely prohibits producers from telling the truth. Thus, the only effect of the Act's prohibition is to censor producers' right to identify the extent to which prices are affected by the Act's regulations. *Thornhill v. Alabama*, 310 U.S. 88, 101–02 (1940). That restriction is either misguided or a blatant attempt to insulate the Act from political accountability. Regardless, it most certainly is *not* one of the "rare cases in which a speech restriction withstands strict scrutiny." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015).

**2. The Act impermissibly compels producers to speak and fund a message with which they fundamentally disagree.**

The Act also violates the producers' rights by forcing them to fund political speech with which they disagree. That forced association offends producers' right *not* to speak and their freedom *not* to associate with organizations with whom they are not aligned. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *Concerned Dog Owners of Calif. v. City of Los Angeles*, 194 Cal. App. 4th 1219, 1229 (2011).

The Act requires producers to join CAA, which is empowered to impose fees to finance its operations and implement the Act's regulations. Cal. Pub. Res. Code § 42051(a). CAA has its own agenda and lobbies other States to pass similar statutes. Am. Compl. ¶ 281. Many of NAW's members expressly disagree with CAA's political messages, and yet the statute requires them to pay fees that finance that speech anyway. Am. Compl. ¶ 285. Such compulsion "plainly violates the Constitution." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018).

That the Act permits producers to opt out of PRO membership does not cure the constitutional violation. *See* Cal. Pub. Res. Code § 42051(b)(2)(A). A producer may opt out only if it satisfies criteria more stringent than the requirements to join CAA, which are impracticable for many producers. *Id.* The Act essentially taxes producers' decision not to fund speech with which it disagrees. The Constitution does not permit that. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

**E. The Act violates the Import-Export Clause.**

The Constitution prohibits any State, absent "the Consent of Congress," from imposing "any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing" its "inspection Laws." U.S. Const. Art. I, § 10, cl. 2. Properly understood, this provision prevents States "from imposing certain especially burdensome" taxes and duties on *domestic* imports from other States. *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 573 (2015) (Scalia, J., dissenting); *see also Brown v. Maryland*, 25 U.S. 419, 438−39, 449 (1827) (Marshall, C.J., for the Court). For the same reasons that California's Act violates the dormant Commerce Clause, it also violates the Import-Export Clause. It improperly "conditions sale of a good on the use of preferred farming, manufacturing, or production practices in another State where the good was grown or made." *Pork Producers*, 598 U.S. at 408 (Kavanaugh, J., concurring and dissenting in part).

Plaintiffs acknowledge that the Supreme Court has cabined the Import-Export Clause to imports from foreign countries. *See Woodruff v. Parham*, 75 U.S. 123, 133–36 (1869). That is wrong, and this is "an appropriate case" to reassess "the *Woodruff* Court's reasoning." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 624–25 (1997) (Thomas, J., dissenting).

**F. The Act is an impermissible private delegation.**

The Fourteenth Amendment prohibits States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The requirements of Due Process forbid delegating government power that, in effect, results in one private entity being "intrusted with the power to regulate the business of another." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). But that is precisely what the Act does.

The Act broadly delegates its enforcement to CAA. Cal. Pub. Res. Code § 42051(a). CAA is required to have a "governing board consisting of producers"—that is to say, a board of competitors. *Id.* § 42061.5(a)(1). That board is likely to be made up of representatives from large producers who have resources to spare. Indeed, many of CAA's directors are among the nation's largest companies and direct competitors with NAW members who do not have representation on the board. Am. Compl. ¶¶ 296, 299. Those large producers, then, directly govern their less powerful rivals. The Supreme Court has struck down precisely these types of arrangements as unconstitutional delegations of power.

For instance, the Supreme Court held that a delegation "to private persons whose interests may be and often are adverse" was a "legislative delegation in its most obnoxious form"— "so clearly a denial of rights safeguarded by the due process clause." *Carter Coal*, 298 U.S. at 311. In *Carter*, the Court struck down a statutory scheme that granted regulatory authority to industry-leading coal producers and laborers. *Id.* at 310–11. The Court reasoned that "one person may not be entrusted with the power to regulate the business of another, and especially of a competitor," and "a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property." *Id.* at 311. Since *Carter*, courts have continued to recognize that delegations of government power to self-interested private parties violate due process. *See, e.g.*, *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 821 F.3d 19, 31–34 (D.C. Cir. 2016); *Gen. Elec. Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448, 1455 (2d Cir. 1991); *Johnson v. Mich. Milk Mktg. Bd.,* 295 N.W. 346, 352–53 (Mich. 1940).

Like in *Carter*, the Act here gives certain private persons the power to regulate others, including their competitors. CAA is the only approved PRO and a private organization governed by the largest producers and competitors of NAW's members. The Act delegates to CAA, without procedural safeguards, broad discretion to prepare and implement a program plan as well as authority to set the terms, conditions, and fees for all producers, including authority to adjust fee rates. CAA administers producer reporting, conducts or requires audits, imposes interest or other consequences for nonpayment, and may terminate participation in its program. And producers have no independent administrative or judicial remedy in the event of a dispute with CAA: CAA requires binding arbitration for resolving disputes involving member producers, including disputes related to fee-

setting or allocations. Am. Compl. ¶ 301. Producers are strongarmed into this arrangement, as the only alternative is to individually satisfy more onerous recycling standards—including recycling rates for *past* years. *See* Cal. Pub. Res. Code § 42051(b)(2).

