ROB BONTA, State Bar No. 202668
Attorney General of California
SETH E. GOLDSTEIN, State Bar No. 238228
R. MATTHEW WISE, State Bar No. 238485
Supervising Deputy Attorneys General
KEVIN L. QUADE, State Bar No. 285197
KRISTEN C.A. KIDO, State Bar No. 335667
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7693
Fax: (916) 324-8835
E-mail: Kevin.Quade@doj.ca.gov
*Attorneys for Defendant Zoe Heller, in her official capacity as Director of the California Dep't of Resources Recycling & Recovery*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF NEBRASKA, et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ZOE HELLER, in her official capacity as Director of the California Dep't of Resources Recycling & Recovery, et al.,**<br><br>Defendants | 2:26-cv-02214-DC-CKD<br><br>**DEFENDANT HELLER'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: January 15, 2027<br>Time: 1:30 p.m.<br>Courtroom: 10, 13th Floor<br>Judge: Hon. Dena M. Coggins<br><br>Action Filed: June 22, 2026 |

## TABLE OF CONTENTS


Page

Introduction ..... 1

Legal Standard ..... 1

Argument ..... 2

I. Plaintiffs Have Not Shown a Likelihood of Success on the Merits of Their Claims ..... 2

A. Plaintiffs' Facial Challenge Is Unlikely to Succeed ..... 2

B. The Act Does Not Discriminate Against or Regulate Out-of-State Commerce ..... 2

1. The Act does not violate the horizontal separation of powers or Fifth Amendment right to due process ..... 3

2. The Act does not violate the dormant Commerce Clause ..... 5

a. The Act does not discriminate against interstate commerce ..... 6

b. The Act does not violate the dormant Commerce Clause under *Pike* balancing ..... 9

(1) The Act does not substantially burden interstate commerce ..... 9

(2) The Act's local benefits are not substantially outweighed by any burden on interstate commerce ..... 12

3. The Act Does Not Violate the Import-Export Clause ..... 12

C. The Act Is Not Unconstitutionally Vague ..... 12

1. The Act's term "recyclable" is not vague ..... 13

2. The Act's term "covered material" is not vague ..... 15

D. The Act Does Not Impermissibly Restrict Speech or Compel Association ..... 17

1. The Act's line-item prohibition is permissible ..... 17

a. The line-item prohibition regulates commercial, not political, speech ..... 17

b. The line-item prohibition is permissible because it prevents misleading commercial speech ..... 18

2. The Act's PRO provisions do not compel speech or association ..... 19

a. Plaintiffs are not compelled to associate with CAA ..... 19

b. Plaintiffs are not compelled to subsidize CAA's speech ..... 20

3. Plaintiffs cannot show that the Act facially infringes associational rights by mere affiliation with CAA ..... 21

E. The Act Does Not Result in an Unconstitutional Private Delegation ..... 22

## TABLE OF CONTENTS
(continued)


| | Page |
|---|---|
| F. Plaintiffs' Claims under the California Constitution are Barred | 26 |
| II. Plaintiffs Have Not Demonstrated That They Will Suffer Irreparable Harm | 26 |
| III. The Balance of Equities and Public Interests Do Not Support Injunctive Relief | 27 |
| Conclusion | 30 |

## TABLE OF AUTHORITIES

Page

**CASES**

*44 Liquormart, Inc. v. Rhode Island*
517 U.S. 484 (1996) ........ 18

*Abbott v. Perez*
585 U.S. 579 (2018) ........ 26

*Agendia, Inc. v. Becerra*
4 F.4th 896 (9th Cir. 2021) ........ 22

*Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*
729 F.3d 937 (9th Cir. 2013) ........ 5, 6

*Bingue v. Prunchak*
512 F.3d 1169 (9th Cir. 2008) ........ 3, 22

*Blue Circle Cement, Inc. v. Bd. of Cnty Com'rs of Cnty of Rogers*
27 F.3d 1499 (10th Cir. 1994) ........ 11

*Cal. Chamber of Com. v. Brown*
196 Cal. App. 4th 233 (2011) ........ 13

*Cal. League of Food Prods. v. Bonta*
839 F. Supp. 3d 925 (S.D. Cal. 2026) ........ 13, 14, 15

*Cal-Almond Inc. v. U.S. Dep't of Agr.*
192 F.3d 1272 (9th Cir. 1999) ........ 19

*Calfarm Ins. Co. v. Deukmejian*
48 Cal. 3d 805 (1989) ........ 9, 14, 19

*Carter v. Carter Coal Co.*
298 U.S. 238 (1936) ........ 25

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm. of New York*
447 U.S. 557 (1980) ........ 17, 18

*Coastside Fishing Club v. Cal. Res. Agency*
158 Cal. App. 4th 1183 (2008) ........ 22, 26

*Comptroller of the Treasury of Md. v. Wynne*
575 U.S. 542 (2015) ........ 11

*Connally v. General Constr. Co.*
269 U.S. 385 (1926) ........ 12, 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Crowe v. Oregon State Bar*
112 F.4th 1218 (9th Cir. 2024) .......... 21

*Davies Warehouse Co. v. Bowles*
321 U.S. 144 (1944) .......... 12

*Edgar v. MITE Corp.*
457 U.S. 624 (1982) .......... 3

*Elec. Power Supply Ass'n v. Star*
904 F.3d 518 (7th Cir. 2018) .......... 11

*Expressions Hair Design v. Schneiderman*
581 U.S. 37 (2017) .......... 17

*Exxon Corp. v. Gov. of Maryland*
437 U.S. 117 (1978) .......... 10

*FCC v. Consumers' Rsch.*
606 U.S. 656 (2025) .......... 22, 24, 25

*FCC v. Fox Television Stations, Inc.*
567 U.S. 239 (2012) .......... 12, 16

*Flynt v. Bonta*
131 F.4th 918 (9th Cir. 2025) .......... 6, 8, 10

*Fresenius Med. Care Orange Cnty., LLC v. Bonta*
172 F.4th 718 (9th Cir. 2026) .......... 15

*Gallo Cattle Co. v. Cal. Milk Advisory Bd.*
185 F.3d 969 (9th Cir. 1999) .......... 19

*Gallo Cattle Co. v. Kawamura*
159 Cal. App. 4th 948 (2008) .......... 22

*Garcia v. Cnty. of Alameda*
150 F.4th 1224 (9th Cir. 2025) .......... 27

*Glickman v. Wileman Bros. & Elliott*
521 U.S. 457 (1997) .......... 20, 21

*Human Life of Wa. Inc. v. Brumsickle*
624 F.3d 990 (9th Cir. 2010) .......... 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Int'l Franchise Ass'n, Inc. v. City of Seattle*
803 F.3d 389 (9th Cir. 2015)........................................................................................ 6

*Iowa Pork Producers Ass'n v. Bonta*
2024 WL 3158532 (9th Cir. June 25, 2024) ................................................................. 6

*Italian Colors Rest. v. Becerra*
878 F.3d 1165 (9th Cir. 2018)...................................................................................... 17

*Johanns v. Livestock Mktg. Ass'n*
544 U.S. 550 (2005) ............................................................................................ 20, 21, 22

*Kasky v. Nike, Inc.*
27 Cal. 4th 939 (2002) .................................................................................................. 19

*Keller v. State Bar of Cal.*
496 U.S. 1 (1990)........................................................................................................... 20

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*
567 U.S. 298 (2012)....................................................................................................... 21

*Kugler v. Yocum*
69 Cal. 2d 371 (1968) .................................................................................................... 26

*Legislature v. Eu*
54 Cal. 3d 492 (1991) .................................................................................................... 14

*Levin v. Commerce Energy, Inc.*
560 U.S. 413 (2010)....................................................................................................... 27

*Maryland v. King*
567 U.S. 1301 (2012) ..................................................................................................... 28

*N. Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.*
414 U.S. 156 (1973)....................................................................................................... 27

*Nat'l Ass'n of Optometrists & Optician LensCrafters, Inc. v. Brown*
567 F.3d 521 (9th Cir. 2009)...................................................................................... 6, 8

*Nat'l Ass'n of Wholesaler-Distribs. v. Feldon*
2026 WL 2532218 (D. Or. Aug. 27, 2026)...................................................................*passim*

*Nat'l Pork Producers Council v. Ross*
6 F.4th 1021 (9th Cir. 2021)......................................................................................*passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*National Pork Producers Council v. Ross*
598 U.S. 356 (2023) ........ *passim*

*Nebbia v. People of New York*
291 U.S. 502 (1934) ........ 27

*NetChoice, LLC v. Bonta*
170 F.4th 744 (9th Cir. 2026) ........ 2, 20, 21

*PacificCorp v. Sixkiller*
186 F.4th 596 (9th Cir. 2026) ........ 9, 11

*Palermo v. Stockton Theatres, Inc.*
32 Cal. 2d 53 (1948) ........ 13

*Pennhurst State Sch. & Hosp. v. Halderman*
465 U.S. 89 (1984) ........ 26

*People v. Domagalski*
214 Cal. App. 3d 1380 (1989) ........ 13

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*
153 F.4th 795 (9th Cir. 2025) ........ 17, 18

*Pike v. Bruce Church, Inc.*
397 U.S. 137 (1970) ........ 6, 9, 10, 12

*Rosebud Sioux Tribe v. Trump*
495 F. Supp. 3d 968 (D. Mont. 2020) ........ 3

*Simon v. City & Cnty. of San Francisco*
135 F.4th 784 (9th Cir. 2025) ........ 4

*Sunshine Anthracite Coal Co. v. Adkins*
310 U.S. 381 (1940) ........ 22, 25, 26

*U.S. WeChat Users All. v. Trump*
488 F. Supp. 3d 912 (N.D. Cal. 2020) ........ 12

