Michael J. Mongan (Bar No. 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
50 California Street, Suite 2600
San Francisco, CA 94111
Telephone: (628) 235-1000
Facsimile: (628) 235-1001

Molly Jennings (*pro hac vice*)
molly.jennings@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant Circular Action Alliance*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

STATE OF NEBRASKA, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NORTH DAKOTA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TEXAS, STATE OF UTAH, STATE OF WEST VIRGINIA, and NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,

Plaintiffs,

v.

ZOE HELLER, in her official capacity as Director of the California Department of Resources Recycling & Recovery, and CIRCULAR ACTION ALLIANCE,

Defendants.

Case No. 2:26-cv-02214-DC-CKD

**DEFENDANT CIRCULAR ACTION ALLIANCE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Date: January 15, 2027
Time: 1:30 PM
Place: Courtroom 10, 13th Floor
Judge: Hon. Dena Coggins

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ II
INTRODUCTION ........ 1
STATUTORY & FACTUAL BACKGROUND ........ 2
A. The Act's Purpose And Goals ........ 2
B. Formation and Selection of Circular Action Alliance As Producer Responsibility Organization ........ 4
C. The Department's Oversight Of CAA As The California PRO ........ 5
D. Fee Collection And Other Ongoing CAA Obligations ........ 7
PROCEDURAL BACKGROUND ........ 9
STANDARD OF REVIEW ........ 9
ARGUMENT ........ 10
I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS FOR THE REASONS DETAILED IN DIRECTOR HELLER'S OPPOSITION AND IN *NAW* ........ 10
II. PLAINTIFFS' CLAIMS AGAINST CAA INDEPENDENTLY FAIL FOR LACK OF STANDING AND ARE FORECLOSED BY THE STATE ACTION DOCTRINE ........ 11
A. Plaintiffs Lack Standing to Pursue Counts VII and VIII Against CAA And Plaintiff States Lack Standing To Sue CAA Altogether ........ 11
B. Plaintiffs' Federal Constitutional Rights Claims (Counts I, V, VII, IX, XI) Fail Under The State Action Doctrine ........ 12
C. Plaintiffs' State Constitutional Claims (Counts VIII, X, XII) Also Fail As To CAA ........ 16
D. Plaintiffs' Dormant Commerce Clause and Import-Export Clause Claims (Counts II-IV, VI) Cannot Restrain CAA ........ 17
III. PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE LIKELY TO SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ........ 18
IV. PLAINTIFFS HAVE NOT ESTABLISHED THAT THE BALANCE OF HARDSHIPS WEIGHS IN THEIR FAVOR ........ 20
V. PLAINTIFFS HAVE NOT ESTABLISHED THE PUBLIC INTEREST FACTOR WEIGHS IN THEIR FAVOR ........ 22
CONCLUSION ........ 23

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abbott v. Perez*, 585 U.S. 579 (2018) .....18

*Anthropic PBC v. Department of War*, 825 F. Supp. 3d 1101 (N.D. Cal. 2026).....19

*Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015).....19

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023).....10

*Bernhardt v. Los Angeles County*, 339 F.3d 920 (9th Cir. 2003) .....22

*Bingue v. Prunchak*, 512 F.3d 1169 (9th Cir. 2008).....12

*Boardman v. Pacific Seafood Group*, 822 F.3d 1011 (9th Cir. 2016) .....18, 19

*Brunette v. Humane Society of Ventura County*, 294 F.3d 1205 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Aug. 23, 2002).....13

*Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988).....18

*Carson Mobilehome Park Owners' Association v. City of Carson*, 35 Cal. 3d 184 (1983).....16

*Children's Health Defense v. Meta Platforms, Inc.*, 112 F.4th 742 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2846 (2025) .....12

*Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989).....13

*FCC v. Consumers' Research*, 606 U.S. 656 (2025) .....11

*Golden Gateway Center v. Golden Gateway Tenants Association*, 26 Cal. 4th 1013 (2001).....16

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) .....20

*Human Rights Defense Center v. County of Riverside*, 831 F. Supp. 3d 963 (C.D. Cal. 2026).....19

*Inari Medical, Inc. v. Imperative Care, Inc.*, 806 F. Supp. 3d 937 (N.D. Cal. 2025).....22

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) .....15

*Johnson v. Knowles*, 113 F.3d 1114 (9th Cir. 1997).....15

*L.A. Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197 (9th Cir. 1980) ....... 20

*League of Wilderness Defenders v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ....... 10, 20

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ....... 12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....... 11

*Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802 (2019). ....... 12, 13, 14, 15

*Maryland v. King*, 567 U.S. 1301 (2012) ....... 1

*Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498 (9th Cir. 1996) ....... 13

*National Association of Optometrists & Opticians v. Harris*, 682 F.3d 1144 (9th Cir. 2012) ....... 17

*National Association of Wholesaler-Distributors v. Feldon* (*NAW*), 2026 WL 2532218 (D. Or. Aug. 27, 2026) ....... 1, 10, 11, 13

*National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ....... 19

*New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) ....... 13

*Newton v. Duke Energy Florida, LLC*, 895 F.3d 1270 (11th Cir. 2018) ....... 17

*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ....... 12

*Park Village Apartment Tenants Association v. Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011) ....... 18

*Pasadena Republican Club v. Western Justice Center*, 985 F.3d 1161 (9th Cir. 2021) ....... 13, 14

*Petroleum Exploration v. Public Service Commission of Kentucky*, 304 U.S. 209 (1938) ....... 19, 20

*Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996) ....... 22

*Poretti v. Dzurenda*, 11 F.4th 1037 (9th Cir. 2021) ....... 21

*Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020) ....... 14

*Rondeau v. Rogers*, 2010 WL 3070192 (D.N.H. Jul. 8, 2010), *report and recommendation adopted*, 2010 WL 3070184 (D.N.H. Jul. 29, 2010) ....... 17

*South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82 (1984) ....... 17

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) ....... 14

*Tennessee Wine & Spirits Retailers Association v. Thomas*, 588 U.S. 504 (2019) .......................17

*The Real Estate Bar Association For Massachusetts, Inc. v. National Real Estate Information Services*, 608 F.3d 110 (1st Cir. 2010), *certified question answered sub nom. Real Estate Bar Association for Massachusetts, Inc. v. National Real Estate Information Services*, 459 Mass. 512, 946 N.E.2d 665 (2011) .......................17

*Villegas v. Gilroy Garlic Festival Association*, 541 F.3d 950 (9th Cir. 2008) .......................15

*Where Do We Go Berkeley v. California Department of Transportation*, 32 F.4th 852 (9th Cir. 2022) .......................10, 18

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .......................9, 18