This system is rife with conflicts of interest that the Due Process Clause prohibits. Large producers have the scale and resources to absorb fees and devote resources to compliance. Thus, the Act incentivizes CAA leadership to impose higher fees and more onerous obligations that will pose a greater threat to their competition than to their own companies. Conflicts may also arise with compliance disputes for a company represented on the board. If such disputes are resolved in such company's favor, that leaves others to bear a relatively greater share of the system costs. Thus, as in *Carter*, a block of controlling, self-interested producers are wielding inordinate power and influence to regulate the terms of business across multiple business sectors. And there is good reason to be wary that such companies might use CAA as a means of obtaining an advantage over their competitors.

That delegation violates due process and is unconstitutional.

## II. Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm.

The Act will impose irreparable harms on Plaintiff States and NAW's members. Indeed, it's already doing so. "[W]hen a plaintiff alleges a constitutional violation and injury," if the plaintiff "shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation." *Id.*

Plaintiffs are suffering irreparable harms for other reasons, too. To start, Plaintiff States are suffering sovereign harms that, like constitutional violations, are by nature irreparable. Plaintiff States have a sovereign interest in applying their own law within their own borders. And Plaintiff States have chosen not to burden manufacturers, distributors, and retailers within their borders with the same regulations on single-use packaging. That choice is undermined by California's attempt to leverage the size of its interstate economic market to strongarm manufacturers, distributors, and retailers. Invasion of sovereign prerogatives cannot be remedied through a damages award. *Cf. Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (a State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 860–61 (2025) (similar). Only an injunction can ease the harm to Plaintiff States' sovereign authority.

Moreover, the Act requires Plaintiffs to incur substantial costs to comply with its onerous regulations. Allen Decl. ¶¶ 14–15; Wild Decl. ¶¶ 20–22; Ehly Decl. ¶ 13. Plus, the Act charges exorbitant fees. And the PRO sets these fees based in part on now-enjoined recyclability requirements, making both the PRO standards themselves and any resulting fee obligations indeterminate. Plaintiffs are thus presented with a "Hobson's choice": either incur the costs and fees or violate the statute and risk enforcement. *Am. Trucking Ass'n*, 559 F.3d at 1057. "That is an imminent harm." *Id.* at 1058.

That harm is not disqualified because it is pecuniary. For many producers, the costs of compliance will be measured in more than mere monetary costs—compliance will threaten their very existence. *See* Am. Compl. ¶¶ 123–24; Ehly Decl. ¶¶ 12–13; *Am. Trucking Ass'n*, 559 F.3d at 1058. And even if Plaintiffs' harms were purely pecuniary, they are highly unlikely to recover any of the monetary costs imposed by the Act's unconstitutional scheme. Sovereign immunity would likely bar any economic recovery from defendants. *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated and remanded on other grounds*, 565 U.S. 606 (2012).

**III. The Balance of the Equities and Public Interest Favor Plaintiffs.**

Both the equities and public interest favor an injunction given the constitutional violations at stake. A "plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." *Baird*, 81 F.4th at 1042. That is because "all citizens have a stake in upholding the Constitution" such that "it is always in the public interest to prevent a violation of a party's constitutional rights." *Id.* (citations omitted).

The Act has nationwide effects well beyond California's borders, meaning California's enforcement inflicts harms on producers in all 49 other States. California's interest is up against the interests of all other States. And the very purpose of the horizontal separation of powers and the dormant Commerce Clause is to protect the national economy from a single State's prerogatives.

Additionally, a preliminary pause won't cause any significant prejudice to California. The Act's key provisions are designed to mature several years in the future. For example, the statute requires "25-percent reduction by weight and 25-percent by plastic component source … by *January 2032*." Cal. Pub. Res. Code § 42057(a)(1) (emphasis added). Its requirement that "all covered material … is recyclable in the state … or eligible for being labeled 'compostable'" is also delayed

until January 2032. *Id.* § 42050(b). The earliest effective date for its target "recycling rates" is January 2028, with its most stringent requirements also delayed until January 2032. *Id.* § 42050(c). And the criteria on which these requirements rely have already been preliminarily enjoined. California cannot credibly claim that the public interest or its equities would be harmed.

For the same reason, California cannot claim that impending environmental hazards weigh against an injunction—that position is also undermined by the statute's delayed effects. And regardless, a preliminary injunction would not prejudice California's legitimate powers to mitigate those concerns by enacting laws and regulations that lawfully operate within its own borders.

**CONCLUSION**

This Court should enjoin Defendants from enforcing the Act and its implementing regulations.

Dated: Aug. 19, 2026

Respectfully Submitted.

*/s/ David R. Carpenter* (as authorized Aug. 18, 2026)
David R. Carpenter (SBN 230299)
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
drcarpenter@sidley.com
Gordon D. Todd*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
gtodd@sidley.com
*Counsel for Plaintiff National Association of Wholesaler-Distributors*

***Additional counsel listed in Attachment A to this Memorandum

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ *Cody S. Barnett*
Cody S. Barnett*
*Solicitor General*
/s/ *Beatrice O. Strnad* (as authorized Aug. 19, 2026)
Beatrice O. Strnad (SBN 327791)†
*Assistant Attorney General*
Lincoln J. Korell*
*Deputy Solicitor General*
Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
cody.barnett@nebraska.gov
bebe.strnad@nebraska.gov
lincoln.korell@nebraska.gov
*Counsel for Plaintiff State of Nebraska*
**Admitted Pro Hac Vice*
† *Counsel for All Plaintiff States*