*United States v. Nat'l Dairy Prods. Corps.*
372 U.S. 29 (1963) ........ 12

*United States v. Williams*
553 U.S. 285 (2008) ........ 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Valle Del Sol Inc. v. Whiting*
709 F.3d 808 (9th Cir. 2013)........ 17

*Vivid Ent., LLC v. Fielding*
774 F.3d 566 (9th Cir. 2014)........ 14

*Wa. State Grange v. Wa. State Rep. Party*
552 U.S. 442 (2008)........ 2, 20

*Winter v. Nat. Res. Def. Couns., Inc.*
555 U.S. 7 (2008)........ 2, 27

*Woodruff v. Parham*
75 U.S. (8 Wall.) 123 (1868)........ 12

*X Corp. v. Bonta*
116 F.4th 888 (9th Cir. 2024)........ 2, 20

**STATUTES**

United States Code, Title 26
§ 501........ 21
§ 501(c)(3)........ 21

United States Code, Title 42
§ 6901(a)(4)........ 11

# TABLE OF AUTHORITIES
(continued)

**Page**

California Public Resources Code
§ 41821.5(b)(1) .... 8
§ 42041(x) .... 21
§ 42041(aa) .... 9
§ 42041(aa)(3) .... 9
§ 42041(aa)(4)(A) .... 8
§ 42041(aa)(4)(C) .... 8
§ 42041(ab) .... 8
§ 42041(af) .... 15
§ 42041(af)(1)(A) .... 15
§ 42041(af)(1)(B) .... 15
§ 42041(af)(1)(C) .... 15
§ 42041(af)(2)(A) .... 15
§ 42041(af)(2)(B) .... 15
§ 42041(af)(2)(C) .... 15
§ 42041(ai) .... 15
§ 42041(c) .... 8
§ 42041(e)(1)(A) .... 15
§ 42041(w) .... 4, 7
§ 42050 .... 23
§ 42050(b) .... 14, 30
§ 42051 .... 19
§ 42051.1 .... 22
§ 42051.1(a) .... 20, 24
§ 42051.1(b)–(n) .... 22
§ 42051.1(b)(1) .... 23
§ 42051.1(d) .... 22
§ 42051.1(g) .... 22
§ 42051.1(j) .... 22
§ 42051.1(j)(1) .... 20
§ 42051.1(j)(1)(H) .... 21
§ 42051.1(j)(2)(C) .... 21
§ 42051.2 .... 22
§ 42051.2(a)-(b)(1) .... 23
§ 42051.2(b)(2) .... 23
§ 42051.3(a)(1) .... 23
§ 42051.3(a)(2) .... 23
§ 42051.3(a)(3)(A) .... 23
§ 42051.3(b) .... 24
§ 42051.3(b)(2) .... 24
§ 42052 .... 18
§ 42053(a) .... 17, 18
§ 42053(a)(1) .... 17, 18
§ 42053(a)(2) .... 18

# TABLE OF AUTHORITIES
**(continued)**

**Page**


§ 42053(d)(1) .......... 24
§ 42053(d)(1)–(4) .......... 24
§ 42053(e) .......... 23
§ 42053(g) .......... 20, 24
§ 42054(a) .......... 23
§ 42054(b) .......... 23
§ 42054(c) .......... 23
§ 42057(a)(1) .......... 30
§ 42061(c) .......... 13
§ 42064(c)–(f) .......... 29
§ 42064(f)(2) .......... 30
§ 42064(j)–(k) .......... 29
§ 42070(h) .......... 23
§ 42080(a) .......... 24
§ 42081(a)(1) .......... 24
§ 42081(b) .......... 24
§ 42355.51(b)(1) .......... 14
§ 42355.51(d)(1) .......... 13
§ 42355.51(d)(2)(B)(i) .......... 14
§ 42355.51(d)(3)(A) .......... 14
§ 42355.51(d)(3)(B) .......... 14

Code of Civil Procedure
§ 410.10 .......... 7
§§ 413.10-417.40 .......... 7

Corporations Code
§ 2110 .......... 7

**CONSTITUTIONAL PROVISIONS**

United States Constitution
First Amendment .......... *passim*
Fifth Amendment .......... 3, 22
Eleventh Amendment .......... 26
Article I § 10, cl. 2 .......... 12

## TABLE OF AUTHORITIES
**(continued)**

**Page**

### REGULATIONS

California Code of Regulations, Title 14
§ 18980.1.1(a) .......... 7
§ 18980.1(a)(17)(F)(i) .......... *passim*
§ 18980.3(a)(1) .......... 9
§ 18980.3(a)(2)(C) .......... 9
§ 18980.6.1(b)(2) .......... 23
§ 18980.6.1(e) .......... 23
§ 18980.6.7(2)(A) .......... 24
§ 18980.6.7(e)(2)(A) .......... 4
§ 18980.6.7(f) .......... 23
§ 18980.13.2(a) .......... 24

### OTHER AUTHORITIES

CalRecycle, *Update to Covered Material Category (CMC) List* (Dec. 31, 2025), https://www2.calrecycle.ca.gov/Docs/Publications/137815 (last accessed Oct. 6, 2026). .......... 16

Leslie, et al., *Discovery and quantification of plastic particle pollution in human blood*, Env't Int'l (Mar. 24, 2022), https://www.sciencedirect.com/science/article/pii/S0160412022001258 (last accessed: Oct. 20, 2026). .......... 29

## INTRODUCTION

The epidemic of plastic waste and pollution is one of the most pressing health and environmental crises facing California today. The Plastic Pollution Prevention and Packaging Producer Responsibility Act (Act) targets this ever-growing problem by requiring the producers of single-use plastic and packaging to take responsibility for their products by funding pollution mitigation efforts, reducing the use of single-use plastic, and transitioning the goods they sell in California to recyclable or compostable materials. As a district court in Oregon recently acknowledged when rejecting constitutional challenges to a similar law brought by some of the same plaintiffs here, producer responsibility laws have been well-established in the United States for nearly 40 years, with laws covering product categories like pharmaceuticals, paint, mattresses, batteries, and electronic waste in 35 different states. *Nat'l Ass'n of Wholesaler-Distribs. v. Feldon*, 2026 WL 2532218, at *3 n.14 (D. Or. Aug. 27, 2026) ("*NAW*").[1]

Plaintiffs, a group of 17 States and an association of wholesalers and distributors, claim the Act is unconstitutional and ask this Court to enjoin its operation in full for the pendency of this case. But plaintiffs have not shown that there is merit to any of their facial constitutional claims. Indeed, the Act provides producers of plastic packaging with fair notice of their obligations and does not directly regulate commercial activity beyond California's borders or discriminate against out-of-state commerce. Nor does the Act violate the speech and association rights of producers or constitute an unlawful delegation of legislative authority to the private sector. And since the Act's critical restorative work commences next year, an injunction preventing its requirements from taking effect would allow the ever-rising tide of plastic pollution to continue wreaking havoc on California's environment, and in the lives of the State's people. The requested preliminary injunction should be denied.

## LEGAL STANDARD

A party seeking a preliminary injunction must establish that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary

[1] Additional background information about the Act can be found in the concurrently filed motion to dismiss.

relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Couns., Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I. PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS

#### A. Plaintiffs' Facial Challenge Is Unlikely to Succeed

Facial challenges to laws are generally "disfavored" because "they raise the risk of premature interpretation of statutes on the basis of factually barebones records"; require courts to decide constitutional questions in the abstract; and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wa. State Grange v. Wa. State Rep. Party*, 552 U.S. 442, 450–51 (2008). Apart from challenges under the First Amendment, a plaintiff may only succeed on a facial challenge where he establishes that "no set of circumstances exists" under which the law would be valid. *X Corp. v. Bonta*, 116 F.4th 888, 898 (9th Cir. 2024) (internal quotation omitted). And even on First Amendment claims, a plaintiff still must show that the unconstitutional applications of the law "substantially outweigh" the constitutional ones. *NetChoice, LLC v. Bonta*, 170 F.4th 744, 758 (9th Cir. 2026). Because plaintiffs seek facial invalidation of the Act and bring no as-applied challenges, claims of possible unconstitutional applications or isolated evidence about how the Act will purportedly violate the rights of certain producers provide no support for the requested relief.

#### B. The Act Does Not Discriminate Against or Regulate Out-of-State Commerce

Plaintiffs argue that the Act is ultra vires, violates the dormant Commerce Clause, and violates the Import-Export Clause. These claims are essentially premised on the idea that the law discriminates, regulates, or otherwise interferes with out-of-state commerce. That is wrong.

### 1. The Act does not violate the horizontal separation of powers or Fifth Amendment right to due process

Plaintiffs contend that the Act is ultra vires because it violates the horizontal separation of powers between the states, as well as the due process rights of out-of-state citizens and businesses. ECF 43-1 (Mot.) at 9–13. At the outset, however, to the extent plaintiffs' due process arguments are based on the Fifth Amendment's Due Process Clause, such arguments are not cognizable against the State. *See Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008). Nevertheless, beyond reference to generalized precedent expressing limitations of the ability of states to regulate conduct that has no connection to the enforcing state, as well as due process limitations on such regulation affecting out-of-state persons, plaintiffs set forth no cases recognizing either a horizontal separation of powers or due process claim based on alleged extraterritorial effects of economic regulation of in-state activity. The fact that plaintiffs' theory would require this Court to break substantial new ground in this area of the law counsels significant hesitance in this preliminary injunction posture. *Rosebud Sioux Tribe v. Trump*, 495 F. Supp. 3d 968, 975 (D. Mont. 2020) (novel legal issues weigh heavily against granting preliminary injunctive relief).