**CONSTITUTIONS**

U.S. Const. art. I, § 10, cl. 2 .......................17

**STATUTES**

Cal. Pub. Res. Code § 40004 .......................13

Cal. Pub. Res. Code § 42040 .......................1, 2, 3, 22

Cal. Pub. Res. Code § 42041 .......................3, 4

Cal. Pub. Res. Code § 42050 .......................3, 15

Cal. Pub. Res. Code § 42051 .......................4, 15

Cal. Pub. Res. Code § 42051.1 .......................5

Cal. Pub. Res. Code § 42051.2 .......................5, 6, 14

Cal. Pub. Res. Code § 42051.3 .......................6, 7, 8

Cal. Pub. Res. Code § 42052 .......................8

Cal. Pub. Res. Code § 42053 .......................5, 8, 19

Cal. Pub. Res. Code § 42053.5 .......................8

Cal. Pub. Res. Code § 42057 .......................3, 5, 8, 19

Cal. Pub. Res. Code § 42060 .......................8, 13, 19

Cal. Pub. Res. Code § 42064 .......................21

Cal. Pub. Res. Code § 42067 .......................7

Cal. Pub. Res. Code § 42070 ....................................................................................5, 6

Cal. Pub. Res. Code § 42081 ....................................................................................7

**REGULATIONS**

Cal. Code Regs. tit. 14, § 18980.1 ....................................................................................3

Cal. Code Regs. tit. 14, § 18980.5 ....................................................................................7

Cal. Code Regs. tit. 14, § 18980.6.1 ....................................................................................6

Cal. Code Regs. tit. 14, § 18980.6.2 ....................................................................................6

Cal. Code Regs. tit. 14, § 18980.6.5 ....................................................................................7

Cal. Code Regs. tit. 14, § 18980.13.2 ....................................................................................7

Cal. Code Regs. tit. 14, § 18980.13.5 ....................................................................................7

**INTRODUCTION**

The Plaintiffs here are 17 States, led by Nebraska, and the National Association of Wholesaler-Distributors (NAW). They object to an innovative extended producer responsibility (EPR) statute: the Plastic Pollution Prevention and Packaging Producer Responsibility Act. The California Legislature passed the Act to "ensure that producers of single-use packaging and food service ware . . . take responsibility for the costs associated with the end-of-life management of that material and ensure that the material is recyclable or compostable." Cal. Pub. Res. Code § 42040(b)(3)(B). Plaintiffs argue that California's solution to this policy problem violates the state and federal Constitutions in 12 different ways, and ask this Court to preliminarily enjoin the Director of the California Department of Resources Recycling & Recovery (the Department) and Circular Action Alliance (CAA) from enforcing the Act and its implementing regulations. There is no sound basis for this Court to grant that relief.

As Plaintiffs' papers make clear, their dispute is with the sovereign State that adopted the Act and the state official (Director Heller) who is statutorily responsible for it. Director Heller's opposition persuasively explains why Plaintiffs have not carried their burden to obtain a preliminary injunction. Plaintiffs cannot show that they are likely to succeed on the merits of their claims, or even establish serious questions on that score. Some of their claims have threshold jurisdictional defects; others are substantially similar to constitutional claims that an Article III judge recently rejected on a developed record following a week-long bench trial, *see National Association of Wholesaler-Distributors v. Feldon* (*NAW*), 2026 WL 2532218 (D. Or. Aug. 27, 2026); and none is meritorious. Although Plaintiffs halfheartedly contend that equitable considerations favor a preliminary injunction—in fewer than two pages at the end of their brief, *see* Dkt. 43 (Mot.) at 23-25—they fail to establish any genuine irreparable injury they would suffer in the absence of an injunction that provides a basis for an injunction against CAA. And the balance of the equities, as well as the public interest, overwhelmingly favor allowing the State to "'effectuat[e]'" this important "'statute[] enacted by representatives of its people.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

The State has made several arguments in defense of the Act, which CAA endorses, but CAA does not intend to repeat those arguments in this brief. Instead, this opposition focuses on why, in all events, Plaintiffs cannot obtain a preliminary injunction against CAA. Plaintiffs are particularly unlikely to succeed on the merits of their claims against CAA, a private, nonprofit entity. They lack standing to challenge the Act's itemization ban as to CAA because CAA plays no role in enforcing the relevant provision; their federal constitutional rights claims against CAA are foreclosed by the state action doctrine; their dormant Commerce Clause and Import-Export Clause claims can only run against state officers who are responsible for enforcing the Act; and their state constitutional claims fail because the State (not CAA) enacted and enforces the Act. What is more, Plaintiffs identify no irreparable harms for which CAA is responsible. And they fail to account for the extraordinary hardship a preliminary injunction would impose on CAA, or the interest of localities and service providers in ensuring that CAA can collect fees to reimburse them for infrastructure investments, or the profound benefits the public would lose if CAA were barred from implementing its California program plan. Plaintiffs' motion for a preliminary injunction should be denied.

## STATUTORY & FACTUAL BACKGROUND

### A. The Act's Purpose And Goals

The California Legislature enacted the Plastic Pollution Prevention and Packaging Producer Responsibility Act (codified as amended at Cal. Pub. Res. Code §§ 42040-42084) in June 2022. Buckingham Decl. ¶ 11. The Legislature's stated purpose was to (1) "shift the burden of costs to collect, process, and recycle materials from the local jurisdictions to the producers of covered material"; (2) "establish a producer responsibility program designed to ensure that producers of single-use packaging and food service ware . . . take responsibility for the costs associated with the end-of-life management of that material and ensure that the material is recyclable or compostable"; (3) "allow California . . . to better harmonize curbside collection programs" for qualifying materials across local jurisdictions; and (4) "ensure that local jurisdictions will be made financially whole for any new costs incurred associated with the implementation of" the Act and its attendant regulations. Cal. Pub. Res. Code § 42040(b)(2)-(3).

The Act identifies key goals for "producers of covered material sold, offered for sale, imported, or distributed in" California. Cal. Pub. Res. Code § 42050.[1] Those goals include meeting a collective source-reduction requirement for plastic covered material by weight and plastic component by 25 percent on January 1, 2032, *id.* §§ 42050(a), 42057(a)(1); ensuring that recycling rates for plastic covered material reach 30 percent on January 1, 2028, 40 percent on January 1, 2030, and 65 percent on January 1, 2032, *id.* § 42050(c); and ensuring that all covered material offered for sale in, distributed in, or brought into the State is generally recyclable within the State or "eligible for being labeled 'compostable'" by January 1, 2032, *id.* § 42050(b).