In any event, plaintiffs' argument that "the Act's extraterritorial reach conflicts with plaintiff States' own policy prerogatives and offends their territorial sovereignty," Mot. at 10, is greatly undermined by *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ("*Pork Producers II*"). The Court there rejected an argument that the extraterritorial effects of state economic regulation resulted in a *per se* violation of the dormant Commerce Clause. *Pork Producers II*, 598 U.S. at 371–76. In a footnote, the Court also rejected the plaintiffs' attempt to rely on an earlier plurality opinion addressing a state law that regulated "wholly" out-of-state conduct with "no connection" to the State. *Pork Producers II*, 598 U.S. at 376 n.1 (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 641–43 (1982)). Some commentators had characterized that opinion as implicating "the territorial limits of state authority under the Constitution's horizontal separation of powers" rather than the dormant Commerce Clause. *Id.* But the Court explained that, either way, the challenged law before it was different from truly extraterritorial regulation.

*Id.* Although the plaintiffs in *Pork Producers II* had emphasized the law's expansive effects—including pork producers around the country choosing to alter their production operations at great cost—California's law did not "*directly* regulate[] out-of-state transactions by those with *no* connection to the State." *Id.* The law instead regulated "only products that companies choose to sell 'within' California." *Id.* The same is true here. *See* § 42041(w) (limiting regulation to conduct that occurs *in California*); *see also* Cal. Code Regs. tit. 14, § 18980.6.7(e)(2)(A) (fees calculated on "covered material sold, distributed, or imported in or into the state"). The Act does not regulate out-of-state conduct that has no connection to California.

Plaintiffs maintain that the Act is not so limited—that it directly regulates covered material "not manufactured, used, or disposed of in California, and whose only nexus to California is temporary presence 'in or into' California while traveling in interstate commerce." Mot. at 10–11. They pose the hypothetical scenario of a producer who imports covered material into California, warehouses the goods through the end of the calendar year (the time for calculation of a producer's annual covered-material totals), and then exports the covered material for sale and consumption in another state. Mot. at 12 (citing ECF 43-4 (Allen Decl.) ¶ 7). In this situation, they argue, California would regulate wholly out-of-state transactions. *Id.*

But this argument fails. At the threshold, plaintiffs ignore the facial nature of their constitutional challenge. As noted above, a facial challenge must show unconstitutionality in "every conceivable application." *Simon v. City & Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir. 2025). Plaintiffs have not met that standard. In any event, the implementing regulations provide that covered material "transported outside the state without being provided to users of the products in the state or discarded in the state . . . shall not be considered distributed or imported in or into the state, provided that documentation of such transport is available upon request by the Department . . . ." Cal. Code Regs. tit. 14, § 18980.1(a)(17)(F)(i). As such, the Act does not apply to the hypothetical scenario of a producer who eventually exports their covered material.

Plaintiffs also allege that some producers will transfer their warehoused covered material to distributors who later ship the goods to unknown retailers, leaving the producers with no knowledge of the ultimate destination of their products or packaging and no way to document

when the items are shipped out of state. Mot. at 12 (citing ECF 43-4 (Allen Decl.) ¶ 7). But again, such evidence does not support plaintiffs' *facial* constitutional challenge. Even if some producers cannot utilize the Act's carveout, others will be able to provide the necessary documentation for exported goods, *see* ECF 43-3 (Simons Decl.) ¶ 4 (producer "tracks where the products are delivered to" through delivery "to an end user"), while some will be appropriately assessed fees for imported items consumed in California.

And, in any event, even a hypothetical sale or transfer of imported and warehoused covered material to a distributor within California, regardless of the item's ultimate destination, necessarily establishes a sufficient connection to the State's undisputed health and environmental interests. California may permissibly subject producers responsible for introducing harmful single-use material into the State to regulation. Indeed, the act of importing such material, then later transferring it to another in the State, evidences the producer's conduct-based connection to California, conduct that releases the material into California's stream of commerce, thereby heightening the risk that it will add to the State's pressing crisis of plastic pollution. For all these reasons, plaintiffs cannot plausibly allege that the Act's framework violates the horizontal separation of powers or due process rights.

**2. The Act does not violate the dormant Commerce Clause**

Plaintiffs next argue that various provisions of the Act violate the dormant Commerce Clause. Mot. at 13–18. That is incorrect. The Commerce Clause grants power to Congress to regulate interstate commerce, and is also "'a self-executing limitation on the power of States to enact laws imposing substantial burdens'" on interstate commerce. *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013) ("*Eleveurs*") (citation omitted). This "dormant" Commerce Clause "prohibits the enforcement of state laws 'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Pork Producers II*, 598 U.S. at 369. "[T]he 'very core' of dormant Commerce Clause jurisprudence" is this "antidiscriminatory principle." *Id.* Thus, "[i]f a statute discriminates . . . on its face, in its purpose, or in its practical effect, it is unconstitutional unless it serves a legitimate local purpose, and this purpose could not

be served as well by available non-discriminatory means." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015) (citation omitted). To establish discrimination, a plaintiff must show that the law treats "'similarly situated entities' within and outside the state" differently. *Flynt v. Bonta*, 131 F.4th 918, 927 (9th Cir. 2025) (quoting *Nat'l Ass'n of Optometrists & Optician LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009) ("*Optometrists*")).

On the other hand, where a statute is not discriminatory, the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), applies. *Pork Producers II*, 598 U.S. at 379–80. Under *Pike*, where a statute has only indirect effects on interstate commerce and regulates evenhandedly, courts have examined whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike*, 397 U.S. at 142; *Eleveurs*, 729 F.3d at 948. However, before any balancing of interests, a plaintiff must demonstrate that the challenged law imposes "substantial burdens" on interstate commerce. *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1032 (9th Cir. 2021) ("*Pork Producers I*").[2]

**a. The Act does not discriminate against interstate commerce**

Plaintiffs posit two theories of the Act's unlawful discriminatory effects. *See* Mot. at 13–15. Neither has merit. They first claim that the Act's definition of "producer" creates an incentive for retailers to discriminate against out-of-state manufacturers. Mot. at 14. Section 42041(w) defines the "producer" of covered material using a three-tiered hierarchy:

> (1) "Producer" means a person who manufactures a product that uses covered material and who owns or is the licensee of the brand or trademark under which the product is used in a commercial enterprise, sold, offered for sale, or distributed in the state. [¶] (2) If there is no person in the state who is the producer for purposes of paragraph (1), the producer of the covered material is the owner or, if the owner is not in the state, the exclusive licensee of a brand or trademark under which the product using the covered material is used in a commercial enterprise, sold, offered for sale, or distributed in the state. For purposes of this subdivision, a licensee is a person holding the exclusive right to use a trademark or brand in the state in connection with the manufacture, sale, or distribution of the product packaged in or made from the covered material. [¶] (3) If there is no person in the state who is the

[2] The Ninth Circuit has held that its holding in *Pork Producers I* is the binding decision on *Pike* in light of the Supreme Court's split opinions in *Pork Producers II*. *See Iowa Pork Producers Ass'n v. Bonta*, 2024 WL 3158532, at *2 (9th Cir. June 25, 2024).

> producer for purposes of paragraph (1) or (2), the producer of the covered material is the person who sells, offers for sale, or distributes the product that uses the covered material in or into the state.

Focusing on subdivision (w)(2) and (w)(3)'s "in the state" qualifying language, plaintiffs argue that the absence of a manufacturer located in California results in "producer" status falling to a California retailer who sells items packaged with covered material, thereby creating an incentive for such retailers to only contract with California-based manufacturers for goods. Mot. at 14.

This theory of discriminatory effects is wrong. In plaintiffs' hypothetical, where a California retailer purchases goods for retail sales, and must make decisions about who to contract with for purchase of those goods, the California retailer *will never be the producer* under the Act. By definition, if there is no producer pursuant to subdivisions (w)(1) and (w)(2), assessment of producer status at subdivision (w)(3) goes to the entity that "sells, offers for sale, or distributes the product that uses the covered material in or into the state." In the context of a California retailer who must purchase products to sell, there will always be another upstream business in the chain of commerce that has sold and/or distributed the covered material to the retailer, making *that seller*, not the California retailer, the producer under subdivision (w)(3). This fact nullifies the discriminatory effects plaintiffs have alleged. The California retailer has no incentive to contract with a California supplier to the exclusion of an out-of-state supplier because the retailer *will not be the producer* in either scenario.[3]

Plaintiffs next argue that the Act's regulation of "recycling rates" discriminates against out-of-state commerce. Mot. at 14–15. They contend that plastic waste sent out of state for recycling can only be considered "recycled" for purposes of a producer's "recycling rate" if the producer

[3] It bears emphasis that plaintiffs mistakenly cabin Section 42041(w)'s "in the state" language to domicile. Under the Act's implementing regulations, "in the state" denotes a business that is "subject to the jurisdiction of California courts pursuant to section 410.10 of the Code of Civil Procedure," where either "service of summons . . . may be completed in the state pursuant to section 413.10 through 417.40 of the Code of Civil Procedure or section 2110 of the Corporations Code" or the business "consents to being considered in the state . . . and being personally subject to the jurisdiction of California courts." *See* Cal. Code Regs. tit. 14, § 18980.1.1(a). Accordingly, there are undoubtedly many businesses domiciled in other states which, because of their contacts, presence, or consent to jurisdiction in California, may be deemed "in the state."

certifies to the Department the standards used by the out-of-state recycler. *Id.*; *see* § 42041(c), (aa)(4)(C), (ab).[4] Because there is no similar certification required for California recyclers, plaintiffs claim that this provision incentivizes discrimination against out-of-state recycling. Mot. at 14–15. They are wrong in multiple respects.