These purposes and goals were motivated by the State's interests in public health, safety, and efficiency. In 2021, "only 5 percent of postconsumer plastic waste in the United States was recycled," whereas much of the remaining material was "incinerated or dumped into the environment and not recycled." Cal. Pub. Res. Code § 42040(b)(3)(A). And "[d]isadvantaged and low-income communities" were "disproportionately impacted by the human health and environmental impacts of plastic pollution and fossil fuel extraction." *Id.* § 42040(b)(1). The Legislature recognized that producer "standardization" of single-use packaging and food service ware would "reduce consumer confusion regarding recycling and composting, reduce costs to ratepayers, and increase system efficiency." *Id.* § 42040(b)(3)(B); *see also* Cal. Code Regs. tit. 14, § 18980.1(a)(19) (defining "ratepayer" as "a person that pays user fees for recycling,

[1] The Legislature defined "producer" as "a person who manufactures a product that uses covered material and who owns or is the licensee of the brand or trademark under which the product is used in a commercial enterprise, sold, offered for sale, or distributed in the state. . . . If there is no person in the state who is the producer for purposes of [the previous category], the producer of the covered material is the owner or, if the owner is not in the state, the exclusive licensee of a brand or trademark under which the product using the covered material is used in a commercial enterprise, sold, offered for sale, or distributed in the state. . . . If there is no person in the state who is the producer for the purposes of [the previous two categories], the producer . . . is the person who sells, offers for sale, or distributes the product that uses the covered material in or into the state." Cal. Pub. Res. Code § 42041(w). The Legislature defined "covered material" to include both "[s]ingle-use packaging that is routinely recycled, disposed of, or discarded after its contents have been used or unpackaged, and typically not refilled or otherwise reused by the producer" and "[p]lastic single-use food service ware." *Id.* § 42041(e)(1)(A)-(B).

composting, or solid waste collection and handling services provided by a local jurisdiction and/or their designated recycling service provider").

### B. Formation and Selection of Circular Action Alliance As Producer Responsibility Organization

Under the Act, "producers of covered material shall form and join" a producer responsibility organization (PRO), Cal. Pub. Res. Code § 42051(a), for the purpose of implementing the Act, *id.* § 42041(x). For any producer to continue selling, importing, or distributing covered material in California after January 1, 2027, it must either (1) be "approved to participate in the plan of a PRO that is approved by" the Department (that is, become a member of a PRO with a program plan), or (2) separately demonstrate individual compliance with the Act without participating in a PRO's plan. *Id.* § 42051(b). In other words, producers are not compelled to join the PRO approved by the Department and may instead pursue individual compliance.

The "governing body of the PRO shall submit an application to" the Department for approval to carry out the Act. Cal. Pub. Res. Code § 42051(a). CAA submitted an application to serve as California's PRO by the January 1, 2024 deadline. Buckingham Decl. ¶ 20; *see also* Cal. Pub. Res. Code § 42051. CAA is a nonprofit, producer-governed organization committed to helping producers comply with EPR laws, in California and other States; delivering harmonized compliance services; and working with governments, businesses, and communities to reduce waste and increase recycling. Buckingham Decl. ¶ 15. It is governed by a board comprising directors appointed by CAA's founding member companies, which include some of the largest food, beverage, consumer-packaged-good, restaurant, and retail companies in the United States. *Id.* ¶¶ 23, 26. CAA formed a limited liability company—CAA California (CAA-CA)—for the purposes of serving as the California PRO. *See id.* ¶ 17. The Department selected CAA to be the California PRO in January 2024. *Id.* ¶ 21. It based this selection on a detailed application that described CAA's capacity, expertise, and structure. *Id.* ¶ 20.[2]

[2] Plaintiffs named CAA (but not CAA-CA) as a defendant. References to "CAA" in this brief generally encompass both entities.

As the approved PRO, CAA must fulfill several requirements. To begin with, it was required to submit a program plan and budget that "include[d] the provisions necessary for the department to ensure producers covered under the plan comply" with the Act. Cal. Pub. Res. Code § 42051.1(a). The Act required that plan to include, among other things: "[a]ctions and investments that the PRO will implement" in order to meet the Act's requirements "and address the needs and investments identified in the needs assessment," *id.* § 42051.1(b)(1); and "a fee for participants of the PRO" consistent with the Act, "the calculation of the fee," "the process through which the PRO will collect the fee from producers that are participants of the PRO's approved plan," and "a description of the fee structure and a schedule of the fees actually charged to producers," *id.* § 42051.1(d).

CAA's budget had to provide for "fully funding the plan and all other costs associated with implementing the plan." Cal. Pub. Res. Code § 42051.1(j)(1). Those include "[c]osts . . . incurred by local jurisdictions, recycling service providers, and other collection programs, and costs related to consumer outreach and education"; "[r]eimbursing costs incurred by the department and the California Department of Tax and Fee Administration"; costs of "[a]dministering the PRO"; and costs associated with "[e]nvironmental mitigation activities." *Id.* § 42051.1(j)(1).

The Act separately imposes fee-setting requirements on the PRO. CAA's proposed fees must be "based on a fee schedule" that is "developed by the PRO." Cal. Pub. Res. Code § 42053(a)(1). That schedule must include: (1) individual assessments; (2) any malus fee or credit adjustments for participant producers; (3) the California circular economy administrative fee; (4) reimbursing the Department for costs to administer the advisory board; (5) fees associated with the Act's environmental mitigation activities; (6) the costs of the PRO; and (7) any other costs outlined in the Act's description of the budget. *Id.* § 42053(a), (c), (e).

**C. The Department's Oversight Of CAA As The California PRO**

CAA's draft California program plan was not automatically accepted by the Department. Instead, consistent with the Act, that plan was reviewed by the Department's producer responsibility advisory board (advisory board). *See* Cal. Pub. Res. Code §§ 42070, 42051.2(a).

That advisory board must be established to identify barriers and solutions to creating a circular economy and to advise on program plan implementation. *See id.* § 42070. Following submission of the draft program plan to the advisory board, the public had 60 days to provide written comments. *Id.* § 42051.2(a); Buckingham Decl. ¶ 30.[3] CAA received approximately 2,400 public comments during that period. Buckingham Decl. ¶ 31. CAA considered those comments, incorporated them along with the Department's direct feedback into the plan as appropriate, and submitted a revised plan and consultation report to the Department on October 13, 2026. *Id.* ¶¶ 31, 34; *see* Cal. Pub. Res. Code § 42051.2(a), (b)(1).

The Department is now reviewing the revised program plan for statutory and regulatory compliance ahead of rendering a final determination regarding its approval. Buckingham Decl. ¶ 35. Based on the Act and its regulations, CAA expects the Department to render a decision on CAA's revised plan by January 1, 2027. *Id.* It has the power to approve, disapprove, or conditionally approve the plan; request additional information; or provide a timeline for a decision on approval or disapproval within 75 days. Cal. Code Regs. tit. 14, § 18980.6.1(b); *see also* Cal. Pub. Res. Code § 42051.2(b)(2); *id.* § 42051.2(b)(4) (authorizing Department to reject proposed final plan and conclude that PRO is out of compliance with the Act if, after revision and resubmission, the plan does not conform to statutory and regulatory requirements).

If the Department conditionally approves the plan, CAA will need to submit monthly reports documenting the estimated date for resubmittal of the revised plan. Cal. Code Regs. tit. 14, § 18980.6.2(b)-(c). That date must be "no later than 12 months after conditional approval." *Id.* § 18980.6.2(c)(1). The reports also must provide "[s]tatus updates addressing each approval condition" and how CAA will address them. *Id.* § 18980.6.2(c)(2).