Initially, plaintiffs fail to acknowledge that the certification outlined in Section 42041(aa)(4)(C) is not a self-executing statutory requirement. Section 42041(aa)(4)(A) states that "[t]he department *may adopt regulations* to define guidelines and verification requirements for covered material shipped out of state . . . for recycling, including processing requirements, and contamination standards, *or to otherwise implement this paragraph*." (emphasis added). Because the Department has not adopted regulations, there is no requirement that out-of-state recycling be certified to meet certain standards (and thus no discriminatory incentives). *See* Declaration of Marcus Santillano (Santillano Decl.) ¶ 4 (the Department "has no plans to adopt regulation implementing . . . [S]ection 42041(aa)(4)").

Even if plaintiffs could show that the certification will affect where California's plastic waste is recycled, that difference does not evidence unconstitutional discrimination. A cognizable showing of discrimination under the dormant Commerce Clause requires a plaintiff to establish "'discrimination between similarly situated entities' within and outside the state." *Flynt*, 131 F.4th at 927 (quoting *Optometrists*, 567 F.3d at 525); *accord NAW*, 2026 WL 2532218, at *18. California-based plastics recyclers and out-of-state recyclers are not similarly situated with respect to the underlying purpose of the certification requirement. Because California recyclers must periodically report the types and quantities of material transferred out of their facilities, the Department possesses far more information about the processing conducted by in-state recyclers than it does about out-of-state recycler processing. *See* § 41821.5(b)(1) (requiring reporting on "the types and quantities of materials that are disposed of, sold, or transferred to other recycling . . . facilities, end users inside of the state or outside of the state, or exporters, brokers, or transporters for sale"). This reporting provides the Department with substantially more

[4] Section 42041(aa)(4)(C) states: "For any mixture of plastic waste exported to other states or countries, the PRO or producer shall certify to the department that the recycling technology used meets the requirements of this subdivision."

information relevant to whether in-state activity satisfies the requirements of Section 42041(aa), including whether the activity is subject to California solid waste permitting laws—which facilities (and all upstream entities sending them material) must comply with for the facilities' activities to be considered "recycling." *See* § 42041(aa)(3) ("responsible end market" requirement); Cal. Code Regs. tit. 14, § 18980.3(a)(1), (2)(C) (permit-related criteria for identifying responsible end markets); *see also* Declaration of Dan Brown (Brown Decl.) ¶¶ 4–8. In-state and out-of-state recyclers are not similarly situated because they are subject to different regulatory regimes, thus neutering any resulting disparate effect of the Act's certification requirement. *See PacificCorp v. Sixkiller*, 186 F.4th 596, 604–09 (9th Cir. 2026) (no discrimination where in-state and out-of-state businesses subject to "different regulatory requirements," and, thus, not similarly situated); *accord NAW*, 2026 WL 2532218, at *18 n.174.[5]

**b. The Act does not violate the dormant Commerce Clause under *Pike* balancing**

Plaintiffs further contend that various provisions of the Act substantially and excessively burden interstate commerce as compared to the Act's local benefits. Mot. at 15–18 (citing *Pike*, 397 U.S. at 137, 142). These arguments fail at both steps of the *Pike* inquiry.

**(1) The Act does not substantially burden interstate commerce**

At the outset, plaintiffs cannot demonstrate a threshold burden on interstate commerce. *Pork Producers I*, 6 F.4th at 1032 (a plaintiff must establish "substantial or "significant" burden on interstate commerce *before* any *Pike* balancing). As the Supreme Court recently reemphasized, the burden on interstate commerce necessary to proceed to *Pike* balancing typically turns on the presence of discrimination against out-of-state commerce. *See Pork*

[5] Should this Court disagree, the certification provision for mixed plastic waste sent to out-of-state recyclers is severable for purposes of the requested preliminary injunction. This documentation provision (assuming the Court concludes it is self-executing) is an independent accounting requirement that does not directly affect whether plastics waste is actually recycled, and thus can be removed without compromising the calculation of a producer's recycling rate. Moreover, given the Legislature's aims at increasing producers' long-term recycling rates, it would be illogical to presume the Legislature would have preferred the Act's entire framework for recycling rates to be stricken on account of the challenged certification. *See Calfarm Ins. Co.*, 48 Cal.3d at 821.

*Producers II*, 598 U.S. at 377–78; *accord Flynt*, 131 F.4th at 931–32 ("the *Pike* line of cases can largely be justified under the dormant Commerce Clause's core anti-discrimination principle"). Because the discrimination allegations addressed above lack merit, plaintiffs' reiteration of these arguments, *see* Mot. at 16, cannot establish a cognizable burden on interstate commerce.

Plaintiffs argue generally that the Act's coverage of "a large portion of consumer goods . . . threatens to . . . impede the flow of goods." Mot. at 16. But the cost of compliance for out-of-state producers to alter their operations, even if substantial, does not establish a burden on interstate commerce. *Pork Producers I*, 6 F.4th at 1032; *NAW*, 2026 WL 2532218, at *21; *see Pork Producers II*, 598 U.S. at 405–06 (Kavanaugh, J., concurring in part and dissenting in part) (noting the "millions (if not billions) of dollars" that compliance would cost pork producers). Nor does the fact that producers must make choices about investing in compliance or withdrawing from the California market. *See Pork Producers I*, 6 F.4th at 1032–33 (market participant choice to withdraw from market rather than comply with regulation is not a substantial burden on interstate commerce); *see also Pork Producers II*, 598 U.S. at 384 (citing *Exxon Corp. v. Gov. of Maryland*, 437 U.S. 117, 125–27 (1978)) (choice of pork producers to either provide all pigs the California-required space, segregate their operations, or withdraw from selling pork in California's market did not burden commerce). And, since the Act does not regulate the means by which covered material is transported in and around the State, plaintiffs cannot show the mere imposition of fees on producers fits within the "small number" of cases recognizing a burden associated with the "instrumentalities of interstate transportation—truck, trains, and the like." *Pork Producers II*, 598 U.S. at 379–80 & n.2.[6]

Plaintiffs' related argument that the Act "threatens to fragment the national economy" and undermine "national uniformity," *see* Mot. at 16, is similarly defective. In the field of solid-waste disposal and recycling, Congress has *not* mandated national uniformity between the States. To

[6] Plaintiffs similarly argue that the Act burdens interstate commerce because "the inevitable consumer pass-through costs . . . will not be limited to California but will extend nationwide." Mot. at 18. But producers' choices about how those costs are recouped from consumers (and from which consumers) do not establish a cognizable burden on interstate commerce. *See Pork Producers II*, 598 U.S. at 374 (recognizing that "[i]n our interconnected national marketplace" most state regulations have the practical effect of altering commerce-related behavior outside the state).

the contrary, in the Resource Conservation and Recovery Act ("RCRA"), Congress adopted a cooperative federalism model, maintaining the states' primary responsibility for regulating the collection and disposal of solid waste, while authorizing financial and technical assistance by the federal government. *See* 42 U.S.C. § 6901(a)(4); *NAW*, 2026 WL 2532218, at *22 (noting Congress's recognition in RCRA that state, regional, and local agencies primarily regulate solid waste disposal); *see also Blue Circle Cement, Inc. v. Bd. of Cnty. Com'rs of Cnty. of Rogers*, 27 F.3d 1499, 1504–05 (10th Cir. 1994) (finding no implied field preemption in RCRA of state and local solid waste regulations). Accordingly, Congress, in the way it has wielded (or not wielded) its commerce power, has specifically contemplated that States will adopt their own regulatory regimes for the end-of-life management of consumer goods and that differences in state regulation do not impose substantial burdens on interstate commerce. *See PacificCorp*, 186 F.4th at 607–08 (citing *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 524–25 (7th Cir. 2018)).

Plaintiffs also restate the hypothetical in their complaint of a producer who imports covered material, warehouses it in California through the end of the annual reporting period, and then exports it without selling to users or discarding it in California, arguing that this scenario hinders the flow of commerce to California. Mot. at 17. But again, assessment of fees in such circumstances does not establish that the Act *facially* burdens interstate commerce. And even if some producers choose to avoid transporting goods through California to avoid the Act's regulation, this effect does not establish a cognizable burden on interstate commerce. *See Pork Producers I*, 6 F.4th at 1032–33. Plaintiffs' related argument that the "proliferation of other state laws" risks "double-counting" of regulatory fees, *see* Mot. at 17, also fails because, unlike imposition of state taxes on the same income in two different states, *see Comptroller of the Treasury of Md. v. Wynne*, 575 U.S. 542, 550 (2015), assessment of fees in California is based on economic activity *in California*. Another state's decision to charge fees based on a producer's conduct in California is not a deficiency attributable to the Act. Because plaintiffs fail to establish any substantial burden on interstate commerce, this Court need go no further. *Pork Producers I*, 6 F.4th at 1032.

**(2) The Act's local benefits are not substantially outweighed by any burden on interstate commerce**

Without analysis, plaintiffs state that the Act's "discriminatory effects are 'clearly excessive'" because the law "fails to meet any 'putative local benefits.'" Mot. at 18. The lack of sufficient briefing on this point forfeits the argument. *See U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 928 (N.D. Cal. 2020). But forfeiture aside, the assertion is plainly wrong. As explained below, the Act's provisions specifically target and mitigate the catastrophic health and environmental harms posed by the ever-increasing problem of plastic pollution in California. *See infra* Section III. Even if the Act regulates a small amount of "covered materials that happen to be present in California for some time," Mot. at 18, the Act's substantial benefits, which target harms that overwhelmingly occur in-state, easily refute plaintiffs' *Pike* balancing argument.

**3. The Act Does Not Violate the Import-Export Clause**

Plaintiffs next assert that the Act's purported effects on the importation of covered material violates the Constitution's Import-Export Clause. Mot. at 21.[7] However, as they acknowledge, plaintiffs cannot succeed on the merits of this claim. *Id.*; *see Woodruff v. Parham*, 75 U.S. (8 Wall.) 123, 133–36 (1868).