If the Department approves the revised plan, CAA will be required to submit an annual report to the Department describing how it is implementing the approved plan and how it has complied with the Act and its regulations. Cal. Pub. Res. Code § 42051.3(a)(1). The annual

[3] CAA's membership on the advisory board did not have any impact on the advisory board's assessment of the program plan, as CAA is a non-voting member of the body. *See* Buckingham Decl. ¶ 42.

report must contain (1) updates on the program plan process, outreach efforts, and activities CAA has taken to implement each provision of the plan, Cal. Code Regs. tit. 14, § 18980.6.5(b); *see* Cal. Pub. Res. Code § 42051.3(a)(2), (a)(3)(B)-(E); and (2) CAA's cost and revenues, an updated budget, and "any updates to the fee schedule necessary to ensure the revenues are sufficient to cover the full costs of implementing" the program, Cal. Code Regs. tit. 14, § 18980.6.5(c); *see* Cal. Pub. Res. Code § 42051.3(a)(3)(A). The Department must review the annual report for compliance and approve, disapprove, or conditionally approve the report. Cal. Pub. Res. Code § 42051.3(b)(2). If the Department conditionally approves or disapproves the report, CAA must resubmit a revised report addressing the Department's reasons for conditional approval or disapproval within 30 days. *Id.* § 42051.3(b)(3)(A). If a revised annual report is again disapproved by the Department, the "PRO may submit only one additional [revised] final annual report," *id.* § 42051.3(b)(4), after which the Department may deem the PRO "no longer in compliance" with the Act if the final revised annual report remains deficient, *id.* § 42051.3(b)(5).

Critically, the Department retains the authority to enforce the Act, including against CAA. If "any entity [is] not in compliance" with the Act or its regulations, then the Department "may issue a notice of violation" "and impose an administrative civil penalty" of up to $50,000 "per day per violation on [that] entity." Cal. Pub. Res. Code § 42081(a)(1). Penalty determinations are made by the Department's Director following a hearing, not by CAA. *See* Cal. Code Regs. tit. 14, § 18980.13.2(c). The Department also enforces the Act as to CAA and independent producers through disciplinary actions. Its regulations authorize the Department to "[r]evoke a previously approved plan," "[r]evoke [the Department's] approval of the PRO," and "[r]equire additional reporting relat[ed] to compliance with the requirements of th[e] Act." *Id.* § 18980.13.5.

**D. Fee Collection And Other Ongoing CAA Obligations**

CAA's ongoing obligations to ensure successful program-plan implementation include data collection, additional research to build on a needs assessment (which is developed by the Department, *see* Cal. Pub. Res. Code § 42067), and fee collection. Between late 2025 and June 1, 2026, CAA held open registration and reporting for California producers. *See* Cal. Code Regs.

tit. 14, § 18980.5(b); Buckingham Decl. ¶ 44. Once that registration period closed, CAA gathered statewide producer data and began analyzing that data to validate key program plan assumptions and inform next steps, including inputs to the proposed program plan. As the PRO, CAA has several other ongoing data collection obligations. *See, e.g.*, Cal. Pub. Res. Code § 42052(a)(3) (requiring PRO to "collect, validate, and submit" data "demonstrating take-back and dropoff and alternative collection and recycling program performance"); *id.* § 42052(a)(4) (requiring PRO to "collect and report" "[a]ny additional information deemed necessary by the department" per California Public Resources Code § 42060).

With respect to fee collection, producers will have received multiple invoices from CAA by the end of 2027, which will cover the estimated $1.1 billion program cost for the year as well as the past and current administrative costs of setting up the program required by the Act. Buckingham Decl. ¶ 47. On August 31, 2026, CAA started issuing early fee invoices in the amount of $65.8 million. *Id.* ¶ 45. These fees are authorized by statute to cover "estimated costs of implementing the plan, operating costs, the cost of completing the needs assessment, and the costs to reimburse the department." Cal. Pub. Res. Code § 42053(b); *see also id.* § 42053(c)(6). They allow CAA to recoup, in part, its program start-up costs for pre-launch program plan development. Buckingham Decl. ¶ 45. Payments of those invoices were due October 15, 2026. Buckingham Decl. ¶ 46.

CAA also published the 2027 Fee Schedule on October 1, 2026. Buckingham Decl. ¶ 47. That schedule sets the fees CAA may use for its 2027 invoices, which will cover the $1.1 billion annual program cost. *Id.* The 2027 invoices will collect producer fees to cover individual assessments, Cal. Pub. Res. Code § 42053(c)(1); the California circular economy administrative fee, to cover the $50 million payment due to the Department, *id.* §§ 42053(c)(3), 42053.5(a)(1); the environmental mitigation surcharge fee, to cover the $500 million due to the California Department of Tax and Fee Administration for the California Plastic Pollution Mitigation Fund, *id.* § 42053(c)(5); and additional fees to cover the costs of CAA's operation, *id.* § 42053(c)(6). *See* Buckingham Decl. ¶ 52. CAA has an immediate need to collect these fees, because it is slated to remit both the first environmental mitigation surcharge to the California Department of

Tax and Fee Administration for the Plastic Pollution Mitigation Fund and the first administrative fee to the Department in 2027. *Id.* ¶ 48. No producer has been invoiced or paid a California producer fee to date or will be required to do so until 45 days after issuance of the first 2027 invoice, at the earliest. *Id.* ¶ 49.

**PROCEDURAL BACKGROUND**

The Plaintiffs are 17 States and NAW, a "national trade association whose members constitute wholesalers and distributors across the United States," Dkt. 42 (Am. Compl.) ¶¶ 14-15. In June 2026, Plaintiffs sued Defendant Zoe Heller, in her official capacity as Director of the Department, and CAA. Dkt. 1. They advanced 11 federal and state constitutional counts. *See id.* Nearly two months later, Plaintiffs filed their first amended complaint, which adds a new count challenging the Act as unconstitutionally vague. Am. Compl. ¶¶ 155-164. They simultaneously moved for a preliminary injunction. *See* Mot. That motion argues that Plaintiffs are likely to succeed on the merits of their claims challenging the Act under the federal and state constitutions, Mot. 6-21, that they will suffer irreparable harm absent an injunction, *id.* at 23, and that the balance of the equities and public interest weigh in their favor, *id.* at 24.

Plaintiffs filed three declarations in support of their motion that they also cite to support their irreparable harm argument. The first declarant is Ed Allen, President of a company called WCP Solutions. Dkt. 43-4 (Allen Decl.) ¶ 1. The second is Jon Ehly, President and CEO of Plastilite Corporation, a Nebraska business. Dkt. 43-5 (Ehly Decl.) ¶¶ 2-3. And the final declarant is Brian Wild, the Chief Government Relations Officer for NAW. Dkt. 43-6 (Wild Decl.) ¶ 1.

**STANDARD OF REVIEW**

To obtain a preliminary injunction, Plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, if they "establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, they need only show 'serious questions' on the

merits." *Where Do We Go Berkeley v. California Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022). While the last two factors for preliminary injunctive relief, equities and public interest, "merge" when "the nonmovant is the government," *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *see* Mot. 5, those factors do not merge when a nonmoving party is *not* a governmental entity. *See, e.g.*, *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) ("Although 'when the government is a party, these last two factors merge, the [private] intervenors' interests in this case make it appropriate to consider the factors separately.'" (internal citation omitted)).