**C. The Act Is Not Unconstitutionally Vague**

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (statute is unconstitutionally vague where persons "of common intelligence must necessarily guess at its meaning"). The Supreme Court, however, has long recognized that state statutes are entitled to a presumption of constitutionality, which functionally requires a court to adopt an interpretation that supports the lawfulness of statutory language. *See Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944); *see also United States v. Nat'l Dairy Prods. Corps.*, 372 U.S. 29, 32 (1963) (applying presumption to federal statute, which was "not automatically invalidated

[7] This provision states: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws . . . ." U.S. Const. Art. I, § 10, cl. 2.

as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language"). As explained below, the challenged provisions of the Act are not vague.

**1. The Act's term "recyclable" is not vague**

Plaintiffs argue that the Act's term "recyclable," which partially defines the type of covered material that producers will be required to utilize in California by January 2032, fails to provide the necessary certainty of what California law will eventually require. Mot. at 6–7. Plaintiffs first seek to take advantage of an existing preliminary injunction ordered against a separate California law in the Southern District of California. *See id.* at 15 (citing *Cal. League of Food Prods. v. Bonta*, 839 F. Supp. 3d 925 (S.D. Cal. 2026)). Because the Act's definition of "recyclable" incorporates various preexisting statutory criteria by reference, and those criteria have been enjoined in the context of the earlier-challenged separate law, *see* §§ 42061(c); 42355.51(d); *see also Cal. League*, 839 F. Supp. 3d at 946–58, plaintiffs argue that "producers are left with next-to-no guidance as to what makes covered material 'recyclable,'" Mot. at 7.

But this misunderstands state law. California courts have long recognized that the Legislature's adoption of a statute by specific reference is effectively the same as the Legislature setting out the incorporated statutory language verbatim a second time. *See Palermo v. Stockton Theatres, Inc.*, 32 Cal. 2d 53, 58–59 (1948); *accord People v. Domagalski*, 214 Cal. App. 3d 1380, 1385 (1989); *Cal. Chamber of Com. v. Brown*, 196 Cal. App. 4th 233, 257 (2011). Under this specific-reference canon, the incorporated provisions are adopted in the form they exist at the time of the reference and are not affected by subsequent modification or even repeal of the referenced statute. *Palermo*, 32 Cal. 2d at 58–59. In other words, as a matter of California law, and contrary to plaintiffs' bootstrapping argument, the *Cal. League* injunction does not deprive producers of the criteria for determining whether their covered materials are "recyclable."

Nevertheless, plaintiffs maintain (without any analysis) that Act's incorporated statutory criteria for "recyclable" are independently vague for the reasons articulated in the *Cal. League* injunction.[8] Mot. at 7. Though plaintiffs' lack of argument obviates the need for fulsome

[8] The Act specifically incorporates covered materials "considered recyclable pursuant to *subdivision (d)* of 42355.51," § 42061(c) (emphasis added). But section 42355.51(d)(1), like (continued…)

response, it remains the case that none of the challenged provisions are facially vague. As to the "Basel Convention" provision (§ 42355.51(d)(2)(B)(i)), the requirements of this international treaty are publicly available for producers to consider when making determinations about the materials they place into the stream of commerce and how such materials are typically disposed of. Indeed, to that point, plaintiffs have not made any showing that *all* producers will be unable to procure the necessary information. As to the "[Association of Plastics Recyclers (APR)] Design Guide" provision (§ 42355.51(d)(3)(A)) and "ensure/prevent" provision (§ 42355.51(d)(3)(B)), producers are easily capable of understanding their obligations given their presumed familiarity with these well-known industry standards. As explained in more detail in the concurrently filed motion to dismiss, the court in *Cal. League* erred in its determination that the requirement at issue in these provisions resulted in ambiguity about what is *not* recyclable. *See* Def. Heller's Mem. of P & A in Supp. of Mot. to Dismiss, Section II(B)(2).

However, if this Court disagrees as to one or more of the challenged provisions, the statutory language must be severed from the remaining recyclability criteria for purposes of the requested preliminary injunction. *See Cal. League*, 839 F. Supp. 3d at 958–60 (citing *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 573 (9th Cir. 2014)) (countervailing separation-of-powers principles, as well as respect for federalism and local control, counsel in favor of severability). Under California law, the absence of a severability clause is not conclusive. *Legislature v. Eu*, 54 Cal. 3d 492, 535 (1991). Rather, courts look to whether the invalidate provision is "grammatically, functionally, and volitionally separable." *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 821 (1989). Grammatical and functional separability concern whether offending language can be removed without affecting the coherence and completeness of the full statute, while volitional separability addresses whether the Legislature would have adopted the remaining statute had it foreseen the partial invalidation. *Id.* at 822.

---

42355.51(b)(1), refers to "recyclable in the state" and "routinely becomes feedstock" as two separate requirements, expressly stating that 42355.51(d)(2) governs the former. Moreover, section 42050(b) states the Act's recyclability requirement only with respect to 42355.51(d)(2): covered material must be "recyclable in the state." Therefore, plaintiffs' inclusion of the *Cal. League* analysis of Section 42355.51(b)(1)'s separate requirement that a "material type and form . . . routinely becomes feedstock" is improper. That requirement has no bearing on recyclability under the Act.

As the *Cal. League* court concluded for each of the challenged provisions, all aspects of California's test for severability are met. *See Cal. League*, 839 F. Supp. 3d at 958–60. The provisions concerning the Basel Convention, the APR Design Guide, and the "ensure/prevent" language are all grammatically and functionally separable because they are either qualifying phrases or independent provisions that can be removed without compromising the remaining statutory elements of the Act's definition of "recyclable." *Id.* at 959. As for volitional separability, the structure and extent of the Legislature's definition of "recyclable" unequivocally substantiates an intent to retain the remaining statutory text and its independent effects. *Id.* at 960 (citing *Fresenius Med. Care Orange Cnty., LLC v. Bonta*, 172 F.4th 718, 735 (9th Cir. 2026)). The challenged provisions make up just three components of a statutory definition comprised of nearly a dozen elements and qualifications. Given the centrality of recyclability to the purpose of the Act, it would be illogical to conclude that the Legislature would not have preferred for the remaining, independent prongs of "recyclable" to facilitate the Act's intended goal.

**2. The Act's term "covered material" is not vague**

Plaintiffs also argue that the Act's definition of "covered material" is vague because it encompasses packaging that is "routinely recycled, disposed of, or discarded" after its contents are used or unpackaged. Mot. at 7; *see* § 42041(e)(1)(A). Plaintiffs argue that producers have no way of knowing whether and when an item is "routinely" disposed of consistent with the Act, and thus whether it is "covered material." Mot. at 7–8.

But this argument ignores other provisions of the Act that plainly inform what constitutes covered material. Specifically, the phrase "routinely recycled, disposed of, or discarded" must be read in the context of the Act's definition of "reusable" and "refillable." *See* § 42041(af). To be considered reusable or refillable, an item must satisfy detailed conditions, including that the items are designed for multiple uses, *see* § 42041(af)(1)(A) & (2)(A), are durable enough to remain in their original condition, § 42041(af)(1)(B) & (2)(B), and are supported by infrastructure enabling the items to be reused or refilled conveniently, § 42041(af)(1)(C) & (2)(C). In addition, the Act defines an item as "single use" if it "[is] conventionally disposed of after a single use or not sufficiently durable or washable to be, or not intended to be reuseable or refillable." § 42041(ai).

Taken together, these provisions fully inform producers of the dichotomy between repeat-use materials (*i.e.*, those that are "reusable and refillable" under the Act) and those that are "routinely" disposed of after their use (*i.e.*, "single use"). This provides producers of "common intelligence" more than enough information to determine whether packaging is covered material. *Fox Television Stations, Inc.*, 562 U.S. at 253; *Connally*, 269 U.S. at 391.

Moreover, on top of the clear guidance provided by statute, the Department publishes a list of covered material categories (CMC List).[9] This CMC List specifies both the types of materials that can be considered covered material, and their current approximate recycling rates. Plaintiffs discount the utility of the Department's CMC List, arguing that the specification of mere "categories of covered material and their recyclability . . . does not say whether a material is a 'covered material' in the first place." Mot. at 8. But this disregards the CMC List's value for aiding producers in their covered-material determinations. That a producer manufacturers, for example, "Solid Hinged Containers, Plates, Cups, Tubs, Trays, and Other Solid Forms" (which the CMC List categorizes as "Plastic," *see* CMC List at 10), plainly affords "fair notice" that such items may be covered material. In short, the Act's plain statutory language, along with the guidance provided directly by the Act's enforcing agency, makes clear what is considered "covered material," easily defeating plaintiffs' allegation of facial vagueness. *See United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what the fact is."); *see also Human Life of Wa. Inc. v. Brumsickle*, 624 F.3d 990, 1021 (9th Cir. 2010) (speculation about vagueness in "hypothetical situations" does not support a facial attack where the statute is clearly valid in "the vast majority of its intended applications").

[9] *See* CalRecycle, *Update to Covered Material Category (CMC) List* (Dec. 31, 2025), https://www2.calrecycle.ca.gov/Docs/Publications/137815 (last accessed Oct. 6, 2026).

### D. The Act Does Not Impermissibly Restrict Speech or Compel Association

#### 1. The Act's line-item prohibition is permissible

Section 42053(a)(1) of the Act prohibits producers from passing the PRO participant "fee on to consumers as a separate item on a receipt or invoice." Plaintiffs cannot show this prohibition is a facially invalid restriction on protected speech.