## ARGUMENT

Director Heller persuasively explains why Plaintiffs cannot carry their burden under either preliminary injunction standard. In all events, Plaintiffs cannot obtain a preliminary injunction running against CAA. None of Plaintiffs' claims are likely to succeed (or even raise serious questions) as to CAA, in light of Article III and principles that limit a plaintiff's ability to sue a private entity for a constitutional violation. And the equitable factors overwhelmingly weigh against an injunction.

### I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS FOR THE REASONS DETAILED IN DIRECTOR HELLER'S OPPOSITION AND IN *NAW*

Plaintiffs advance a bevy of state and federal constitutional claims, each one brought against both Director Heller—the state official with responsibility under the Act—and CAA—a private, nonprofit producer responsibility organization. Those claims invoke the federal Due Process Clause, dormant Commerce Clause, Import-Export Clause, First Amendment, and principles of horizontal separation of powers, as well as the free-speech clause and nondelegation doctrine of the California Constitution. As Director Heller has explained in opposing Plaintiffs' motion, none of these claims raises serious questions, let alone presents a likelihood of success. Indeed, a federal district court recently rejected dormant Commerce Clause and Due Process claims advanced by Plaintiff NAW against Oregon's comparable EPR statute, following a week-long bench trial. *See NAW*, 2026 WL 2532218, at *16-22. Much of the reasoning in that order is equally applicable to this lawsuit. For example, there is "no evidence that the [challenged

statute] was enacted with a protectionist purpose," *id.* at *16; the plaintiffs have not presented evidence sufficient to conclude that any burdens presented by that law are clearly excessive when compared with the substantial local benefits, *see id.* at *21-22; and the Oregon law "sets criteria for" CAA's "decision-making" and Oregon "retains ultimate 'decision-making authority,'" *id.* at *28 (quoting *FCC v. Consumers' Rsch.*, 606 U.S. 656, 693-695 (2025)). For these and other reasons discussed in Director Heller's opposition, *see* Dkt. 61 (Director Heller's Opp'n to Pls.' Mot. for Preliminary Injunction) at 2-26, the Plaintiffs here are not likely to succeed in their claims regarding the constitutionality of the Act.

## II. Plaintiffs' Claims Against CAA Independently Fail For Lack of Standing And Are Foreclosed By The State Action Doctrine

### A. Plaintiffs Lack Standing to Pursue Counts VII and VIII Against CAA And Plaintiff States Lack Standing To Sue CAA Altogether

Plaintiffs' claims are weakest with respect to CAA. To start, neither Plaintiff States nor NAW has standing to pursue Plaintiffs' claims that CAA has violated the federal and California Constitutions on the ground that the Act prohibits "including 'a separate item on a receipt or invoice' accurately reflecting the fee charged by CAA." *See* Dkt. 62-1 (CAA Mot. to Dismiss) at 10 (quoting Am. Compl. ¶¶ 247, 270). Those claims allege no injury "fairly traceable" to CAA's conduct. And relief against CAA would not redress Plaintiffs' alleged injury since CAA plays no role in enforcing the Act's prohibition on receipt line-items. *Id.* at 11; *see also* Buckingham Decl. ¶ 24.

Nor do Plaintiff States have standing to sue CAA for any of their claims. Plaintiff States do not allege any injury fairly traceable to a challenged action taken (or to be taken) by CAA. *See* CAA Mot. to Dismiss at 11 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). They have not alleged that any of them is a participant producer of CAA (and none of them is, *see* Buckingham Decl. ¶ 25). They have not alleged that any of them has been invoiced by or otherwise has paid CAA (and none of them has, *see* Buckingham Decl. ¶ 25). And so they have not identified any injury traceable to CAA. *See* CAA Mot. to Dismiss at 11-12.

**B. Plaintiffs' Federal Constitutional Rights Claims (Counts I, V, VII, IX, XI) Fail Under The State Action Doctrine**

The state action doctrine "reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982). And "[c]areful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Id.* That requirement applies to Plaintiffs' First Amendment free speech claims (Counts VII, IX) and their Fourteenth Amendment Due Process claims (Counts I, XI). *See* CAA Mot. to Dismiss at 12-20.[4] Director Heller is a state actor who can be sued in connection with her responsibilities under the Act (although the claims against her fail for independent reasons). But CAA is a private, non-profit entity. Buckingham Decl. ¶ 15.

Apart from "exceptional cases," a private party is not "treated as a state actor for [federal] constitutional purposes." *O'Handley v. Weber*, 62 F.4th 1145, 1155-1156 (9th Cir. 2023). For a private party to be deemed a "state actor," the "party must 'fairly be said to be a state actor,' which requires that it meet one of four tests." *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 754 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2846 (2025) (internal citations omitted). Those tests are: (1) "the private actor performs a traditionally public function"; (2) "the private actor is a 'willful participant in joint activity' with the government"; (3) "the government compels or encourages the private actor to take a particular action"; or (4) "there is a 'sufficiently close nexus' between the government and the challenged action." *Id.* (internal citations omitted). CAA fails every test.

*1. No traditional public function.* To begin with, CAA's work as the designated producer responsibility organization in California does not remotely qualify as performing "a traditionally public function." *Meta*, 112 F.4th at 754. The function of administering a novel paper and packaging collection and recycling regime is not a power historically and "exclusively reserved

[4] Plaintiffs' claims under the Due Process Clause of the Fifth Amendment (Counts V, XI) also cannot run against either CAA (or Director Heller) because such claims may only restrain the federal government. *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008); *see also* CAA Mot. to Dismiss at 13.

to the State." *See Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019); *see* CAA Mot. to Dismiss at 14-16. Indeed, States only began passing EPR statutes for paper and packaging recently. *Cf. NAW*, 2026 WL 2532218, at *1 (holding Oregon's EPR law did not violate the Constitution and noting "'[i]t is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory, and try novel social and economic experiments'" (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932))). California enacted its statute in 2022. Am. Compl. ¶ 25. The first statute of this kind in the Nation passed in Maine in July 2021. Buckingham Decl. ¶ 10. And only seven states have similar statutes as of this filing. *Id*. Throughout most of our history, no government performed this function; and in most of our Nation, no one performs it to this day. To the extent that analogies to historical practices are relevant, moreover, private enterprises (or private-public partnerships) have traditionally performed waste collection and recycling services more generally. Buckingham Decl. ¶ 9; *see also* Cal. Pub. Res. Code § 40004(a)(2).

*2. No joint activity.* CAA is not conducting "joint activity" with the government but is instead operating as the California PRO subject to the Department's approval and oversight. CAA is not engaged in "a substantial degree of cooperative action" with the government, *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989), nor are its "actions . . . 'inextricably intertwined' with those of the government," *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1211 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Aug. 23, 2002) (quoting *Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996)); *see also* CAA Mot. to Dismiss at 16-17. The government also has not "insinuated itself into a position of interdependence with" CAA such that CAA "must be recognized as a joint participant in the challenged activity." *Pasadena Republican Club v. Western Just. Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021); *see* CAA Mot. to Dismiss at 16.