##### a. The line-item prohibition regulates commercial, not political, speech

Commercial speech concerns "how sellers may communicate their prices." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017); *see also Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 821 (9th Cir. 2025) (commercial speech doctrine applies where speech provides "parties to commercial transactions with information about those transactions"). The line-item prohibition exclusively regulates communication of prices on a receipt or invoice. § 42053(a)(1). Such content is commercial speech. *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018) (treating description of costs on receipts as commercial speech).

Ignoring well-settled law differentiating political and commercial speech, plaintiffs merely assert that Section 42053(a) is a "content-based" restriction that should be subject to strict scrutiny. *See* Mot. at 19–20. That is incorrect. *See Italian Colors Rest.*, 878 F.3d at 1176. Even assuming the inclusion of a separate line-item charge for the participant fee might implicate "a matter of public concern," *see* Mot. at 19, that does not convert commercial speech into political speech. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm. of New York*, 447 U.S. 557, 563 n.5 (1980) ("*Central Hudson*") (rejecting concurrence argument that commercial speech be granted full First Amendment protections where it may be "tied to public concerns"); *Pharm. Rsch. & Mfrs. of Am.*, 153 F.4th at 824 ("And although drug pricing decisions may implicate controversial public policy issues, this fact is insufficient to transform the required reports into noncommercial speech."). Where, as here, "the primary purpose of the communication" is commercial, the speech is also commercial. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013) (restriction on soliciting day laborers was commercial speech because primary purpose was "to advertise a laborer's availability for work and to negotiate the terms of such work").

**b. The line-item prohibition is permissible because it prevents misleading commercial speech**

Government regulation of false or misleading speech is permitted. *See Central Hudson*, 447 U.S. at 563 ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it[.]"). That is precisely what the line-item prohibition does. Section 42053(a)(1) prohibits producers from including a charge on a receipt or invoice that purports to be a *per-transaction proportion* of the PRO participant fee, because such charge would be impossible to calculate correctly.

On May 31 of each year, producers must submit a report of their covered material use from the prior calendar year, from which the PRO will determine the per-category tonnage of covered material attributable to each producer. §§ 42052, 42053(a); *see* Request for Judicial Notice in Supp. of Opp. (RJN), Ex. A [CAA proposed plan] at 347. Then, the PRO generates an invoice for each producer in January of the *following* year, including adjustments and charges for operational costs. RJN, Ex. A at 347. Thus, the participant fee is only calculated *after* transactions take place. *See* § 42053(a)(2); RJN, Ex. A at 347. This means that a line-item charge passed on to consumers at the point of sale would be inherently inaccurate if it purported to "pass" the participant fee onto consumers, because producers will not know what fee they were charged in connection with that transaction until up to *two years* later. Plaintiffs admit as much. First Amended Complaint (FAC) ¶ 301 ("CAA assesses fees based on prior years' packaging volumes. It therefore applies rates that are determined only after the fact, and *businesses cannot accurately predict what their fees will be or conform their operations accordingly*.") (emphasis added). The line-item prohibition is thus a permissible restriction on speech that is "more likely to deceive the public than to inform it." *Central Hudson*, 447 U.S. at 563. For the same reason, even if the speech is entitled to First Amendment protection, it would survive intermediate scrutiny. States have a substantial interest in protecting consumers from "commercial harms," *see 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 502 (1996), including in "facilitating informed commercial transactions," *Pharm. Rsch. & Mfrs. of Am.*, 153 F.4th at 826. The line-

item prohibition directly advances that interest by prohibiting the inclusion of a charge that is inherently impossible to calculate with any accuracy. Thus, while producers are permitted to make any number of comments on receipts or invoices—including statements related to increased costs on account of the Act—they can be lawfully prohibited from providing inherently misleading information to consumers. In addition to the jurisdictional bar, *see infra* Section II.F., Plaintiff's identical claim under the California Constitution fails for the same reasons. *See Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 969, 45 P.3d 243, 262 (2002), *as modified* (May 22, 2002) (commercial speech analysis under California Constitution "use[s] the tests fashioned by the United States Supreme Court.").[10]

**2. The Act's PRO provisions do not compel speech or association**

Plaintiffs argue that the requirement to join or form a PRO is facially unconstitutional compelled speech because California's approved PRO, the private entity defendant CAA, "has its own agenda and lobbies other States to pass similar [EPR] statutes," and some NAW members will be required to pay fees to CAA even if they disagree with CAA's political messages. Mot. at 20. Plaintiffs' compelled speech and association claims fail.

**a. Plaintiffs are not compelled to associate with CAA**

First, plaintiffs are not compelled to join CAA. As they admit, the Act expressly provides that "a producer may comply with this chapter individually without participating in a PRO's plan[.]" § 42051; *see* Mot. at 21 ("[T]he Act permits producers to opt out of PRO membership[.]"). Where a party is not actually required to participate in the complained-of speech, there is no facial infringement. *See Gallo Cattle Co. v. Cal. Milk Advisory Bd.*, 185 F.3d 969, 975 (9th Cir. 1999) (requirement that cheesemakers use certain seal on advertising to take full advantage of state programs was not compelled speech where cheesemakers could choose not to use seal); *Cal-Almond Inc. v. U.S. Dep't of Agr.*, 192 F.3d 1272, 1275 (9th Cir. 1999). Plaintiffs argue that "[a] producer may opt out only if it satisfies criteria more stringent than the

[10] Should this Court disagree, the line-item prohibition must be severed from the Act. This provision constitutes an independent prohibition and can be easily removed from the Act without compromising any other requirement. Further, it would be illogical to assume the Legislature would have desired for the entire Act to fall based on invalidation of this discrete provision. *See Calfarm Ins. Co.*, 48 Cal.3d at 821.

requirements to join CAA, which are impracticable for many producers." Mot. at 21. But plaintiffs must do more than asset impracticability for some regulated parties to facially invalidate the law. *See X Corp.*, 116 F.4th at 898; *NetChoice, LLC*, 170 F.4th at 758; *see also Washington State Grange*, 552 U.S. at 449–50 (the merits must be decided based only on the law's "facial requirements," without "speculat[ing] about hypothetical or imaginary cases."). The compelled speech and association claims therefore fail on their face.

**b. Plaintiffs are not compelled to subsidize CAA's speech**

Even setting that fatal flaw aside, plaintiffs' compelled speech claim still fails because plaintiffs are not compelled to subsidize the complained-of speech. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005) (recognizing category of compelled speech claims based on subsidizing unfavored private message); Mot. at 20. Importantly, there is no "broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities." *Glickman v. Wileman Bros. & Elliott*, 521 U.S. 457, 471–73 (1997) (Supreme Court precedent "provides affirmative support for the proposition that assessments to fund a lawful collective program may sometimes be used to pay for speech over the objection of some members of the group"). Whether the funding of speech is constitutionally valid depends on whether the speech is germane to a constitutionally valid state interest. *See, e.g.*, *Keller v. State Bar of Cal.*, 496 U.S. 1, 13–14 (1990); *Johanns*, 544 U.S. at 558–59. Plaintiffs have not shown a likelihood of success on this claim because, even assuming the complained-of lobbying activities are non-germane, neither the FAC nor the Motion argue that the Act requires fees to be expended on those activities. *See* Mot. at 20–21; *see generally* FAC.

Indeed, the Act contains no such requirement. On the contrary, it mandates that fees paid to the PRO must be used to fund compliance with the Act. *See, e.g.*, § 42053(g) (fees "*shall* be used to implement the plan and fund the budget") (emphases added); § 42051.1(a) (the budget "includes the provisions necessary for the department to ensure producers covered under the plan comply with this chapter"); § 42051.1(j)(1) ("The plan shall include a budget designed to fully fund the costs necessary to implement this chapter."). The Act also prohibits the use of fees for numerous activities, including to compensate a person lobbying on behalf of the PRO with

respect to legislation, and to fund advertisements around the time of a legislative session. § 42051.1(j)(2)(C); *see also* § 42051.1(j)(1)(H). Indeed, the PRO must be a registered tax-exempt organization under I.R.S. Code Section 501(c)(3), which requires that "no substantial part of the activities" involve lobbying. 26 U.S.C. § 501; *see* § 42041(x). Plaintiffs are therefore unlikely to succeed on their compelled subsidization claim because there is nothing in the Act to suggest that the PRO may expend producer fees to fund non-germane activities. And even if fees *could* support lobbying activities, those activities may not, as a matter of law, "substantially outweigh" the amounts that must be expended to fund the operation of the program such that the law may be facially invalidated, because in such circumstances the PRO would lose its tax-exempt status and thus be ineligible to serve as the PRO. *NetChoice*, 170 F.4th at 758; *see* Santillano Decl. ¶ 17.

**3. Plaintiffs cannot show that the Act facially infringes associational rights by mere affiliation with CAA**

In addition, plaintiffs claim that the mere affiliation with CAA, separate and apart from the subsidy, violates their associational rights. This likewise fails. "The 'freedom not to associate' . . . is not implicated every time a person would prefer to avoid some interaction." *Crowe v. Oregon State Bar*, 112 F.4th 1218, 1234 (9th Cir. 2024), *cert. denied sub nom. Crowe v. State Bar of Oregon*, 145 S. Ct. 2848 (2025). Rather, infringement depends on whether a "reasonable observer" would attribute the complained-of speech to the plaintiff. *Id*. at 1233–34; *see also Glickman*, 521 U.S. at 470–71 (collective advertising constitutional in part because it would be "attributed not to [plaintiffs], but to the [advertiser]"). Plaintiffs make no attempt to allege or argue that CAA's statements would be attributed to them, much less by operation of the Act. *See Johanns*, 544 U.S. at 564–65 (2005) (no First Amendment harm under a compelled association theory where law did not require speech to be attributed to producer plaintiffs). Plaintiffs thus have no likelihood of success on this theory.[11] And even if it were not barred, *see*

[11] Even if plaintiffs were correct and exacting scrutiny applies, the requirement that producers join and fund the PRO is not only germane but fundamental to ensuring industry compliance with the Act. *See Crowe*, 112 F.4th at 1238–39 ("when a state bar requires attorneys to associate with germane activities, that requirement survives exacting scrutiny"); *see also Knox*

(continued…)

*infra* Section I.F., plaintiffs' parallel claim under the California Constitution would likewise fail. *See Gallo Cattle Co. v. Kawamura*, 159 Cal. App. 4th 948, 963 (2008) (For compelled speech claim, "trial court did not err in accepting the reasoning of *Johanns* for use in resolving free speech issues arising under the California Constitution.").