Instead, Plaintiffs allege the opposite of inextricable intertwinement. *See* CAA Mot. to Dismiss at 16. The Department's authority over CAA's actions is external and regulatory. The Department adopts the regulations that the PRO must follow. *See* Cal. Pub. Res. Code § 42060(a). CAA is responsible for proposing a program plan, but that plan is subject to the

Department's review and approval. *Id.* § 42051.2(a)-(b). If the proposed program plan is insufficient under the Act, the Department can conditionally approve it subject to revision—or reject it altogether. *Id.* § 42051.2(b)(2). Before CAA submitted the final program plan, the Department asked it numerous questions over several months about its development process to ensure that the plan would conform to all provisions of the Act and the implementing regulations. *See* Buckingham Decl. ¶ 33. Prior to October 13, 2026, when CAA submitted the plan, the Department had already directed it to make several revisions. *See* Buckingham Decl. ¶¶ 33-34. That is regulation, not joint action.

CAA's structure underscores its independence. CAA's board is composed of directors selected by the organization's founding members, which are all private companies with no direct relationship with the Department. Buckingham Decl. ¶¶ 15, 18, 23, 26. CAA's funding structure is wholly independent from the Department; it does not depend on the Department for any material resources in order to function as an organization. *Id.* ¶¶ 18, 28. CAA's presence as a non-voting member on the Department's advisory board does not create a joint relationship because CAA has no say in the advisory board's (or the Department's) actions. *Id.* ¶ 42. And CAA's actions are far from the kind of actions that are "'inextricably intertwined' with those of the government" on which the government "depend[s]." *Pasadena Republican Club*, 985 F.3d at 1167-1168.

*3. No compulsion.* "Governmental compulsion or coercion may exist where the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 748 (9th Cir. 2020). "[I]n a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838 (9th Cir. 1999). Indeed, "being regulated by the State does not make one a state actor." *Halleck*, 587 U.S. at 816. And regulation is how the Department ensures CAA's compliance with the Act.

CAA voluntarily applied to serve as California's PRO; it was not compelled to do so. *See* Buckingham Decl. ¶¶ 20-21. Although the Department approved that application, that approval did not automatically bind CAA to serving as the PRO—nothing in the Act or its regulations requires the selected PRO to contract with the State to implement its EPR laws. Once approved, CAA is regulated like any other regulated party. The Act directs an approved PRO to carry out the Act's requirements, *see* Cal. Pub. Res. Code § 42051(a), just as it directs producers to meet the Act's requirements, *see id.* § 42050. Compliance with the Act does not make CAA a state actor. *See* CAA Mot. to Dismiss at 17-18.

Plaintiffs do not allege any facts suggesting that the Department has coerced or compelled CAA into taking any particular action. *See* CAA Mot. to Dismiss at 17-18. Consistent with the Act, the Department has treated CAA as a regulated entity. *See* Buckingham Decl. ¶¶ 33-38, 41. That does not make it a state actor. *See Halleck*, 587 U.S. at 816.

*4. Insufficiently close nexus.* Finally, there is not a "sufficiently close nexus" between the Department and CAA's challenged actions such that the actions "'may be fairly treated as [those] of the State itself.'" *Johnson v. Knowles*, 113 F.3d 1114, 1120 (9th Cir. 1997) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). To apply this test, the Ninth Circuit considers whether "(1) the organization is mostly comprised of state institutions; (2) state officials dominate decision making of the organization; (3) the organization's funds are largely generated by the state institutions; and (4) the organization is acting in lieu of a traditional state actor." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 955 (9th Cir. 2008). All of these factors weigh against a finding that there is a "sufficiently close nexus" between the Department and CAA such that the latter's actions can be attributed to the former.

First, CAA is a private, nonprofit institution, and its board is limited to its founding members, which are all private entities. *See supra* pp. 4, 10; Buckingham Decl. ¶ 15. Second, CAA's board and decisions are not dominated by the Department. Buckingham Decl. ¶¶ 18, 26, 28. Indeed, Plaintiffs' allegations foreclose any such argument. *See, e.g.*, Am. Compl. ¶ 64 (CAA is an "unaccountable private party"); *id.* ¶ 305 (CAA has "almost entirely unfettered, unsupervised authority"). To be sure, the Department must review and approve CAA's fee-

setting plans as part of the program plan approval process. Buckingham Decl. ¶¶ 35-36, 38. But the Department's review is limited to the ordinary oversight of a typical regulator—it reviews the plans for statutory and regulatory compliance.[5] Third, CAA's funds are not generated by state institutions. They are obtained by collecting fees directly from producers through implementation of the Act. Buckingham Decl. ¶ 28. Fourth, CAA's role as the California PRO for paper and packaging was never before performed by any "traditional" state actor. *See supra* pp. 12-13; CAA Mot. to Dismiss at 14-15; *see also* Buckingham Decl. ¶¶ 8-10.

### C. Plaintiffs' State Constitutional Claims (Counts VIII, X, XII) Also Fail As To CAA

Plaintiffs' state constitutional claims fail for the same basic reason that their federal claims fail: CAA is not a state actor subject to the California Constitution's free-speech clause, and the state nondelegation claim cannot reach a private entity like CAA.

California's "free speech clause contains a state action limitation," but it is not identical to the federal state action requirement. *Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*, 26 Cal. 4th 1013, 1023 (2001) (plurality opinion). The California Supreme Court has applied the free speech clause to private parties in just one setting: a private property owner is a state actor "only if the property is freely and openly accessible to the public." *Id.* at 1033. Plaintiffs do not allege that CAA owns any such property. These claims instead lie against the State. *See* CAA Mot. to Dismiss at 24.

Plaintiffs' state nondelegation claim challenges the Legislature's choice to delegate, not any action of the alleged private delegee. *See Carson Mobilehome Park Owners' Ass'n v. City of Carson*, 35 Cal. 3d 184, 190 (1983); CAA Mot. to Dismiss at 24. And Plaintiffs' own complaint confirms that they only plead a claim against the State. *See* CAA Mot. to Dismiss at 25. To the extent Plaintiffs believe that CAA improperly exercises sovereign power when it carries out its statutory fee-setting responsibilities, they misunderstand the statutory framework. The Act and

[5] One example of this discretion was demonstrated by CAA's independent public comment process for the proposed plan. Rather than relying on the Department's interpretation of public comments, CAA reviewed the 2,400 public comments on its proposed program plan without the Department's prior input and revised the plan in light of those comments. Buckingham Decl. ¶ 31.

the Department's regulations prescribe the costs that CAA's fees must cover and how its fee schedule must be structured, and CAA's fee schedule may take effect only through a plan that the Department must approve.