### E. The Act Does Not Result in an Unconstitutional Private Delegation

Plaintiffs argue that the authority granted to CAA under the Act is an unconstitutional delegation of authority under the private nondelegation doctrine. *See* Mot. at 22–23.[12] While strict nondelegation may have been observed at the founding, "[d]elegation . . . has long been recognized as necessary in order that the exertion of legislative power does not become a futility." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398 (1940) ("*Sunshine*"). Accordingly, "federal and state courts have countenanced delegations of an extraordinarily broad array of powers . . . to private groups." *Coastside Fishing Club v. Cal. Res. Agency*, 158 Cal. App. 4th 1183, 1204–05 (2008) (internal citations omitted) (collecting cases). So long as the private entity "function[s] subordinately" to the government entity, delegation is permissible. *Sunshine*, 310 U.S. at 399; *accord FCC v. Consumers' Rsch.*, 606 U.S. 656, 692 (2025); *Agendia, Inc. v. Becerra*, 4 F.4th 896, 902 (9th Cir. 2021). Here, the Act and its implementing regulations make clear that CAA acts subordinately to the Department.

Numerous statutory and regulatory guardrails are in place to constrain CAA's authority. For instance, the PRO is required to create an annual plan describing "[h]ow the PRO will meet the requirements of this chapter," § 42051.1, according to numerous specifically articulated details and criteria set out in the Act, § 42051.1(b)–(n), and including details of how the PRO will calculate fees and manage its budget, § 42051.1(d), (g), (j). That plan must be made publicly available, and must be submitted to an advisory board composed of Department-appointed representatives of local government, environmental organizations, recycling and composting industries, grocery, retail, and covered material manufacturers. §§ 42051.2; 42070. The advisory

---

*v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 310 (2012) ("exacting scrutiny" is satisfied where the law serves a compelling state interest "that cannot be achieved through means significantly less restrictive of associational freedoms").

[12] Here again, to the extent plaintiffs based their arguments in the Fifth Amendment's Due Process Clause, these claims against state law must be rejected. *See Bingue*, 512 F.3d at 1174.

board must review the plan and provide comments, and the PRO must consider those comments along with any public comments, in its revised plan. §§ 42051.2(a)–(b)(1), 42070(h); Cal. Code Regs. tit. 14, § 18980.6.1(b)(2), (e). The Department then reviews the revised plan for compliance with the Act, and must respond to the PRO "with an approval, disapproval, conditional approval, request for additional information, or timeline for a decision on approval or disapproval" within 90 days. § 42051.2(b)(2); Cal. Code Regs. tit. 14, § 18980.6.1(b)(2). CalRecycle exercises this oversight authority. Santillano Decl. ¶¶ 6-13. The PRO thus does not have unbridled authority to implement the Act however it sees fit; the ultimate authority to decide whether the proposed plan is implemented lies with the Department. § 42051.2(b)(2); Cal. Code Regs. tit. 14, § 18980.6.1(b)(2). Plaintiffs essentially admit as much. *See* Mot. at 4 (explaining that CAA must submit a plan for approval by the Department and that "the Act places many requirements on what CAA's plan "shall include.") (quoting § 42051.1(b)(1)); *see also* Santillano Decl. ¶ 9 (describing outreach from CAA regarding obligations for plan).

As to the producer fees and the budget they fund, the PRO is required to "keep minutes, books, and records that clearly reflect the activities and transactions of the PRO." § 42054(a). Those records are subject to an annual audit by an independent public accountant, the results of which must be submitted to the Department, § 42054(b), and to further audits at the discretion of the Department, § 42054(c). In addition, the PRO must submit these records as part of an annual report and budget to the Department, which "shall describe in detail progress made toward meeting or exceeding the requirements in Section 42050 and shall include an evaluation of whether the PRO is reasonably likely to meet those requirements" and must include, among other things, "[t]he PRO's cost and revenues, including an updated budget and any updates to the fee schedule necessary to ensure the revenues are sufficient to cover the full costs of implementing this chapter in the upcoming year." § 42051.3(a)(2), (a)(3)(A). The annual report must also be made publicly available on the PRO's website. § 42051.3(a)(1). It must include a justification for any adjustments (that is, malus fees or credits) to a producer fee based on the statutory requirements of Section 42053(e). Cal. Code Regs. tit. 14, § 18980.6.7(f).

Once submitted, the Department reviews the annual report for completeness, evaluating "to determine whether the PRO, in light of its implementation of the plan and any amendments or pending amendments . . . is reasonably likely to meet the requirements of the plan and this chapter." § 42051.3(b). The Department ultimately must determine whether to "approve, disapprove or conditionally approve the annual report." § 42051.3(b)(2); Santillano Decl. ¶¶ 14–16. The Department thus retains oversight over not only the plan submission but also the continuing operation, budget, and fee determinations made by the PRO, in conjunction with an advisory committee and independent accountants. *See Consumers' Rsch.*, 606 U.S. at 692–94 (no impermissible delegation where agency retained ultimate decision-making power, required the public report of budget and underlying calculations before fees took effect, and could approve, revise or reject private entity recommendations); *see* Santillano Decl. ¶¶ 6–14.[13]

Plaintiffs complain that the PRO is entitled to determine fees levied on producers. *See, e.g.*, Mot. at 22; FAC ¶¶ 96–99, 295, 315. But the PRO's fee calculations are based on specific guidelines and requirements contained in the Act and its implementing regulations. The amount each producer is required to pay is determined by the "costs to ensure each covered material category meets the requirements of" the Act, § 42053(d)(1), including, for example, costs to develop and sustain viable responsible end markets and operational costs of local jurisdictions, the commodity value of the covered materials, and the costs the PRO incurs in helping producers achieve the Act's source reduction requirements. § 42053(d)(1)–(4). The statute mandates that the fees paid to the PRO "shall be used to implement the plan and fund the budget," § 42053(g), where the budget "includes the provisions necessary for the department to ensure producers covered under plan comply with this chapter," § 42051.1(a); *see also, e.g.*, Cal. Code Regs. tit. 14, § 18980.6.7(2)(A) (formula for calculating individual assessments). The Supreme Court has upheld program funding provisions based on obtaining revenue necessary to administer a

[13] Additionally, the Department retains the authority to investigate and audit producers and the PRO, and if it finds any entity—including the PRO—in noncompliance with the Act, it may impose penalties of up to $50,000 per day per violation. §§ 42080(a), 42081(a)(1); Cal. Code Regs. tit. 14, § 18980.13.2(a). The PRO is considered in violation of the Act for any violations by a producer of a requirement that should have been satisfied by the PRO. Cal. Code Regs. tit. 14, § 18980.13.2(a). The Department may also withdraw approval of the PRO or its plan. § 42081(b); *see also* Santillano Decl. ¶¶ 15–17.

program, because that legislative mandate provides sufficient guidance for fee-setting. *See Consumers' Rsch.*, 606 U.S. at 681 ("[T]he word 'sufficient' sets a floor and a ceiling alike. An amount of money is 'sufficient' for a purpose if it is '[a]dequate' or 'necessary' to achieve that purpose. [Citation]. That means, of course, that the [agency] cannot raise less than is adequate or necessary to finance the [program]. But it also means that the [agency] cannot raise more than that amount."); *see also* Santillano Decl. ¶¶ 14–16 (fees are audited, and if fees used incorrectly, the Department would consider CAA out of compliance with the Act). Accordingly, plaintiffs are unlikely to prevail on the theory that the Act provides inadequate guidance to calculate fees based on the program's funding needs.

For these same reasons, the composition of CAA's board is not an independent constitutional violation. Notably absent from plaintiffs' motion is any argument based on the prevailing standard: whether CAA acts subordinately to the Department. *See* Mot. at 21–23; *Sunshine*, 310 U.S. at 399; *Consumers' Rsch.*, 606 U.S. at 692. Plaintiffs argue that because CAA's board may "likely" be composed of competitors to plaintiff NAW, the potential for larger producers to "directly govern their less powerful rivals" is an unconstitutional delegation of power. Mot. at 22 (citing *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936)). In *Carter*, the Bituminous Coal Conservation Act of 1935 established a private commission within the Department of the Interior that had the authority to promulgate binding rules in the form of the Bituminous Coal Code. *See Carter*, 298 U.S. at 280–81. Included in that authority was the "power to fix maximum hours of labor." *Id.* at 311. That provision was held to be an unconstitutional delegation of legislative authority. No governmental oversight of that authority is discussed. Thus, the presence of potential competitors on a board was not an independent *source* of constitutional violation, but rather an aggravating factor that made the delegation there particularly "obnoxious." *Id.* That NAW competitors may or may not sit on CAA's board is thus insufficient to show an unconstitutional delegation of authority here. *See Consumers' Rsch.*, 606 U.S. at 692 (citing *Sunshine*, 310 U.S. at 399) (lawfulness of delegation to private entity, however composed, turns on that entity's subordination to the government); *see also NAW*, 2026 WL 2532218, at *27 ("[T]he potential self-interest of a delegee is not the end of the private

nondelegation analysis. A self-interested delegee may assist an agency, so long as the government body retains ultimate decision-making authority.") (citing *Sunshine*, 310 U.S. at 399).