**D. Plaintiffs' Dormant Commerce Clause and Import-Export Clause Claims (Counts II-IV, VI) Cannot Restrain CAA**

Both the dormant Commerce Clause and Import-Export Clause limit the power of the States, and cannot be brought against CAA under these circumstances. Federal appellate courts have generally held that a plaintiff may not maintain an affirmative dormant Commerce Clause claim against a *private* defendant, like CAA. *See* CAA Mot. to Dismiss at 20-21; *see also The Real Est. Bar Ass'n For Mass., Inc. v. National Real Est. Info. Servs.*, 608 F.3d 110, 123 (1st Cir. 2010), *certified question answered sub nom. Real Est. Bar Ass'n for Massachusetts, Inc. v. National Real Est. Info. Servs.*, 459 Mass. 512, 946 N.E.2d 665 (2011); *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1275 (11th Cir. 2018). That makes sense. The dormant Commerce Clause is a "self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate and foreign] commerce," *National Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (quoting *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)), not a limitation that can give rise to liability for private parties.

Plaintiffs' Import-Export Clause claim fares no better. *See* CAA Mot. to Dismiss at 21-22. That Clause "generally prohibits a State from 'lay[ing] any Imposts or Duties on Imports or Exports.'" *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 516 (2019) (quoting U.S. Const. art. I, § 10, cl. 2). This claim also fails as to CAA because it is not a State. Courts that have entertained Import-Export Clause claims against private entities have rejected them on the ground that "Article I, section 10, of the United States Constitution limits the powers of State governments" only. *See, e.g.*, *Rondeau v. Rogers*, 2010 WL 3070192, at *3 (D.N.H. Jul. 8, 2010), *report and recommendation adopted*, 2010 WL 3070184 (D.N.H. Jul. 29, 2010).

* * *

However this Court assesses the likelihood that Plaintiffs' claims against Director Heller will succeed, their claims against CAA are foreclosed by Article III, the state action doctrine, and related principles. Since there is not even a serious question on the merits of those claims as to CAA, no preliminary injunction is available against it. *See Where Do We Go Berkeley*, 32 F.4th at 863 ("serious question" standard does not permit a "district court to enter an injunction on a merely plausible claim").

## III. Plaintiffs Have Not Established That They Are Likely To Suffer Irreparable Harm Absent A Preliminary Injunction

A party seeking a preliminary injunction must "'demonstrate that irreparable injury is likely in the absence of an injunction.'" *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011). This requires "a clear showing," *Winter*, 555 U.S. at 22, of "immediate threatened injury," *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter*, 555 U.S. at 22). The purported harms identified by Plaintiffs (Mot. 23-24) do not satisfy these requirements.

Plaintiffs first contend that they are "suffering irreparable harm" because they are "likely to prevail on the merits" of their constitutional claims. Mot. 23. As just discussed, however, those claims are not likely to prevail.

Next, Plaintiffs argue that they are suffering sovereign harms that "are by nature irreparable." Mot. 23. That argument also fails. Plaintiffs offer no support for their assertion that the Act conflicts with a "duly enacted plan[]" of any Plaintiff State in a manner implicating state sovereignty. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). They reason that they "have chosen not to burden manufacturers, distributors, and retailers within their borders with the same regulations on single-use packaging" now imposed by California. Mot. 23. But the *absence* of a plan bears no resemblance to a state plan to "conduct[] . . . elections pursuant to a statute enacted by" its legislature, *Abbott*, 585 U.S. at 602-603, or some other affirmative, intentional statutory

scheme. Plaintiffs also contend that their "choice" not to enact an EPR statute "is undermined by" California's enactment of its own EPR statute, which might alter the conduct of firms participating in the "interstate economic market." Mot. 23. That amounts to a critique of our federal system, in which sovereign States are expected to serve as "laboratories" of democracy, *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015), and divergence in policy choices between the States is the norm. In that context, "many (maybe most) state laws" have practical effects on the incentives facing firms operating "[i]n our interconnected national marketplace." *National Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023). That dynamic is a feature of our constitutional order—not a source of irreparable injury for States that have chosen a different path.

Plaintiffs also complain of "pecuniary" harms connected to "exorbitant fees" and "costs of compliance" with the Act and its regulations. Mot. 24. Even if these purported injuries were sufficiently imminent and concrete, however, they cannot provide a basis for enjoining CAA. The asserted injuries flow from a statute enacted by the California Legislature and administered by a state official (Director Heller). The "regulations" and "fees" of which Plaintiffs complain (*id.*) are required by that Act, *see* Cal. Pub. Res. Code §§ 42053, 42060, and enforced by the Department, *see supra* p. 7. Because CAA is not responsible for the conduct giving rise to Plaintiffs' asserted injuries, those injuries cannot justify a preliminary injunction against it. *Cf. Anthropic PBC v. Dep't of War*, 825 F. Supp. 3d 1101, 1137 (N.D. Cal. 2026); *Human Rts. Def. Ctr. v. Cnty. of Riverside*, 831 F. Supp. 3d 963, 970 (C.D. Cal. 2026). In any event, pecuniary harms must be concrete and predictable to support a preliminary injunction. The Act undoubtedly requires CAA to invoice certain fees, and some NAW members will be required to pay those fees. By Plaintiffs' own telling, however, the fees are "indeterminate" (Mot. 24) at this juncture. That is not the type of concrete, "immediate threatened injury" that is "a prerequisite to preliminary injunctive relief," *Boardman*, 822 F.3d at 1022; and any harm to Plaintiffs from paying the fees owed under the Act is far outweighed by the other factors in the *Winter* test.

Nor do asserted harms from the "costs of compliance" (Mot. 24) suffice as irreparable injuries. Where "[c]ompliance . . . subjects [Plaintiffs] only to" expenses proportionate "to the

business" of Plaintiff, there can be no "irreparable injury against which equity protects." *Petroleum Exploration v. Public Serv. Comm'n of Kentucky*, 304 U.S. 209, 220-221 (1938). Plaintiff NAW and its members may have to "spend time and resources" to evaluate the Act and plan for complying with its requirements. Ehly Decl. ¶ 13; *see* Wild Decl. ¶ 22; Allen Decl. ¶ 15. But that alone cannot establish an entitlement to preliminary relief: It is routine for businesses to spend time and resources to determine how to comply with statutory and regulatory requirements. Plaintiffs fail to show that those "costs" are disproportionate to the typical cost of conducting business in any State.

Finally, Plaintiffs suggest that lost business or the "threat[]" of "extinction" are irreparable compliance harms. Mot. 24. "[M]onetary injury [from revenue loss] is not normally considered irreparable." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). And although "showing a threat of 'extinction' is enough to establish irreparable harm," *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022), Plaintiffs fail to make such a showing. They cite (1) Declarant Ehly's assertion that Plastilite lost its "largest customer" due to the customer's efforts to comply with the Act, Ehly Decl. ¶¶ 7-9, 12; and (2) two paragraphs in the amended complaint claiming that the Act will change business models, reduce taxable income, and force businesses to bear some of the burden of increased expenses, *see* Am. Compl. ¶¶ 123-124. *See* Mot. 24. As noted, however, loss of revenue from a single customer is not normally considered irreparable. *See L.A. Mem'l Coliseum Comm'n*, 634 F.2d at 1202. And nothing in the Amended Complaint or Ehly's declaration references the potential extinction of any businesses, much less as a result of the Act. Without any allegations or factual support for these claimed harms, this aspect of Plaintiffs' irreparable harm argument fails.