Analysis of the private nondelegation doctrine under the California Constitution would yield the same result. *See Kugler v. Yocum*, 69 Cal. 2d 371, 379–80 (1968) (legislature may properly delegate to private entities). Where, as here, the legislature has resolved all fundamental policy issues, private entities may assist in implementing those policy choices, so long as appropriate safeguards are in place. *See, e.g.*, *Coastside Fishing Club*, 158 Cal. App. 4th at 1209 (no improper delegation where legislature determined scope and contents of private party's master plan to implement statutory scheme and plan adoption was subject to agency review and approval). But in any event, the state law claim is barred. *See infra* Section I.F.

### F. Plaintiffs' Claims under the California Constitution are Barred

Finally, the Eleventh Amendment bars suits against unconsenting states even where pendent federal claims are brought. *See Pennhurst State Sch. & Hosp., v. Halderman,* 465 U.S. 89, 121 (1984) ("pendent jurisdiction does not permit such an evasion of the immunity guaranteed by the Eleventh Amendment"). Because plaintiffs' state-law claims are not properly before the Court, plaintiffs are not likely to succeed on these arguments.

## II. PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEY WILL SUFFER IRREPARABLE HARM

Plaintiffs maintain that absent a preliminary injunction, they will be irreparably harmed by the Act. Mot. at 23–24. These assertions do not stand up to scrutiny.

Plaintiffs first argue that the Act's purported constitutional violations are, themselves, evidence of irreparable injury. Mot. at 23. As explained above, however, plaintiffs are unlikely to succeed on the merits of any of their constitutional challenges. They next claim that plaintiff States will suffer inherently irreparable "sovereign harms" because the Act purportedly interferes with their "sovereign interest in applying their own law within their own borders." Mot. at 23. But the Act applies only when producers import, distribute, or sell their covered material *in California*—which plaintiffs acknowledge permits the State to validly exercise regulatory power. *See* Mot. at 10. Though plaintiffs cite *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) for the

proposition that interference with a state's ability to enforce duly enacted state law constitutes irreparable injury, the Act has no effect whatsoever on the power of plaintiff States to enact and enforce their own laws. California's exercise of regulatory authority over economic conduct within its borders may have incidental effects that drive volitional market choices by producers wishing to do business in California, *see Pork Producers II*, 598 U.S. at 384; *Pork Producers I*, 6 F.4th at 1032–33, but that does not curtail plaintiff States' sovereignty in any way.

Plaintiffs further contend that the Act's compliance costs for NAW members amount to irreparable injury. Mot. at 24. They submit that producers are put to a "Hobson's choice": either incur the costs and fees or violate the statute and risk enforcement." *Id.* This claim, however, relies on the faulty assumption that any and all businesses have a protected right to do business in California. The Supreme Court has long recognized that state regulation of business operations—i.e., forcing businesses to either incur costs and conditions or face regulatory enforcement—does not impinge on a fundamental right. *See Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 426 & n.5 (2010); *N. Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 167 (1973); *see also Nebbia v. People of New York*, 291 U.S. 502, 523–30 (1934) ("The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases . . . the right to conduct a business . . . may be conditioned."). Indeed, nothing in the Act forces the supposed Hobson's choice that plaintiffs claim because there is always a third option: a producer can decide not to transact in California, thereby relieving it of the costs of regulation or the threat of enforcement.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTERESTS DO NOT SUPPORT INJUNCTIVE RELIEF

The equities and public interests here overwhelmingly weigh against a preliminary injunction. *See Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1234 (9th Cir. 2025) (when the government opposes injunctive relief, the third and fourth *Winter* factors merge). Plaintiffs claim the public interest favors them because all citizens have a stake in upholding constitutional rights. Mot. at 24. As explained above, plaintiffs have not shown a likelihood that any of the challenged provisions violate the Constitution. They further claim that the Act's effects on out-of-state

producers implicate "the interests of all other States," as compared to California's interest. *Id.* But again, California's regulation of out-of-state producers doing business *in California* has no effect whatsoever on the home states of those out-of-state producers.

Against these hollow assertions, the Court must weigh the substantial and pressing harms that an injunction risks for the State and its people. Initially, an injunction against the Act would directly and irreparably injure California's weighty sovereignty interest in enforcement of duly enacted state law. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (an injunction barring a state "'from effectuating statutes enacted by representatives of its people'" constitutes a "'form of irreparable injury'" (citation omitted)).

Moreover, curtailment of the Act's critical work would gravely harm the public. The excessive and increasing amount of waste and pollution in California from single-use packaging and food service ware, especially plastic materials, is one of the most serious environmental crises confronting the State today. As the Act's legislative history shows, the amount of plastic both in California and nationwide has exploded in recent decades, with "[h]alf of all plastic ever created . . . manufactured in the last 15 years." RJN, Ex C [Report of Cal. Assem. Nat. Res. Comm.] at 9. In California, plastic accounts for roughly 12 percent—more than 4.5 million tons—of all annual solid waste. *Id.* And "[r]oughly two-thirds of all plastic ever produced has been released into the environment and remains there in some form, either in our landfills or polluting our coast and ocean, and our streets, parks, streams, and rivers." *Id*. at 8. In a stark example, researchers off the Monterey coast observed a large number of plastics bags 2,000 feet below the surface. RJN, Ex D [Report of Cal. Coastal Comm'n] at 3-4. Another study found that 25 percent of fish offered for sale in markets contained human-made items, including plastic, in their digestive tracts. *Id.* at 4.

The Legislature also considered the "distinct risks to human health at every stage of [the plastic] lifecycle." RJN, Ex B [Report of Sen. Env't Qual. Comm.] at 4. Because plastic does not biodegrade, its exposure to the environment inevitably causes disintegration into smaller and smaller pieces called "microplastics," which can be readily transported by air, wind, water, and ingested by animals. RJN, Ex C at 10. The environmental ubiquity of these microplastics results

in harmful materials "contaminating and accumulating in food chain through agricultural soils, terrestrial and aquatic food chains, and water supply." RJN, Ex B at 4. Indeed, a 2015 study considered by the California Coastal Commission found that, in the San Francisco Bay Area, "eight waste water treatment plants discharged an average of 490,000 particles of microplastic per day into the Bay." RJN, Ex D at 2. Recent studies have even revealed the presence of microplastic pollutants in human blood.[14]

In addition to these tangible environmental and health risks, plastic pollution results in concrete monetary harms borne by public entities and taxpayers. According to the Act's author, "taxpayers and local governments . . . spend $420 million annually in ongoing efforts to clean up and prevent litter in streets, storm drains, parks and waterways." RJN, Ex C at 8. One study, commissioned by the National Oceanic and Atmospheric Administration (NOAA), concluded that the prevalence of marine debris cost residents of Orange County millions of dollars annually, and that a mere 50% reduction would return $67 million in just a three-month period. RJN, Ex E [Study of Nat'l Oceanic and Atmospheric Admin.] at 2. Similarly, the Department, in conducting an economic analysis during its rulemaking for the Act, determined that the law's pollution mitigation provisions will avoid $53.3 billion in costs through 2032. *See* Santillano Decl. ¶ 3.

The Act targets each of these substantial public harms by requiring a reduction in the amount of plastic used California and ensuring that what is used is repurposed or recycled at higher rates rather than discarded. Further, the annual surcharge of $500 million collected from producers within the PRO funds the California Plastic Pollution Mitigation Fund. § 42064(c)–(f). This money is earmarked for state agencies to "monitor and reduce the environmental impacts of plastics on terrestrial, aquatic, and marine life and human health, including to restore, recover, and protect the natural environment," while also reducing "the historical and current environmental justice and public health impacts of plastics, including to mitigate . . . impacts of plastics on disadvantaged or low-income communities or rural areas." § 42064(j)–(k).

---

[14] *See, e.g.*, Leslie, et al., *Discovery and quantification of plastic particle pollution in human blood*, Env't Int'l (Mar. 24, 2022), https://www.sciencedirect.com/science/article/pii/S0160412022001258 (last accessed: Oct. 20, 2026).

Plaintiffs discount the impact of their requested injunction—arguing that "a preliminary pause won't cause any significant prejudice to California" because "[t]he Act's key provisions are designed to mature several years in the future." Mot. at 24–25. But the Act's annual surcharge, which directly aims to reduce all the harms outlined above, commences its work in 2027. *See* § 42064(f)(2). An injunction barring collection and distribution of these critical funds undoubtedly and irreparably harms the public interest. Moreover, even as to the Act's staggered requirements for producers' shift towards recyclable or compostable materials, which commence in 2028 and peak in 2032, *see* §§ 42050(b), 42057(a)(1), plaintiffs' premise is flawed. Given the nature of operational changes that may be required of producers who wish to remain in California's market, and the time it will take such producers to implement those changes, an injunction invalidating these requirements for the pendency of this case would greatly prejudice California's targeted substantial reduction and recycling of single-use plastic packaging in a few short years. At bottom, the requested injunction would be disastrous for the undeniably compelling public interests associated with the Act's health and environmental benefits.

**CONCLUSION**

This Court should deny plaintiffs' motion for preliminary injunction.

Dated: October 23, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
SETH E. GOLDSTEIN
R. MATTHEW WISE
Supervising Deputy Attorneys General
KRISTEN C.A. KIDO
Deputy Attorney General

KEVIN L. QUADE
Deputy Attorney General
*Attorneys for Defendant Zoe Heller, in her official capacity as Director of the California Dep't of Resources Recycling & Recovery*