## IV. PLAINTIFFS HAVE NOT ESTABLISHED THAT THE BALANCE OF HARDSHIPS WEIGHS IN THEIR FAVOR

In seeking a preliminary injunction against CAA, Plaintiffs must make an independent showing as to both the balance of the equities and the public interest. *See League of Wilderness Defs.*, 752 F.3d at 766; *supra* p. 10; *but see* Mot. 24-25. As to the balance of the equities, the

Court considers "the burdens or hardships to" plaintiffs "compared with the burden on Defendants if an injunction is ordered." *Poretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021).

Remarkably, Plaintiffs do not make *any* arguments about how a preliminary injunction would affect CAA. Mot. 24-25. They do assert in passing that "a preliminary pause won't cause any significant prejudice to California." *Id.* at 24. As Director Heller explains, however, that is wrong. *See* Director Heller's Opp'n to Pls.' Mot. for Preliminary Injunction at 27-30. And a "preliminary pause," which could last for years as appellate proceedings play out, would undoubtedly harm CAA both operationally and financially. It would prevent CAA from collecting the individual assessment fees, the circular economy administrative fees, the environmental mitigation surcharge fees, or other fees to cover the cost of its operations—which are CAA's most significant source of funding. Buckingham Decl. ¶¶ 28, 51. A preliminary injunction would leave CAA unable to meet its own statutory repayment obligations, because it would not be able to (1) pay the $500 million environmental mitigation surcharge due to the California Department of Tax and Fee Administration as required by statute, *see* Cal. Pub. Res. Code § 42064(e)(1); (2) pay $50 million to the Department for administrative costs, Buckingham Decl. ¶ 52; or (3) recover $425 million in program and operational costs through planned 2027 invoices, *id*. This breach would directly harm CAA. Moreover, ongoing data collection and other efforts related to EPR implementation in California would halt until the preliminary injunction is lifted. Buckingham Decl. ¶¶ 56, 65.

At that time, CAA would hardly be able to flip a switch and resume its operations in California. It would instead need to incur significant additional expenses to restart those programs after the fact, for three reasons. First, it is highly unlikely that hiring and training of key personnel would go forward as planned while a preliminary injunction was in place because of the lack of funding. Buckingham Decl. ¶ 57. Second, CAA is almost certain to lose personnel with unique skillsets related to EPR implementation, and there is no guarantee that it would be able to rehire them after an injunction is lifted. Buckingham Decl. ¶¶ 59-60. Finally, without appropriate data—which the preliminary injunction as envisioned by Plaintiffs would

effectively prohibit CAA from collecting—CAA cannot make progress in working to improve California's recycling and reuse systems or drive progress toward the state's regulatory targets. Buckingham Decl. ¶¶ 56, 61.

Compared with the severe hardships a preliminary injunction would inflict on CAA and the State, the harm to Plaintiffs from denying a preliminary injunction is slight. The alleged constitutional violations are meritless (Mot. 24), and do not in any event imperil Plaintiffs' existence. All of the other equities Plaintiffs identify are insufficient to support an injunction against CAA, speculative, or typical costs of compliance associated with conducting economic activity in another State, *see supra* pp. 18-21—none of which outweigh the hardships CAA would bear if an injunction against the organization were to issue. *Cf. Inari Med., Inc. v. Imperative Care, Inc.*, 806 F. Supp. 3d 937, 947 (N.D. Cal. 2025) ("[A] trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors" (quoting *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973-974 (Fed. Cir. 1996))).

### V. PLAINTIFFS HAVE NOT ESTABLISHED THE PUBLIC INTEREST FACTOR WEIGHS IN THEIR FAVOR

The "'public interest'" mostly concerns the injunction's "'impact on non-parties rather than parties.'" *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003). Here, the public profoundly benefits from CAA's continued work to implement the Act and its regulations. That work would come to a halt if CAA were prevented from collecting fees. As the Legislature found and Director Heller has explained, pollution connected to single-use packaging and food service ware, especially plastic materials, harms human health and our environment. *See* Cal. Pub. Res. Code § 42040(b)(1); Director Heller's Opp'n to Pls.' Mot. for Preliminary Injunction at 28. Those harms are particularly severe in disadvantaged communities, which do not have the means to prevent deposits of plastic pollution into their communities. *See id.* at 29; Cal. Pub. Res. Code § 42040(b)(1). That pollution would persist unmitigated throughout the course of this litigation if an injunction were granted.

As to the public's interest in CAA's work specifically, the preliminary injunction sought by Plaintiffs (*see* Dkt. 43-7) would stop current programs that serve the people of California and would stymie CAA's imminent implementation of beneficial 2027 program plan elements. CAA would not be able to reimburse recycling service providers for the hundreds of millions of dollars in investments they reported making in anticipation of the Act's implementation. Buckingham Decl. ¶ 63. Local jurisdictions, which have identified tens of millions of dollars in spending that they believe are eligible for reimbursement under the Act, would similarly not be reimbursed if the injunction were to issue. *Id.* Moreover, an injunction would end CAA's current efforts to develop "opportunities across [California] in which to invest producer fees," which include "expanding collection of covered material, upgrading recycling facilities to raise recycling rates, developing end markets that create new products from recycled materials, converting venues such as schools from single-use plastic to reusable food service ware and launching campaigns to better educate Californians about recycling." *Id.* ¶ 64. Finally, CAA would also not be able to move forward with the 2027 program plan elements that serve the public interest directly by improving recyclability and recycling collection, increasing recycling access, educating the public on recycling, creating new and upgraded sorting and processing infrastructure, supporting local-government recycling systems, and otherwise contributing to the purpose of the Act for lack of funding. Buckingham Decl. ¶ 66.

An injunction would forestall all of these current and imminent public benefits—and would do so despite the fact that the Act was passed by California's Legislature. In these circumstances, it would be inequitable to halt the implementation of a nascent program that benefits the public and that the people's representatives overwhelmingly approved.

**CONCLUSION**

This Court should deny Plaintiffs' motion for preliminary injunction.

Dated: October 23, 2026

Respectfully submitted,

*/s/ Michael J. Mongan*

Michael J. Mongan (Bar No. 250374)
michael.mongan@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
50 California Street, Suite 2600
San Francisco, CA 94111
Telephone: (628) 235-1000
Facsimile: (628) 235-1001

Molly Jennings (*pro hac vice*)
molly.jennings@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant Circular Action Alliance*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2026, the foregoing document was filed electronically in the Court's Electronic Case Filing (ECF) system; thereby upon completion, the ECF system automatically generated an electronic notification of such file through ECF to registered e-mail addresses of parties of record in this case.

*/s/ Michael J. Mongan*
Michael J. Mongan (Bar No. 250374)